1

**JONATHAN W. BIRDT – SBN 183908**
18252 Bermuda Street
2
Porter Ranch, CA 91326
3 Telephone:     (818) 400-4485
Facsimile:     (818) 428-1384
4 jon@jonbirdt.com
Plaintiff
5

6

7
**UNITED STATES DISTRICT COURT**
8 **CENTRAL DISTRICT OF CALIFORNIA**

9

10

11 JONATHAN BIRDT,                                     )   **CASE NO.  2:10-CV-08377-RGK -JEM**
                                                                         )
12                                     Plaintiff,           )   **PLAINTIFF'S OPPOSITION TO**
                                                                         )   **MOTION FOR STAY**
13  vs.                                                          )
                                                                         )   Date: March 14, 2011
14 CHARLIE BECK, LEE BACA, THE LOS            )   Time: 9:00 a.m.
ANGELES POLICE DEPARTMENT and         )   Department: 850
15 THE LOS ANGELES COUNTY                     )   Before: Hon. R. Gary Klausner
SHERIFFS DEPARTMENT, DOES 1 to 50, )   Location: Roybal Courthouse,
16                                                                      )   255 East Temple Street
17                                     Defendants.         )   Los Angeles, CA 90012
                                                                         )
18                                                                      )
                                                                         )
19 _____ )

20

21 **I.   INTRODUCTION**

22      The suggestion that this case is identical or even similar to <u>Peruta</u> is not legally tenable because

23 the two policies are fundamentally different.  A Stay of this action now would only deny Plaintiff

24 justice as there are many cases herein that will continue to evolve as jurisprudence expands on this

25 issue, especially in the 9th Circuit. Most importantly, however, is the fact that the <u>Peruta</u> decision

26 was rendered before the Appellate decision in <u>Chester</u>, which provides all the guidance needed to

27 decide this case.  This instant case is but one small wheel on a giant train that has already left the

28 station and a Stay does nothing to further the interests of justice.

319030.1

1   While Plaintiff would suffer substantial harm from the continued denial of his fundamental civil

2   liberties, there is no judicial economy or harm to having this Court review a policy that is as

3   different as night is to day from the policy in Peruta.  Further, appellate review of Peruta would

4   shed no light on resolution of this case as it will likely be sent back for re-evaluation in light of the

5   Chester decision discussed herein and pursuant to which this Court can render a decision.

6   The facts in this case are completely different from Peruta, the legal challenge is completely

7   different, and the law has evolved since Judge Gonzalez' opinion and continues to evolve; as noted

8   by the Ninth Circuit in an opinion filed January 26, 2011 :

9   In District of Columbia v. Heller 554 U.S. 570, 635 (2008), the Supreme Court held that the
    right to bear arms is a personal right, rather than a collective or State right, and that the
10  District of Columbia's complete ban on firearms in the home violated the Second
    Amendment. Defendant argues that, because he has a personal right to bear arms in his
11  home,§ 924(c)(1)(A) is unconstitutional. We disagree. [2] Both implicitly and explicitly, the
    Court made clear that its holding concerned the lawful possession and use of a firearm.
12  **Although the courts undoubtedly will continue to develop the full scope of the rights
    conferred by the Second Amendment**, it cannot seriously be contended that the Second
13  Amendment guarantees a right to use a firearm in furtherance of drug trafficking.  United
    States v. Potter (2011) Case No. 09-30266 Emphasis Added.
14

15  **II.    THE DEFENDANTS' MOTION STARTS WITH AN UNFORTUNATE
    MISREPRESENTATION TO THE COURT**
16

17  In the Introduction to the Defendant's Motion to Stay, the City represents to this court that

18  "Plaintiff contends the Second Amendment of United States Constitution defines 'good cause' as

19  meaning a right to general self-defense."  However, the City knows, and Plaintiff has offered to

20  stipulate, that he does not so contend.  Further, in verified responses to discovery Plaintiff has

21  clearly stated:

22  RESPONSE TO INTERROGATORY NO.5:  As set forth in the Motion for Summary
    Judgment and proposed order, this is an issue Plaintiff has asked the Court to resolve.
23  Whatever the legal standard that may be under the Second Amendment, it is clear that
    defendants policy of requiring proof of a clear and present danger before a citizen can
24  exercise his rights is excessive and violates Plaintiff's civil liberties.  The complaint and
    proposed order suggest that self-defense should be sufficient good cause to permit a
25  citizen, engaged in lawful activity to possess and carry arms…

26  The moving papers then callously suggest that other than the denial of a fundamental civil

27  liberty, Plaintiff would not otherwise suffer any harm by the Stay.  And while such assertion is true,

28

319030.1

1    Plaintiff would state that delayed redress of the denial of a fundamental civil liberty is in fact a

2    substantial harm that should not be countenanced by this Court.

3        To be clear, Plaintiff does assert that self-defense is a reasonable definition that could be

4    applied and has been applied by many, but that is not the gravamen of the pleadings at this juncture.

5    Plaintiff challenges the Policy of Los Angeles, quoted below, and that which was applied to his

6    application as violating his fundamental rights.  Whether the ultimate policy is self-defense, or even

7    the policy followed by San Diego in Peruta, that is not this case.  Because it bears repeating:

8        Our decision in Heller points unmistakably to the answer. Self-defense is a basic right,
         recognized by many legal systems from ancient times to the present day, and in Heller, we
9        held that individual self-defense is "the central component" of the Second Amendment right.
         McDonald v. City of Chicago (2010) 130 S. Ct. 3020, at 3037.
10

11   III.    THE PERUTA CASE INVOLVED A MYRIAD OF DIFFERENT CHALLENGES

12           BY DIFFERENT PLAINTIFFS,  NONE SIMILAR TO THIS ACTION

13        In Peruta, the ruling identified how the County defined "good cause" as:

14       Defendant defines "good cause" under Penal Code section 12050 as a set of circumstances
         that distinguishes the applicant from other members of the general public and causes him or
15       her to be placed in harm's way.  See Def.'s SUF ¶ 5.  Generalized fear for one's personal
         safety is not, standing alone, considered "good cause."  Id.  To demonstrate "good cause,"
16       new applicants must provide supporting documentation.  See Pls.' SUF ¶ 9.  Ruling on MSJ
         at Pages 2-3, Exhibit "A" attached hereto.
17

18       The Peruta policy is significantly different than the Policy challenged in the instant case:

19       "Good cause exists if there is convincing evidence of a clear and present danger to life or of
         great bodily injury to the applicant, his spouse, or dependent child, which cannot be
20       adequately dealt with by existing law enforcement resources, and which danger cannot be
         reasonably avoided by alternative measures, and which danger would be significantly
21       mitigated by the applicant's carrying of a concealed firearm."

22       Being "placed in harms' way" is as different as night is to day from "clear and present

23   danger to life."  When a fundamental right is recognized, substantive due process forbids

24   infringement of that right "at all, no matter what process is provided, unless the infringement is

25   narrowly tailored to serve a compelling state interest." Reno v. Flores (1993) 507 U.S. 292 at 301-

26   02 (citations omitted).   Defendants' policies in interpreting Section 12050 infringe upon Plaintiff's

27   Second Amendment right "to possess and carry weapons in case of confrontation." District of

28   Columbia v. Heller (2008) 128 S. Ct. 2783 at 2797. The Second Amendment secures a right to carry

319030.1

arms for self-defense; however, defendants instead demand that applicants prove their need to exercise the right once applicants have been a victim of crime defendants failed to prevent.

In addition to completely different policies being at issue, the <u>Peruta</u> decision relies heavily on the ability of those Plaintiffs to engage in exposed open carry, that is not an option available to plaintiff because he lives across the street from a school, which in and of itself makes this case fundamentally different from <u>Peruta</u>.

## IV.   THE EXERCISE OF DISCRETION IS A CRITICAL AND SPECIFIC ISSUE NOT ADDRESSED IN PERUTA

While it is a given that only Judges, celebrities and crime victims have a chance of getting a CCW permit in Los Angeles, the law specifically requires the Sheriff to exercise his discretion.  "It is the duty of the sheriff to make such an investigation and determination, on an individual basis, on every application under section 12050."  <u>Salute v. Pitchess</u> (1976) 61 Cal. App. 3d 557, 560-561. The disclosures in this case to date do not in any way reflect any action by either Defendant Beck, or Sheriff Baca, something attacked directly in Plaintiff's instant motion for summary judgment set for hearing on April 4, 2011.  It does not appear this issue was even mentioned in the <u>Peruta</u> ruling, though it is difficult to tell what the issues are to justify a stay from the moving papers.

There is something deeply illogical about Defendants' refusal to issue a permit to carry a handgun until after a realistic threat to one's life and/or loved ones has materialized. Bearing arms, within the meaning of the Second Amendment, includes carrying handguns "for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." <u>Heller</u>, 128 S. Ct. at 2793 (citations omitted). The Second Amendment does not exist merely to increase the security of previously victimized individuals. If the conflict has already occurred, the unarmed would-be permit applicant might be dead. And because criminal attacks are often random, there is no particular reason to expect that a person who has previously been victimized might be more likely to need a gun than someone who has yet to be victimized. The point of having guns available for self-defense is to avoid victimization in the first place.

319030.1

**V.      APPELLATE COURT PRECEDENT SUBSEQUENT TO PERUTA IS**

**CONTROLLING ON THE INSTANT ACTION**

Peruta was decided on December 10, 2010, before the 4th District opinion in Chester on

December 30, 2010.  Chester fundamentally altered the landscape for this case and if anything, will

likely mean that Peruta will be remanded for consideration consistent with Chester and possibly the

eventual Nordyke decision. U.S. v. Chester (2010) 2010 U.S.App.LEXIS 26508.  Thus, Peruta has

been effectively mooted by the Chester decision, at least until the Ninth Circuit further addresses

the issue:

> In fact, the phrase "*presumptively lawful regulatory measures" suggests the possibility that one or more of these "longstanding regulations" could be unconstitutional in the face of an as applied challenge.* "  United States v. Williams (7th Cir. 2010) 616F.3d685, 692.  In view of the fact that Heller ultimately found the District's gun regulations invalid "under any standard of scrutiny," it appears to us that the Court would apply some form of heightened constitutional scrutiny if a historical evaluation did not end the matter. The government bears the burden of justifying its regulation in the context of heightened scrutiny review; using Heller's list of "presumptively lawful regulatory measures" to find §922(g)(9) constitutional by analogy would relieve the government of its burden. Thus, a two-part approach to Second Amendment claims seems appropriate under Heller, as explained by the Third Circuit Court of Appeals, see Marzzarella, 614 F.3d at 89, and Judge Sykes in the now vacated Skoien panel opinion, see 587 F.3d at 808-09. The first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." Id. This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification.  See Heller, 128 S. Ct. at 2816. If it was not, then the challenged law is valid.  *See* Marzzarella, 614 F.3d at 89.  If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means end scrutiny. *See* Id.  Heller left open the issue of the standard of review, rejecting only rational basis review. Accordingly, unless the conduct at issue is not protected by the Second Amendment at all, *the Government bears the burden of justifying the constitutional validity of the law*. Id. At page 18-19.  Emphasis added.

**VI.      A DIRECT CHALLENGE TO REQUIRE GOOD CAUSE TO BE DEFINED AS**

**SELF-DEFENSE IS ALREADY SET FOR HEARING ON MSJ ON MARCH 10,**

**2011**

In the Defendants' moving papers, it is suggested that the policy of self-defense should

suffice is being addressed in the Eastern District because that matter is set for hearing on a motion

for summary judgment asserting exactly what the Defendants say Peruta says, i.e. self-defense

should equal good cause.  Richards v. Prieto, Eastern District of California Case No. 2:09-cv-

01235-MCE-DAD.

319030.1

As such, the judicial economy argument is vitiated by that hearing, assuming arguendo Plaintiff were making the same argument herein, which he is not.

## VII.   THE 9TH CIRCUIT IS DUE TO DELIVER AN EN BANC DECISION ON THE LEVEL OF SCRUTINY ANY DAY NOW

On July 12, 2010 the 9th Circuit vacated its' ruling in <u>Nordyke v. King</u> (9th Cir. 2009) 563 F.3d 439 and ordered an en banc review. (*See* Exhibit B attached hereto).  Oral argument was heard October 19, 2010 and applying a four month average (though perhaps a little longer for en banc review) an opinion could issue any day, though, given the Fourth Circuit opinion in <u>Chester</u>, it is not necessary for a review of this action, nor an independent grounds for a stay.  Moreover, the cases discussed herein are all different and add to the general framework of ever evolving Second Amendment Jurisprudence.

## VIII.   THIS IS A PERSONAL ACTION FOR THE PERSONAL VIOLATION OF PLAINTIFF'S RIGHTS BY THE LAPD AND SHERIFF;  PLAINTIFF IS ENTITLED TO REDRESS IN THE COURTS

Most importantly, this case is about Plaintiff's allegation that his Second Amendment rights have been violated because Defendants failed to even review or investigate his application and instead relied upon a policy, that, when applied to his application, created the automatic presumption of denial, i.e., Plaintiff is not a full-time judge, celebrity or person who has already been victimized and proven that the police didn't get there in time.  Plaintiff's various applications have established at least 8 independent grounds upon which his application should have been considered, all beyond mere self-defense and likely sufficient to meet the standard identified in <u>Peruta</u>.  Which isn't to say self-defense alone shouldn't be considered sufficient as it is in 43 States, and several counties in this State, including our Capital, Sacramento.

## IX.   CONCLUSION

Defendants' motion makes no effort made to define the actual facts or law at issue in <u>Peruta</u> or what is being appealed and by which party.  And instead suggests that budget woes justify the denial of civil liberties.  The <u>Peruta</u> case has no bearing upon the issues for which Plaintiff seeks redress - Does the policy followed by Los Angeles violate Plaintiff's Second Amendment rights as applied in this case.

319030.1

There can be no savings in judicial economy where there are two separate and distinct policies to be evaluated and the <u>Peruta</u> analysis is likely going to have to be repealed in light of the ruling in <u>Chester</u>, regardless of what happens with the facts or proceedings in that matter.  This case represents a separate and distinct action for the violation of Plaintiff's civil liberties and justice delayed is justice denied.

February 14, 2011                                         __/s/ Jonathan W. Birdt_____

                                                        By Plaintiff Jonathan W. Birdt

# EXHIBIT A

319030.1

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

EDWARD PERUTA, MICHELLE
LAXSON, JAMES DODD, DR. LESLIE
BUNCHER, MARK CLEARY, and
CALIFORNIA RIFLE AND PISTOL
ASSOCIATION FOUNDATION,

                             Plaintiffs,

    vs.

COUNTY OF SAN DIEGO, WILLIAM
GORE, individually and in his capacity as
sheriff,

                             Defendants.

CASE NO. 09CV2371-IEG (BGS)

**ORDER:**

**(1) DENYING PLAINTIFFS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT, and**

**(2) GRANTING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

[Doc. Nos. 34, 38]

      This is an action brought pursuant to 42 U.S.C. § 1983 in which Plaintiffs seek injunctive and declaratory relief from Defendant's policies for obtaining a license to carry a concealed weapon pursuant to California Penal Code § 12050. At the heart of the parties' dispute is whether the right recognized by the Supreme Court's rulings in <u>District of Columbia v. Heller</u>, 128 S. Ct. 2783 (2008) and <u>McDonald v. City of Chicago</u>, 130 S. Ct. 3020 (2010)—the right to possess handguns in the home for self-defense—extends to the right asserted here: the right to carry a loaded handgun in public, either openly or in a concealed manner. The matter is presently before the Court is a motion for partial summary judgment brought by Plaintiffs and a motion for summary judgment brought by Defendant William Gore. For the reasons set forth below, the Court **DENIES** Plaintiff's motion for partial

summary judgment and **GRANTS** Defendant's motion for summary judgment.

## **BACKGROUND**

The Plaintiffs

Each individual Plaintiff is a resident of San Diego County. Pls.' Statement of Undisputed Facts ("SUF") at 6. None of the Plaintiffs is disqualified under federal or California law from purchasing or possessing firearms. Id. Each individual Plaintiff applied to the San Diego Sheriff's Department for a license to carry a concealed weapon ("CCW") or a renewal, and each was denied for lack of "good cause" or told by the Sheriff's Department that he or she would be ill-advised to apply due to lack of "good cause."[1] Id. at 7. In addition to being denied due to lack of "good cause," Plaintiff Edward Peruta alleges he was denied a CCW license based on his residency. See Pls.' Consolidated SUF ¶ 15. Defendant maintains the residency requirement was not a factor in the denial. Id. Plaintiff California Rifle and Pistol Association Foundation ("CRPAF") is an organization dedicated to educating the public about firearms and protecting the rights thereto. See Pls.' SUF at 6.

Concealed Carry Licensing Scheme

California Penal Code sections 12050-12054 set forth the criteria that applicants for CCW licenses must meet: Applicants must be of good moral character, be a resident of or spend substantial time in the County in which they apply, demonstrate good cause and take a firearms course. In San Diego County, all license applications go to Defendant Sheriff William Gore are handled by his authorized representatives. See Def.'s SUF ¶ 1. The "good cause" provision of Penal Code section 12050 is at issue in this case.

Defendant defines "good cause" under Penal Code section 12050 as a set of circumstances that distinguishes the applicant from other members of the general public and causes him or her to be

---

[1] In 2006, the Sheriff's Department initiated an interview process to assist applicants and staff in determining pre-eligibility and to avoid applicants having to pay application fees and firearms safety course fees when they would not qualify for the license. The interview is voluntary and any person can submit an application without the assistance offered by the interview. Based on what the applicant outlines during the interview, counter clerks are permitted to offer an educated guess as to whether an applicant is eligible for a license based on the scenarios described by applicants. See Def.'s SUF ¶ 7.

Plaintiffs contend that the counter clerks sometimes discourage applicants from applying for a license, and in doing so, they serve Defendants' purpose of minimizing the number of applicants and the documentation of denials.

09cv2371

placed in harm's way.  See Def.'s SUF ¶ 5.  Generalized fear for one's personal safety is not, standing alone, considered "good cause."  Id.  To demonstrate "good cause," new applicants must provide supporting documentation.  See Pls.' SUF ¶ 9.

License holders may renew licenses up to 30 days prior to the expiration date.  Def.'s SUF ¶ 8. Renewals are issued on the spot absent any negative law enforcement contacts, crime cases, arrests, etc.  See id.  Applicants still need to provide some form of documentation to support a continued need but not to the extent of the initial application.  Id.  Plaintiffs maintain that Plaintiff Cleary was required to produce documentation for his renewal, but that the County granted several renewal applications of Honorary Deputy Sheriffs' Association ("HDSA") members without requiring supporting documentation.  Pls.' Consolidated SUF ¶ 10.

Defendant defines residency under Penal Code section 12050 to include any person who maintains a permanent residence in the County or spends more than six months of the taxable year within the County if the individual claims dual residency.  See id. ¶ 16.  Part-time residents who spend less than six months in the County are considered on a case-by-case basis and CCW licenses have been issued to part-time residents.  Id.

Procedural Background

Plaintiff Edward Peruta filed his original complaint on October 23, 2009, asserting that Penal Code section 12050 violated the right to bear arms under the Second Amendment, the right to equal protection under the Fourteenth Amendment, and the right to travel under the Fourteenth Amendment. (Doc. No. 1.)  Defendant moved to dismiss Plaintiff's complaint on November 13, 2009.  (Doc. No. 3.)  The Court denied Defendant's motion to dismiss on January 14, 2010, and Defendant filed an answer soon thereafter.  (Doc. Nos. 7, 8.)  On April 22, 2010, Plaintiff filed a motion for leave to file a First Amended Complaint to add additional Plaintiffs and claims.  (Doc. No. 16.)  The Court granted Plaintiffs' motion on June 25, 2010, and Defendant filed an answer to Plaintiffs' First Amended Complaint on July 9, 2010.  (Doc. Nos. 24, 28.)

Presently before the Court is a motion for summary judgment by Defendant and a motion for partial summary judgment by Plaintiffs.  (Doc. Nos. 34, 38.)  Defendant has moved for summary judgment on all claims, whereas Plaintiffs have moved for summary judgment only on the right to bear

arms and certain equal protection claims.  For purposes of their motions, and with the Court's approval, the parties adopted (and later modified) a stipulated briefing schedule and completed briefing by November 10, 2010.  The Court held oral argument on the parties' motions on November 15, 2010. (Doc. No. 60.)

**LEGAL STANDARD**

Summary judgment is proper where the pleadings and materials demonstrate "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A material issue of fact is a question a trier of fact must answer to determine the rights of the parties under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears "the initial responsibility of informing the district court of the basis for its motion."  Celotex, 477 U.S. at 323.  To satisfy this burden, the movant must demonstrate that no genuine issue of material fact exists for trial.  Id. at 322.  Where the moving party does not have the ultimate burden of persuasion at trial, it may carry its initial burden of production in one of two ways: "The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial."  Nissan Fire & Marine Ins. Co., v. Fritz Cos., 210 F.3d 1099, 1106 (9th Cir. 2000).  To withstand a motion for summary judgment, the non-movant must then show that there are genuine factual issues which can only be resolved by the trier of fact.  Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000).  The non-moving party may not rely on the pleadings alone, but must present specific facts creating a genuine issue of material fact through affidavits, depositions, or answers to interrogatories.  Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324.

The court must review the record as a whole and draw all reasonable inferences in favor of the non-moving party.  Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1112 (9th Cir. 2003).  However, unsupported conjecture or conclusory statements are insufficient to defeat summary judgment.  Id.; Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1103 (9th Cir. 2008).  Moreover, the court is not

required "'to scour the record in search of a genuine issue of triable fact,'" Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996) (citations omitted), but rather "may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).

## DISCUSSION

## I.   Right to Bear Arms

### A.   The Scope of the Right: Heller and McDonald

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In District of Columbia v. Heller, 128 S. Ct. 2783, 2799 (2008), the Supreme Court recognized that the Second Amendment protects the individual right to keep and bear arms for self-defense. Two years later in McDonald v. City of Chicago, 130 S. Ct. 3020, 3026, 3044 (2010), the Court evaluated restrictions "similar to the District of Columbia's" in Heller and held that the Due Process Clause of the Fourteenth Amendment "incorporates the Second Amendment right recognized in Heller."

The Heller Court focused on two restrictions, both of which are relevant to the right asserted in this case: (1) a ban on handgun possession in the home, which the Court characterized as among the most restrictive in the "history of our Nation," and (2) the requirement that firearms be kept inoperable at all times. 128 S. Ct. at 2817-18. The Court's analysis of these restrictions is important because it provides guidance on the scope of the Second Amendment right in terms of both "place" and "manner."

*Place.* After evaluating the prefatory and operative clauses of the amendment, the Court turned to the District of Columbia's total ban on handgun possession in the home. 128 S. Ct. at 2817. In doing so, the Court singled out the home as a place "where the need for defense of self, family, and property is most acute." Id. Likewise, while declining to expound fully on the scope of the Second Amendment, the Court observed that "whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 2821. Accordingly, the Court held that "the District's ban on handgun possession in the home violates the Second Amendment." Id.

*Manner.* The Heller Court also addressed the District's requirement that firearms in the home

be rendered and kept inoperable at all times, and without exception.[2] Id. at 2818. The Court held that

the District's restriction "makes it impossible for citizens to use [firearms] for the core lawful purpose

of self-defense and is hence unconstitutional." Id. In dicta, the Heller Court explained that the Second

Amendment right is "not unlimited" and not a "right to keep and carry any weapon whatsoever in any

manner whatsoever and for whatever purpose." 128 S. Ct. at 2816 (citations omitted). For example,

the Court noted that:

> the majority of the 19th-century courts to consider the question held that prohibitions
> on carrying concealed weapons were lawful under the Second Amendment or state
> analogues. Although we do not undertake an exhaustive historical analysis today of
> the full scope of the Second Amendment, nothing in our opinion should be taken to
> cast doubt on longstanding prohibitions on the possession of firearms by felons and the
> mentally ill, or laws forbidding the carrying of firearms in sensitive places such as
> schools and government buildings, or laws imposing conditions and qualifications on
> the commercial sale of arms.

Id. at 2816-17 (internal citations omitted). In a footnote immediately following, the Court explained:

"We identify these presumptively lawful regulatory measures only as examples; our list does not

purport to be exhaustive." Id. at 2817 n.26.

The Court's recitation of lawful regulatory measures does not provide a blueprint for the

validity of future restrictions; it should be interpreted as "precautionary language" that "warns readers

not to treat Heller as containing broader holdings than the Court set out to establish: that the Second

Amendment creates individual rights, one of which is keeping operable handguns at home for self-

defense." United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (Easterbrook, J.).

**B.    Plaintiffs' Challenge in the Context of California's Statutory Framework**

Plaintiffs maintain that the right recognized in Heller includes a right to carry a loaded handgun

in public, either openly or in a concealed manner. See generally Pls.' Mem. In accordance with such

a right, Plaintiffs maintain that under California law, there is a single outlet for carrying a handgun for

self-defense: concealed carry with a license pursuant Penal Code section 12050. See id. at 1-2.

Because Penal Code section 12050 allows sheriffs to grant concealed carry licenses, Plaintiffs argue

that Defendant's policy—under which an assertion of self-defense is insufficient to demonstrate "good

---

[2] Against the District's urging, the Court declined to construe the statute as containing an exception for self-defense. Id. at 2818.

09cv2371

cause"—is unconstitutional both on its face and as applied.  See generally id.

Defendant disputes each aspect of Plaintiffs' position and argues against extending Heller beyond its express holding.  See generally Def.'s Mem.  According to Defendant, the right recognized in Heller does not extend beyond the home, and the right to self-defense does not entail the right to loaded carry in the absence of an immediate threat.  Id.  Accordingly, Defendant argues that concealed carry pursuant to Penal Code section 12050 is not the sole outlet for carrying a handgun for self-defense.  Defendant highlights other California provisions that permit unloaded open carry and loaded open carry if the individual is in immediate grave danger.[3]  Id.  In light of the foregoing, and based on the Supreme Court's approval of cases upholding concealed weapons bans, Defendant maintains that the restrictions at issue here are "presumptively lawful."  See id. at 9.

Before turning to the burden imposed by Defendant's policy, the Court evaluates Plaintiffs' contention that, under California's statutory framework, concealed carry with a license pursuant Penal Code section 12050 contains the sole outlet for carrying a handgun for self-defense.  See Pls.' Mem. at 1-2.  Plaintiff's contention is based on the assumption that Penal Code section 12031 unlawfully burdens the right to self-defense.[4]

California Penal Code section 12031 generally restricts the open carry of loaded firearms in public.  The statute contains several exceptions, however, including specific exceptions for self-defense and defense of the home.[5]  See Cal. Penal Code §§ 12031(j)(1)-(3).  Section 12031(j)(1) permits loaded open carry by "a person who reasonably believes that the person or property of himself or herself or of another is in immediate, grave danger and that the carrying of the weapon is necessary for the preservation of that person or property."  The term immediate refers to the "brief interval before

---

[3] Defendant also contends that Plaintiffs' challenge amounts to a backdoor attack on the constitutionality of section 12050, rather than mere challenge to its policy.  See Def.'s Mem. at 8.  The Court addresses this contention below.

[4] In its order denying Defendant's motion to dismiss, based on the posture of the case and the briefing of the parties, the Court abided the assumption that section 12031 unlawfully burdens the right to self-defense.  At this stage, however, the Court scrutinizes the assumption more carefully.

[5] There are also exceptions for individuals such as security guards, police officers and retired police officers, private investigators, members of the military, hunters, target shooters, persons engaged in "lawful business" who possess a loaded firearm on business premises and persons who possess a loaded firearm on their own private property.  See Cal. Penal Code §§ 12031(b)-(d) and (h).

and after the local law enforcement agency, when reasonably possible, has been notified of the danger and before the arrival of its assistance." Id. Section 12031(j)(2) permits loaded open carry by a person who "reasonably believes that he or she is in grave danger because of circumstances forming the basis of a current restraining order issued by a court against another person or persons who has or have been found to pose a threat to his or her life or safety." And Section 12031(l) expressly ensures the right of self-defense in the home: "Nothing in this section shall prevent any person from having a loaded weapon, if it is otherwise lawful, at his or her place of residence, including any temporary residence or campsite." As a practical matter, should the need for self-defense arise, nothing in section 12031 restricts the open carry of unloaded firearms and ammunition ready for instant loading. See Cal. Penal Code § 12031(g).

In their Sur-Reply, Plaintiffs argue that despite its self-defense exception, section 12031 does not preserve the right to self-defense because such a need can arise "in a split second." See Pls.' Sur-Reply at 1-2. Like the District of Columbia requirement that firearms be "unloaded and dissembled or bound by a trigger lock or similar device," Plaintiffs maintain that a general requirement that handguns be kept unloaded is foreclosed by Heller. See id.

The Court disagrees. There is an important distinction between section 12031 and the District of Columbia law at issue in Heller, which required that firearms in the home be rendered and kept inoperable *at all times*. See Heller, 128 S. Ct. at 2818. Unlike section 12031, the District of Columbia law did not contain, and the Supreme Court declined to infer, an exception for self-defense. Id. The Heller Court did not reach the question of whether the law would have been constitutional had there been an exception for self-defense. See id. As a consequence, the Court declines to assume that section 12031 places an unlawful burden on the right to carry a firearm for self-defense, and Plaintiffs have elected not to challenge section 12031.[6]

Although Plaintiffs have elected not to challenge section 12031, focusing instead on concealed carry pursuant to section 12050, the validity and open carry restrictions of section 12031 are relevant

---

[6] The Court notes that section 12031 has been challenged and upheld following Heller. See People v. Flores, 169 Cal. App. 4th 568, 576-77 (Cal. Ct. App. 2008) (holding "section 12031 does not burden the core Second Amendment right announced in Heller – the right of law-abiding, responsible citizens to use arms in defense of hearth and home – to any significant degree").

and important here. The <u>Heller</u> Court relied on 19th-century cases upholding concealed weapons bans, but in each case, the court upheld the ban because alternative forms of carrying arms were available. <u>See State v. Chandler</u>, 5 La. Ann. 489, 490 (1850) (holding concealed weapons ban "interfered with no man's right to carry arms . . . in full open view"); <u>Nunn v. State</u>, 1 Ga. 243, 251 (1846) (holding concealed weapons ban valid so long as it does not impair the right to bear arms "altogether"). <u>See also Andrews v. State</u>, 50 Tenn. 165, 178 (1871) (holding that a statute that forbade openly carrying a pistol "publicly or privately, without regard to time or place, or circumstances," violated state right to keep and bear arms); <u>State v. Reid</u>, 1 Ala. 612, 616-17 (1840) (observing that a regulation that amounts to a total ban would be "clearly unconstitutional")). For that reason, in its order denying Defendant's motion to dismiss, this Court emphasized that not *all* concealed weapons bans are presumptively lawful. <u>See</u> Order Denying William D. Gore's Motion to Dismiss (Doc. No. 7) at 7-10. <u>Heller</u> and the 19th-century cases it relied upon instruct that concealed weapons restrictions cannot be viewed in isolation; they must be viewed in the context of the government's overall scheme. Here, to the extent that Penal Code sections 12025 and 12050 and Defendant's policy burden conduct falling within the scope of the Second Amendment, if at all, the burden is mitigated by the provisions of section 12031 that expressly permit loaded open carry for immediate self-defense. With the foregoing in mind, the Court proceeds to the question of whether Defendant's policy satisfies the appropriate level of judicial scrutiny.[7] Because Defendant's policy for issuing concealed carry licenses under

---

[7] Plaintiffs maintain they are not challenging the constitutionality of any of the California Penal Code sections. Pls.' Reply at 1-3. Instead, Plaintiffs contend they are challenging only the Defendant's policy of issuing concealed weapons licenses, both as applied and on its face. <u>Id.</u> In doing so, Plaintiffs urge the Court to hold that section 12050's "good cause" provision is satisfied whenever applicants of good moral character assert self-defense as their basis. <u>See</u> Pls.' Reply at 1 ("This means holding section 12050's 'good cause' criterion to be satisfied where CCW applicants of good moral character assert 'self-defense as their basis'"). Defendant, however, maintains Plaintiffs are asserting a back door attack on the constitutionality of section 12050. <u>See</u> Def.'s Mem. at 8 ("Plaintiffs are asking the Court to strike the 'good cause' language from the statute"); Def.'s Reply at 1 (Plaintiffs are "asking the court to mandate that the State of California become a 'shall issue' state by forbidding Sheriffs from requiring a showing of 'good cause' for concealed carry licensure").

Section 12050 provides that when applicants meet certain requirements, and the sheriff finds that "good cause" exists, the sheriff "may issue" a license to carry a concealed firearm. Cal. Penal Code § 12050(a). "Section 12050 explicitly grants discretion to the issuing officer to issue or not issue a license to applicants meeting the minimum statutory requirements." <u>Erdelyi v. O'Brien</u>, 680 F.2d 61, 63 (9th Cir. 1982); <u>see also Gifford v. City of Los Angeles</u>, 88 Cal. App. 4th 801, 805 (Cal. Ct. App. 2001) (observing that "Section 12050 gives 'extremely broad discretion'" to the sheriff concerning the issuance of concealed weapons licenses"); <u>Nichols v. County of Santa Clara</u>, 223 Cal. App. 3d 1236, 1241 (Cal. Ct. App. 1990) (same). Holding that sheriffs must issue concealed carry

section 12050 would pass constitutional muster even if it burdens protected conduct, the Court does not need to decide whether the Second Amendment encompasses Plaintiffs' asserted right to carry a loaded handgun in public.

### C. Whether Defendant's Policy Satisfies the Appropriate Level of Scrutiny

Plaintiffs acknowledge that the <u>Heller</u> Court expressly declined to prescribe the appropriate level of judicial scrutiny for firearms regulations, but they nevertheless argue that "<u>Heller</u> points clearly to strict scrutiny." <u>See</u> Pls.' Mem. at 9-15. Noting that the <u>Heller</u> Court ruled out a rational basis inquiry and the "interest-balancing" approach suggested by Justice Breyer, Plaintiffs contend that when a law interferes with "fundamental constitutional rights," it must be subject to strict scrutiny. Pls.' Mem. at 9. Plaintiffs also maintain that "the trend after <u>McDonald</u> is toward adopting strict scrutiny." <u>See</u> Pls.' Reply at 11. Defendant argues that, since <u>Heller</u>, heightened scrutiny has been reserved for instances in which the "core right" of possession of a firearm in the home is infringed. <u>See</u> Def.'s Mem. at 17. Defendant contends the appropriate standard is "reasonableness review," or in the alternative, intermediate judicial scrutiny. <u>See id.</u> at 11-17.

The Court is unpersuaded that strict scrutiny is warranted here. Contrary to Plaintiffs' suggestion, fundamental constitutional rights are not invariably subject to strict scrutiny. In the First Amendment context, for example, content-neutral restrictions on the time, place and manner of speech are subject to a form of intermediate scrutiny. <u>See</u> <u>United States v. O'Brien</u>, 391 U.S. 367, 377 (1968). Other restrictions on speech may be held to an even lower standard of review. <u>See</u> <u>Int'l Soc'y for Krishna Consciousness v. Lee</u>, 505 U.S. 672, 678-79 (1992) (noting that limitations on expressive activity conducted in a nonpublic forum need only be reasonable, as long as they are viewpoint neutral); <u>Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.</u>, 473 U.S. 788, 806 (1985) (same). Drawing on First Amendment jurisprudence, several courts have applied intermediate scrutiny in the Second Amendment context. <u>See, e.g.</u>, <u>United States v. Smith</u>, 2010 WL 3743842, at *8 (S.D. W. Va. Sept. 20, 2010); <u>United States v. Walker</u>, 709 F. Supp.2d 460, 466 (E.D. Va. 2010); <u>United States v. Marzzarella</u>, 595 F. Supp. 2d 596 (W.D. Pa. 2009). Accordingly, Plaintiffs are wrong in suggesting

---

licenses all individuals who meet the minimum statutory requirements and assert self-defense as their basis would eliminate the discretion afforded sheriffs under section 12050. Accordingly, Plaintiffs' challenge cannot be properly construed as a mere challenge to Defendant's policy.

09cv2371

1   that the Court must apply strict scrutiny.

2       Plaintiffs are also wrong in suggesting there a trend after McDonald toward adopting strict

3   scrutiny.  In support of such a trend, Plaintiffs cite two cases.[8]  The first case is United States v.

4   Engstrum, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009).  Engstrum predated McDonald and

5   therefore cannot demonstrate a post-McDonald trend.  The second case is State of Wisconsin v.

6   Schultz, No. 10-CM-138, slip. op. (Wis. Ct. App. Oct. 12, 2010).  There, the state appellate court

7   appears to have relied on Justice Thomas' concurrence in McDonald, rather than the majority, in

8   deciding the appropriate level of scrutiny.  At best, Engstrum and Schultz reveal that a post-McDonald

9   trend toward strict scrutiny may emerge but is thus far indiscernible.  To date, a majority of cases citing

10  to McDonald and employing some form of heightened scrutiny—most of which are challenges to

11  criminal convictions—have employed intermediate scrutiny.  E.g., United States v. Skoien, 614 F.3d

12  638 (7th Cir. 2010);  United States v. Marzzarella, 614 F.3d 85, 97 (3rd Cir. 2010).  The trend prior

13  to McDonald was intermediate scrutiny.  See Heller v. District of Columbia, 698 F. Supp.2d 179, 188

14  (D.D.C. 2010) (Heller II) (surveying the landscape of post-Heller decisions and joining "the majority

15  of courts" in holding that "intermediate scrutiny is the most appropriate standard").

16      Neither party has cited, and the Court is not aware of, a case in which a court has employed

17  strict scrutiny to regulations that do not touch on the "core" Second Amendment right: possession in

18  the home.[9]  If it exists, the right to carry a loaded handgun in public cannot be subject to a more

19  rigorous level of judicial scrutiny than the "core right" to possess firearms in the home for self-defense.

20  See Heller, 128 S. Ct. at 2717 (focusing on the home as the place "where the need for defense of self,

21  family, and property is most acute"); McDonald, 130 S. Ct. at 3036 (quoting same).  If anything, the

22  opposite is true; unlike possession in the home, carrying a concealed firearm in public presents a

23

24      [8] Following submission of the case, Plaintiffs filed a Notice of Lodgment of Recent Authority

25  in Support of Plaintiffs' Motion for Partial Summary Judgment.  (Doc. No. 62.)  The Lodgment
    contains two cases as exhibits: United States v. Ligon, 2010 U.S. Dist. Lexis 116272 (D. Nev. Oct.

26  20, 2010) and United States v. Huet, 2010 U.S. Dist. Lexis 123597 (Nov. 22, 2010).  Neither of the
    cases changes the Court's analysis in a meaningful way: The court in Ligon employed  strict scrutiny

27  for the sake of argument, and the court in Huet did not employ a levels of scrutiny analysis at all,
    instead focusing on the restriction's impact on the "core right" of possession in the home.

28      [9] In fact, the Court is not aware of a case in which a court has employed *any* form of heightened
    scrutiny of regulations that do not affect the "core right."

"recognized threat to public order" and "poses an imminent threat to public safety." People v. Yarbrough, 169 Cal. App. 4th 303, 313-14 (Cal. Ct. App. 2010) (quotation marks and citations omitted); see also McDonald, 130 S. Ct. at 3105 (Stevens, J., dissenting) ("firearms kept inside the home generally pose a lesser threat to public welfare as compared to firearms taken outside . . ."). At most, Defendant's policy is subject to intermediate scrutiny.

In contrast with strict scrutiny, intermediate scrutiny, "by definition, allows [the government] to paint with a broader brush." United States v. Miller, 604 F. Supp.2d 1162, 1172 (W.D. Tenn. 2009). In United States v. Marzzarella, 614 F.3d 85, 98 (3rd Cir. 2010), the Third Circuit crafted an intermediate scrutiny standard for the Second Amendment based on the various intermediate scrutiny standards utilized in the First Amendment context. Pursuant to that standard, intermediate scrutiny requires the asserted governmental end to be more than just legitimate; it must be either "significant," "substantial," or "important," and it requires the "fit between the challenged regulation and the asserted objective be reasonable, not perfect." Id. (citations omitted); United States v. Huet, 2010 U.S. Dist. Lexis 123597, at *28 (W.D. Pa. Nov. 22, 2010).

In this case, Defendant has an important and substantial interest in public safety and in reducing the rate of gun use in crime. In particular, the government has an important interest in reducing the number of concealed weapons in public in order to reduce the risks to other members of the public who use the streets and go to public accommodations. See Zimring Decl. The government also has an important interest in reducing the number of concealed handguns in public because of their disproportionate involvement in life-threatening crimes of violence, particularly in streets and other public places. Id. Defendant's policy relates reasonably to those interests. Requiring documentation enables Defendant to effectively differentiate between individuals who have a bona fide need to carry a concealed handgun for self-defense and individuals who do not.

The Court acknowledges Plaintiffs' argument that many violent gun crimes, even a majority, are committed by people who cannot legally have guns, and the ongoing dispute over the effectiveness of concealed weapons laws. See Moody Decl. But under intermediate scrutiny, Defendant's policy need not be perfect, only reasonably related to a "significant," "substantial," or "important" governmental interest. Marzzarrella, 614 F.3d at 98. Defendant's policy satisfies that standard.

1   Accordingly, the Court **DENIES** Plaintiffs' motion for summary judgment and **GRANTS** Defendant's

2   motion for summary judgment on Plaintiffs' right to bear arms claim.

3   **II.     Equal Protection**

4           The "Equal Protection Clause of the Fourteenth Amendment commands that no State shall

5   'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

6   direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne

7   Living Center, Inc., 473 U.S. 432, 439 (1985); Shaw v. Reno, 509 U.S. 630 (1993).   When a

8   government's action does not involve a suspect classification or implicate a fundamental right, even

9   intentional discrimination will survive constitutional scrutiny for an equal protection violation as long

10  as it bears a rational relation to a legitimate state interest. New Orleans v. Dukes, 427 U.S. 297, 303-

11  04 (1976); Cleburne, 473 U.S. at 439; Lockary v. Kayfetz, 917 F.2d 1150, 1155 (9th Cir. 1990).

12  However, "[w]here fundamental rights and liberties are asserted under the Equal Protection Clause,

13  classifications which might invade or restrain them must be closely scrutinized." Hussey v. City of

14  Portland, 64 F.3d 1260, 1265 (9th Cir. 1995) (quoting Harper v. Va. Bd. of Elections, 383 U.S. 663,

15  670 (1966)).

16          **A.     Defendant's "Good Cause" Policy**

17          For the reasons stated in above, the Court concludes that Defendant's "good cause" policy is

18  valid.  Accordingly, the policy does not treat similarly situated individuals differently because not all

19  law-abiding citizens are similarly situated, as Plaintiffs contend.   Those who can document

20  circumstances demonstrating "good cause" are situated differently than those who cannot.  Therefore,

21  Defendant's "good cause" policy does not violate equal protection.

22          **B.     Defendant's Treatment of Honorary Deputy Sheriffs**

23          The Honorary Deputy Sheriffs' Association ("HDSA") is a civilian organization whose primary

24  purpose is to finance projects for the San Diego Sheriff's Department. Plaintiffs allege that Defendant

25  engages in preferential treatment of HDSA members. Pls.' Mem. at 20-22. Defendant denies such

26  allegation and maintains that "Sheriff Gore does not offer special treatment to anyone and membership

27  in the [HDSA] has no bearing on the ability to obtain a CCW license." Def.'s Mem. at 22. Plaintiffs

28  do not contest or attempt to refute the premise that Defendant's policy is facially even-handed, instead

1    asserting arguments consistent with a purely as-applied challenge.  See generally Pls.' Mem.; Pls.'

2    Reply.

3        A concealed weapons licensing program administered so as to unjustly discriminate between

4    persons in similar circumstances may deny equal protection.  Guillory v. County of Orange, 731 F.2d

5    1379, 1383 (9th Cir. 1984); see also Kuzinich v. County of Santa Clara, 689 F.2d 1345, 1349 (9th Cir.

6    1983) (citing Yick Wo v. Hopkins, 118 U.S. 356 (1886)).  At this stage, the Court evaluates whether

7    there is actual evidence that would allow a reasonable jury to conclude first, that others similarly

8    situated to Plaintiffs generally have not been treated in a like manner; and second, that the denials of

9    concealed weapons licenses to them were based on impermissible grounds.  See March v. Rupf, 2001

10   WL 1112110, at *5 (N.D.Cal. 2001) (citing Kuzinich v. County of Santa Clara, 689 F.2d 1345, 1349

11   (9th Cir. 1983) (applying this test to a claim of "selective prosecution" in zoning decision context)).

12       In March v. Rupf, plaintiffs asserted claims similar to those at issue here, that in granting

13   concealed weapons licenses, sheriffs favored a "privileged class" of individuals.  2001 WL 1112110,

14   at *5 (N.D.Cal. 2001).  Plaintiffs submitted more than 700 pages of applications and renewals.  Id.

15   The court observed that "some applicants were granted concealed weapons licenses after stating on

16   paper basically the same grounds for issuance upon which plaintiffs' applications were denied."  Id.

17   Nonetheless, the court held there was no genuine issue of material fact because the records did not

18   establish those who received licenses were similarly situated to plaintiffs.  Id.  The records were

19   incomplete—they did not reveal information compiled in background checks, oral interviews and the

20   like—and the records did not establish a causal connection between factors suggesting "privileged

21   class" and the issuance of a concealed weapons license.  Id.  The court concluded that, "without

22   evidence of anything more than vagaries in [] administration," plaintiffs equal protection claim could

23   not survive summary judgment.  Id.

24       Like the plaintiffs in March, Plaintiffs here cannot demonstrate they were treated differently

25   than similarly situated others.  To show disparate treatment, Plaintiffs have offered a number of HDSA

26   renewal applications as a contrast to Plaintiffs initial applications.  See Exs. U-PP.  But the two types

27   of applications are not comparable; renewal applications are generally issued on the spot and subject

28   to less rigorous documentation requirements than initial applications.  See Pelowitz Decl. ¶ 12.  Just

- 14 -

09cv2371

one of the Plaintiffs contends his renewal was denied, and in that case, the renewal was granted following an appeal. See Exs. K-S. Accordingly, the evidence introduced by Plaintiffs does not establish or create a genuine issue of material fact regarding whether similarly situated individuals were treated differently. At most, it demonstrates "vagaries in [] administration." See March, 2001 WL 1112110, at *5 (N.D.Cal. 2001). Moreover, for the reasons stated above, Plaintiffs have not demonstrated the denials of concealed weapons licenses to them were based on impermissible grounds. Defendant's policy does not favor HDSA members in violation of the equal protection clause of the Fourteenth Amendment.

Accordingly, the Court **DENIES** Plaintiffs' motion for summary judgment and **GRANTS** Defendant's motion for summary judgment on Plaintiffs' equal protection claims as they relate to Defendant's "good cause" policy and treatment of HDSA members.

## C.     Defendant's Residency Requirement[10]

For the reasons stated below, in differentiating between residents (and part-time residents who spend more than six months of the taxable year within the County) and non-residents, Defendant utilizes means that are substantially related to a substantial governmental interest. Because residents and non-residents are situated differently, the residency requirement of Defendant's policy does not violate equal protection. Therefore, the Court **GRANTS** Defendant's motion for summary judgment on Plaintiffs' equal protection claim as it relates to Defendant's residency requirement.

## III.     Right to Travel

The right to travel is usually considered to be one of the rights guaranteed by the Privileges and Immunities Clause of Article IV and the Privileges and Immunities Clause of the Fourteenth Amendment. See Attorney General of N.Y. v. Soto-Lopez, 476 U.S. 898, 902 (1986) (plurality) (citations omitted). The right to travel embraces at least three different components: (1) the right of a citizen of one State to enter and to leave another State; (2) the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and (3) for those travelers

---

[10] The only Plaintiff who alleges the residency requirement impacted his application is Edward Peruta, and the parties agree that Peruta's application was denied for lack of "good cause." See Pls.' Consolidated SUF ¶ 15. In addition to challenging the residency requirement as applied to Peruta, Plaintiffs challenge facial validity of the residence requirement.

who elect to become permanent residents, the right to be treated like other citizens of that State. <u>Saenz v. Roe</u>, 526 U.S. 489, 500 (1999).  However, not all regulations that merely have an effect on travel raise an issue of constitutional dimension.  Rather, "[a] state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right."  <u>Soto-Lopez</u>, 476 U.S. at 903 (plurality) (internal quotation marks and citations omitted).  A law embracing means that are "substantially" related to a "substantial" government interest will survive a right to travel analysis. <u>Bach v. Pataki</u>, 408 F.3d 75, 88 n.27 (2nd Cir. 2005).  Plaintiffs allege Defendant's residency requirement "penalizes applicants for traveling and spending time outside of San Diego," FAC ¶ 122, and accordingly, Plaintiffs allege the policy burdens the right to travel.  Relying on <u>Bach</u>, Defendant contends that its policy passes muster as a bona fide residence requirement.  <u>See</u> Def.'s Mem. at 30.

Like the restrictions at issue here, the Second Circuit in <u>Bach</u> evaluated restrictions that inhibited non-residents from applying for a permit to carry a concealed weapon. Assuming, without deciding, that entitlement to a New York carry license was a privilege under Article IV of the Privileges and Immunities Clause, the Second Circuit concluded that New York had a substantial interest in monitoring gun licensees and that limiting licenses to residents and those working primarily within the state was sufficiently related to that interest.  <u>Bach</u>, 408 F.3d at 91-94.  The Court is unable to discern a meaningful distinction between the issues facing the Second Circuit in <u>Bach</u> and those at issue here.  Adopting the rationale set forth in that decision, the Court concludes there is no genuine issue of material fact as to whether Defendant's policy violates the right to travel.  Accordingly, the Court **GRANTS** Defendant's motion for summary judgment on Plaintiffs' right to travel claim.[11]

## IV.    Due Process

A threshold requirement for asserting a due process claim is the existence of a property or liberty interest.  <u>Board of Regents v. Roth</u>, 408 U.S. 564, 569 (1972).  Plaintiffs' due process claim

---

[11] In addition to their right to travel claim, which arises under the Privileges and Immunities Clause of Article IV and the Privileges and Immunities Clause of the Fourteenth Amendment, Plaintiffs have asserted a separate claim for relief under the Privileges and Immunities Clause of Article IV.  In its motion for summary judgment, Defendant suggests the claims are identical, <u>see</u> Def.'s Mem. at 29, and Plaintiffs have not disputed Defendant's contention, <u>see generally</u> Pls.' Mem; Pls.' Reply.  The Court agrees that separate analyses of the claims would be duplicative and dismisses Plaintiffs' Privileges and Immunities claim along with their right to travel claim.

is governed by <u>Erdelyi v. O'Brien</u>, 680 F.2d 61, 63 (9th Cir. 1982), which held that by virtue its discretionary language, Section 12050 does not create a property interest. Morever, the Court held that the Plaintiff in that case "did not have a liberty interest in obtaining a concealed weapons license." <u>Id.</u> at 64. Pursuant to <u>Erdelyi</u>, the Court concludes that because Plaintiffs do not have "property or liberty interest in a concealed weapons license, the Due Process Clause did not require [Defendant] to provide [them] with due process before denying [their] initial [license] application[s]." <u>Id.</u> In any event, there is nothing to suggest that Defendant's licensing procedures deprive Plaintiffs of the opportunity to be heard at a meaningful time in a meaningful manner. <u>See</u> <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333 (1976). The Court **GRANTS** Defendant's motion for summary judgment on Plaintiffs' due process claim.

## CONCLUSION

For the foregoing reasons, the Court concludes that Defendant's policy does not infringe on Plaintiffs' right to bear arms or violate equal protection, the right to travel, the Privileges and Immunities Clause of Article IV, or due process.[12] Accordingly, the Court **DENIES** Plaintiffs' Motion for Summary Judgment and **GRANTS** Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED.**

DATED: **December 10, 2010**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

---

[12] Plaintiffs have also asserted a claim for relief under 42 U.S.C. § 1983 for Defendant's alleged violation of California Penal Code section 12050. Because there is no cause of action under section 1983 for violation of a state statute, <u>see</u> <u>Moore v. Marketplace Restaurant, Inc.</u>, 754 F.2d 1336, 1349 (7th Cir.1985), the Court dismisses the claim.

09cv2371

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

319030.1

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RUSSELL ALLEN NORDYKE; ANN
SALLIE NORDYKE, dba TS Trade
Shows; JESS B. GUY; DUANE DARR;
WILLIAM J. JONES; DARYL N.
DAVID; TASIANA WESTYSCHYN; JEAN
LEE; TODD BALTES; DENNIS BLAIR,
R.L. ADAMS; ROGER BAKER; MIKE
FOURNIER; VIRGIL MCVICKER,
                *Plaintiffs-Appellants,*

          v.

No. 07-15763

D.C. No.
CV-99-04389-MJJ

ORDER

MARY V. KING; GAIL STEELE;
WILMA CHAN; KEITH CARSON;
SCOTT HAGGERTY; COUNTY OF
ALAMEDA; COUNTY OF ALAMEDA
BOARD OF SUPERVISORS,
                *Defendants-Appellees.*

Filed July 12, 2010

Before: Alex Kozinski, Chief Judge, Harry Pregerson,
Stephen Reinhardt, Diarmuid F. O'Scannlain,
Pamela Ann Rymer, Michael Daly Hawkins,
Susan P. Graber, Ronald M. Gould, Richard C. Tallman,
Milan D. Smith, Jr. and Sandra S. Ikuta, Circuit Judges.

---

## ORDER

The panel opinion in *Nordyke* v. *King*, 563 F.3d 439 (9th
Cir. 2009), is vacated and the case is remanded to that panel
for further consideration in light of *McDonald* v. *City of Chi-
cago*, No. 08-1521, slip op. (U.S. June 28, 2010).

9907