# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN BIRDT<br><br>            Plaintiff<br><br>    v.<br><br>CHARLIE BECK, ET AL.<br><br>            Defendants. | **DECLARATION OF FRANKLIN E. ZIMRING IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Honorable R. Gary Klausner<br><br>[Opposition to Plaintiff's Motion for Summary Judgment and Defendants' Motion for Summary Judgment filed concurrently herewith] |

I, Franklin E. Zimring, declare as follows:

1.      My current academic appointment is William G. Simon Professor of Law, Wolfen Distinguished Scholar and Chair of the Criminal Justice Research Program at the University of California, Berkeley. I have been studying the relationship between firearms and violence, strategies of firearms control, and patterns of gun commerce and civilian gun usage since 1967. I have served as director of research of the task force on firearms of the National Commission on the Causes and Prevention of Violence in 1968-1969 and as a firearms and federal criminal law expert for the National Commission on Reform of Federal Criminal Laws. I have published several empirical studies of firearms and violence and on gun control, and I have co-authored three books with firearms issues at their center, in 1969, 1986 and 1997. I have served as an expert both on the relationship between firearms and violence and on the design and evaluation of firearms control. I am providing expert opinions on both of these topics in this declaration. I was elected a Fellow of the American Academy of Criminology in 1993 and to the American Academy of Arts and Sciences in 1990. A full curriculum vitae is Appendix A of this declaration.

1

2. This declaration will summarize the empirical evidence and my expert opinions concerning four issues arising out of this litigation.

  (1) The relationship between firearms and violence and the governmental interest in reducing the rate of gun use in crime.

  (2) The particular governmental concerns with handguns and other concealable weapons because of their disproportionate involvement in life-threatening crimes of violence, particularly in streets and other public places.

  (3) The special threat posed by concealed handguns as weapons used by criminals in streets and other public spaces. Persons using the streets cannot avoid and police patrolling the streets cannot detect persons who carry concealed handguns and later will find victims who are at risk when concealed guns are displayed in robberies or assaults and not infrequently discharged. The governmental interest in limiting the number of persons licensed to carry weapons hidden on their persons in public places is substantially related to reducing the volume and deadliness of street robberies and assaults.

  (4) A robust right to own a handgun in the privacy of one's own home imposes whatever risks the gun poses on the owner and his family and those who choose to visit those premises as long as the gun stays home. But unlimited freedom given to a person to carry a hidden handgun on the streets subjects everybody else on the street to whatever risks that gun may pose, and the others on the public fare have neither notice of the risk nor power to control it. This "externality" of unrestricted street carrying of concealed weapons is probably the root cause of the longstanding and broadly based history of restricting use of concealed weapons in public places.

3. Firearms and the Death Rate from Violence.

 The overlap between firearms and crime in the United States is a partial but important one. Of all so-called "index" crimes reported to the police nationwide (willful homicide, forcible rape, robbery, burglary, aggravated assault, larceny over

2

1  $50, motor vehicle theft, and arson), guns are known to be involved in only about 4%.

2  But gun use is concentrated in violent crime, where about 20% of all offenses involve

3  guns. And when only criminal acts that kill are counted, guns account for almost 70%

4  of all cases. Why are gun cases seven out of every ten lethal crimes, if firearms are

5  used in only one out of five violent criminal acts? Commonsense suggests that the

6  greater dangerousness of guns when compared to other frequently used instruments of

7  attack such as knives and blunt instruments, plays a major role in increasing the death

8  rate from crimes, but there is an alternative hypothesis, that robbers and assaulters who

9  truly want to kill will choose guns more often, and therefore that the greater death rate

10  simply reflects the more lethal intentions of those who use guns. Which theory is better

11  supported by studying patterns of violent assault?

12       A series of studies that were conducted under my supervision addressed this issue

13  from 1967 to 1988. The first study compared knife and gun attacks in Chicago over

14  four police periods in 1967. I found that when one only compared gun and knife

15  assaults to the same part of the body and controlled for the number of wounds inflicted,

16  the gun attacks were five times as likely to kill.[1] Yet knives were the second most

17  deadly instruments used in violent assault. A second study found that guns that fired

18  smaller bullets were much less likely to kill than guns firing larger bullets, again

19  controlling for both the number of and the location of the most life-threatening wound.

20  The central finding was that instrumentality effects – the influences of weapon

21  dangerousness independent of measurable variations in the attacker's intent was an

22  important influence in the death rate from assault.[2]

23       A second set of studies generated the same general results for the weapons used

24  in robberies. Since the robber usually doesn't mean to inflict harm if his demands are

25  _____

26  [1] Zimring, Franklin E. "Is Gun Control Likely to Reduce Violent Killings?" *University of Chicago Law Review* 35:721 (1968).

27  [2] Zimring, Franklin E. "The Medium is the Message: Firearms Caliber as a
28  Determinant of the Death Rate from Assault," *Journal of Legal Studies* 1:97 (1972). See Philip J. Cook, "The Technology of Personal Violence," *Crime and Justice* 14:1 (1991).

3

1    met, the death rate from all forms of robbery is much lower than from aggravated

2    assault, but robberies with firearms are much more likely to produce a victim's death

3    than robberies using knives or personal force.[3] The availability of guns may or may not

4    influence the rate of robberies, but the proportion of robberies that involve guns will

5    have a major impact on the number of victims who die in robberies, and lethal robberies

6    are a major element in the life-threatening violence that sets U.S. cities apart from the

7    major metropolitan areas of other developed nations.

8         The governmental interest in restricting the use of guns in violent crime is in

9    reducing the number of deaths and life-threatening injuries that are produced when guns

10   rather than less deadly weapons became instruments of robbery and assault.  This

11   interest is clear, appropriate and important for both the State of California and the

12   County and City of Los Angeles.

13        4.     The Special Risks of Handguns.

14        All forms of firearms are very dangerous to life if they are used in assaults and

15   robberies, but the handgun is the major hazard, particularly in big cities, because

16   handguns are much more likely to be used in criminal violence than shotguns and rifles.

17   Handguns are slightly more than one-third of all firearms owned by civilians in the

18   United States, but they are used in more than 75% of all gun killings and in even larger

19   portions of robberies.  The handgun is small, easy to carry and conceal, and deadly at

20   short range.  Handguns are the priority concern of law enforcement everywhere.[4]

21        The special dangers of handgun use in violence have produced a wide variety of

22   different legal strategies to minimize the rate of handgun misuse.  Many nations attempt

23   to restrict both the number of such firearms owned by citizens and reasons why citizens

24   might be permitted to own them.  But California, like most U.S. states, allows

25   _____

26   [3] Zimring, Franklin E. and James Zuehl. "Victim Injury and Death in Urban Robbery: A Chicago Study," *Journal of Legal Studies* 15:1 (1986).

27   [4] Zimring, Franklin E. and Gordon Hawkins. Crime Is Not the Problem: Lethal

28   Violence in America, New York: Oxford University Press (1997), Chapters 1, 3 and 7. See also Zimring, Franklin E. and Gordon Hawkins, The Citizen's Guide to Gun Control, New York: McMillan (1986), at Chapter 5, p. 38.

4

1   competent adults to own handguns if they have no major record of criminal conviction.

2       Because California does not restrict eligibility of most citizens to own handguns

3   or the volume of guns owned, the state's first line of defense against the use of such

4   weapons in street crime is a series of restrictions on the time, place and manner of

5   handgun use.  California law prohibits the carrying of concealed deadly weapons in

6   public without a special permit.  The state law delegates the authority to establish

7   standards and make individual decisions in Los Angeles to county and city law

8   enforcement and government.  The goal here is to distinguish uses of handguns that do

9   not pose a special threat to the public (such as storage and use in the owner's home)

10   from uses that pose greater threats to public safety (such as the carrying of concealed

11   weapons in streets and public places).  The special danger of a hidden handgun is that it

12   can be used against persons in public robbery and assault.  The concealment of a

13   handgun means that other citizens and police don't know it is in their shared space until

14   it is brandished.  Concealed handguns are a special problem for police because an

15   armed police officer has no warning that persons carrying concealed handguns are

16   doing so.  A police officer will be vulnerable to an element of surprise that will not be

17   present if a person is openly carrying a firearm.

18       Of course not all of those carrying concealed handguns intend to use them as

19   instruments of public harm.  But the existence of a loaded weapon is a hidden danger.

20   California's emphasis on controlling this risky use of guns rather than restricting

21   ownership itself is exactly opposite to the policy formerly pursued by Washington, D.C.

22   and disapproved in the *Heller* decision in 2008.  The distinction between restricting

23   ownership and restricting dangerous uses is fundamental in the design of firearms

24   control.  And no public law regulation of firearms is as old or as pervasive as

25   restrictions on public space use of firearms.

26       "The earliest and most numerous state and local laws relate to the carrying or use of firearms.  In the 1600s, Massachusetts prohibited the carrying of

27       defensive firearms in public places.  Kentucky in 1813, Indiana in 1819, Arkansas and Georgia in 1837 passed laws prohibiting the carrying of

28       concealed weapons.  Many states and most cities today have laws attempting to regulate what has been called the place and manner in which

5

1    firearms may be carried or used."[5]

2    Almost all places make special rules for concealed handguns in public places.

3    "Most often, state law prohibits the carrying of concealable firearms
     without a special permit and the discharge of guns within city
4    limits...Forty-nine states now impose some sort of restrictions on carrying
     a concealed gun."[6]

5

6    5.    The Public Danger of Concealed Firearms.

7    The previous section of this declaration documented the statistical dominance of

8    handguns in life-threatening violence but did not explain it. Why are handguns, a

9    minority of all firearms, responsible for three-quarters of all firearms deaths? Why are

10   handguns the overwhelmingly predominant firearm used in armed robbery?

11   This is a matter of simple criminal logistics. Most firearms assaults and almost all

12   firearms robberies take place outside the offender's home, so that using a firearm in

13   crime requires transporting it to a non-home location. But carrying a loaded shotgun to a

14   commercial location for a robbery or to somebody else's home or on the street while

15   looking for a target is a warning to potential victims and a red flag to passersby and to

16   any law enforcement personnel that the armed pedestrian is not on an ordinary errand.

17   Other pedestrians and motorists can avoid the visibly armed person and police can ask

18   questions and subject the visibly armed person to identity checks and surveillance.

19   But the person with a concealed handgun in his pocket generates no special notice

20   until the weapon appears at his criminal destination. The robber or assaulter looks no

21   different from any other user of common public spaces. And this ability to escape special

22   scrutiny is the advantage that makes the concealed handgun the dominant weapon of

23   choice for gun criminals and a special danger to government efforts to keep public spaces

24   _____

25   [5] Newton, George and Franklin E. Zimring, *Firearms and Violence in American
     Life*, staff report submitted to the National Commission on Causes and Prevention of
26   Violence, Washington D.C.: Government Printing Office (1969) at p. 87 (citations in
     original omitted).

27   [6] Zimring, Franklin E. and Gordon Hawkins, *The Citizen's Guide to Gun Control*
     (1986) at p. 123. A more recent compendium lists 47 states with special permits, see
28   www.lcav.org.

6

COLA Sep. Statement   00119

1  safe and secure.

2      The necessity of carrying guns to crime sites without detection is one reason why

3  the National Violence Commission research reported that 86% of all the firearms used in

4  all assaults were handguns and an astonishing 96% of all firearms robberies were

5  committed with handguns in the ten large cities the task force surveyed.[7]  What that

6  robbery percentage means is that the problem of gun robbery in American cities is almost

7  exclusively a problem of concealable handguns.

8      The stringent requirements that California, Los Angeles County and the City of

9  Los Angeles impose on persons wishing to have permits to carry loaded and concealed

10  guns have two strategic objectives.  The first and most important is to restrict drastically

11  the number of persons secretly armed on the streets of Los Angeles County.

12      Figure 1 shows the current control of the volume of California concealed weapons

13  (CCW) permits and the huge stakes of shifting to the standards asserted as rights by the

14  plaintiff in this litigation.  The current system of CCW licensing allows citizens in Los

15  Angeles to apply for CCW licenses either to the county sheriff or to their local police.

16  For this reason, only countywide rates of licensing can be determined without detail on

17  the city of residence for all who obtain county licenses.  Figure 1 provides countywide

18  population and CCW data.

19

20

21

22

23

24

25

26

27

28

---

[7] Newton, George and Franklin E. Zimring (1969), *Firearms and Violence in American Life*, at Figure 8-1, p. 49.

7

1   Figure 1.  Population and Licenses to Carry in Los Angeles County.



11  Sources: population (U.S.Census Bureau, State and County Quickfacts, Los Angeles County, California,
12  available at http://quickfacts.census.gov); permits (California Department of Justice, CCW Counts by
    County, 2000 through 2007, available at http://ag.ca.gov/firearms/forms/pdf/ccwissuances2007.pdf)

14      The rate per thousand adults of CCW permits is .16, indicating that fewer than one

15  of every 5,000 adults holds a permit.  By contrast, a system where all persons without

16  felony convictions, convictions for domestic violence crime or involuntary mental health

17  commitments would make more than 90% of Los Angeles adults eligible for permits.

18  That would be just under seven million potential carriers.

19      Making the carrying of hidden deadly weapons into a very rare privilege enables

20  citizens not to worry that they must choose between carrying a gun themselves or being

21  unarmed in public spaces where many strangers are secretly armed.  Restricting the

22  publicly entitled carriers of concealed handguns to a tiny number also reinforces the

23  practical monopoly of armed force by the police.  And the police are one of the primary

24  groups protected by small rates of carrying concealed guns since more than 90% of

25  killings of police are with guns.[5]

26      The special vulnerability of police to weapons concealed on a person is the element

27  of surprise in the event of an attack.  An openly carried firearm is a special danger to an

28
_____

[5] U.S. Department of Justice, Federal Bureau of Investigation, *Law Enforcement*

8

1    officer, but it is a known danger.  The police officer can be prepared to draw or use his
2    weapon when a weapon is on display.  But the person carrying a concealed handgun is a
3    hidden danger to an officer.  High rates of carrying concealed weapons put the police on
4    the horns of a dangerous dilemma—either they (1) make no assumptions about persons
5    being armed (in which case they are surprised and at a disadvantage when a concealed
6    weapon is drawn) or (2) assume everybody is carrying a loaded gun in which case they
7    will be much quicker to draw and fire their own guns even if no weapons are in fact held
8    by the person being approached.  So once a high rate of CCW takes place, the
9    relationship between armed police and citizens without any visible evidence of carrying
10   guns will get more dangerous for the police, for the citizen, or for both.

11          The second strategic aim of a permit-to-carry requirement is to screen those
12   persons who do have special needs for concealed guns to make sure they will not misuse
13   the guns they carry.  This kind of risk screening explains the good character, minimum
14   age and lack of criminal record requirements.  But the central reason to require a good
15   reason for needing a gun is to reduce the number of secretly armed citizens on the streets
16   and sidewalks of one of the biggest urban areas in the United States.

17          There is one factual dispute of central importance in the distinction between small
18   and large volumes of CCW permits—the degree to which criminal conduct is
19   concentrated among formally identified felons.  It is sometimes claimed that simply
20   excluding former felons would prevent persons with high risks of future crime from
21   being eligible to carry hidden handguns.  This claim is false.  A majority of criminal
22   homicides and other serious crimes are committed by individuals who have not been
23   convicted of a felony.  The first published study on this question found that in Chicago,
24   57% of those adults arrested for homicide did not have a felony record.[9]

25          It has more recently been reported that for all of New York State only 33% of all
26   persons arrested for felonies have a felony conviction at the time of arrest.  Thus, about
27
28   _____
     *Officers Killed and Assaulted* (2008), Table 27.
     [9] P.J. Cook, J. Ludwig and A. Braga, "Criminal Records of Homicide Offenders,"
     *Journal of the American Medical Association* 294(5), August 3, 2005.
                                           9

1. two-thirds of current felons would not be prohibited from eligibility under "shall issue"
2. criteria (meaning criteria wherein if a person has no prior felony conviction, domestic
3. violence conviction, or recent psychiatric commitment, said person would automatically
4. be entitled to a CCW permit).[10]

5.     My efforts to obtain good estimates of the overlap between active felons and those
6. previous convicted of crimes that might render them ineligible to obtain "shall issue"
7. style CCW permits have not yet produced comprehensive data.  The Los Angeles Police
8. Department provided information from 11 of 21 police divisions on homicide arrests,
9. covering 98 of the 221 homicide arrests for 2010, or about 44% of the total.  Not included
10. were complicated and high profile cases assigned to the centralized Robbery Homicide
11. Division or killings involving child abuse.  For the 98 reported persons, half had prior
12. felony convictions (49 of 98 or 50%), 38 had neither felony records nor prior convictions
13. for misdemeanors involving domestic violence (39%) and 11 other suspects had domestic
14. violence records that current state law uses as a basis for denying gun purchase eligibility
15. (11%). The rate of homicide arrestees with prior felony convictions taken from this
16. sample appears to possibly be inflated due to homicides of children and high-profile
17. homicide cases being excluded.  Even with that inflated number, it still shows that
18. approximately 39% of all persons arrested for homicide in the City of Los Angeles had
19. no prior felony or domestic violence convictions, which means they would be allowed to
20. have a CCW permits under a "shall issue" policy. (See Declaration of Conrado Torrez).

21.     We have broader data from the Los Angeles Sheriff's Department, which
22. incorporates other cities in Los Angeles County.  In 2009 there were 126,352 total
23. arrests, and 23,001 of them had prior felony convictions.    (See Embom Decl., ¶ 3;
24. LASD Arrest Statistics 2009, available at www.lasd.org.) Of those arrested in 2009,
25. 46,329 were felony arrests. (See id.)   Thus, even assuming that every single person
26. arrested in 2009 that had a prior felony conviction was a person arrested for a felony, half

27. ────────────────
28.    [10] Reported in expert's declaration of Philip J. Cook in Kachalsky v. Cacase, Civil
Action 10-cv-5413, Southern District of New York (2011).

10

1   of the persons arrested for felonies in 2009 would have been eligible for a CCW permit in

2   a "shall issue" policy state. This 50% minimum estimate grossly understates the probable

3   proportion of felony arrests that are attributable to persons not prohibited from CCW

4   licenses under "shall issue" criteria. [11]

5       The State of California and the City and County of Los Angeles believe that it

6   would threaten the public health and safety to have hundreds of thousands of people in

7   the county carrying loaded handguns that the people who share the streets and stores and

8   parks of Los Angeles cannot see. Is this public choice consistent with *D.C. v. Heller's*

9   conferral of a right to handgun ownership under the Second Amendment? Los Angeles

10  has never tried to restrict home possession, so it obviously believes that public places call

11  for different presumptive policies, and history is on Los Angeles' side. Special

12  restrictions on carrying concealed weapons are venerable and almost universal. Even the

13  plaintiff in this suit does not question the legitimacy of a special license for carrying

14  weapons. The central question is whether publicly concealed weapons can be restricted

15  even if possession in the home is protected by *Heller*.

16      6.    The External Dangers of Concealed Weapons in Public Spaces.

17      The right of home possession announced in the *Heller* case does not require

18  citizens to purchase and own handguns in their houses but rather confers on individuals

19  the right to decide for themselves if the benefits of gun possession in the home outweigh

20  the risks. So the Second Amendment liberty announced in *Heller* puts the homeowner in

21  a position of power to determine what risks to take. As long as the guns owned in the

22  home stay there, Mr. Smith's gun is no risk to his neighbors. But the presence of loaded

23

24      [11] The most comprehensive estimate of the aggregate criminal involvement of persons not prohibited from CCW licenses by "shall issue" criteria is our request to the

25  California Department of Justice to provide the percentage of all felony arrests subject to criminal record checks in 2010 that produced a felony conviction recorded in the state

26  data that would be used in any CCW screening. Because of a shortage of programmers

27  related to the state's current fiscal problems, this data is not yet available. I will report it in a brief supplemental declaration when it is completed.

28

COLA Sep. Statement   00124

1   and concealed guns in public spaces is an act where Mr. Smith's decision will generate

2   risks to others who use the streets, and go to public accommodations. And if the guns are

3   concealed, the people who are exposed to these risks won't have notice or any ability to

4   avoid the armed presence they confront.

5        This "externality" means that the implications of concealed carrying are spread

6   over the community of users of public space and the only method of deciding policy is a

7   collective determination of whether concealed weapon carrying should be allowed and

8   under what circumstances.

9        So government must be involved in public space regulation in a way that is not

10   necessary in the privacy of individual homes. This is why concealed weapons laws are

11   the oldest form of legal regulation of gun use and the most common. There is a public

12   choice that must be made to reduce the number of persons carrying concealed weapons

13   by limiting licenses. But without a general rule on the standard for licenses, there is no

14   way that individual preferences for or against high rates of permits can be translated into

15   a regulatory framework.

16        I declare under penalty of perjury that the forgoing is true and correct. Executed at

17   _Fort Walton Beach, FL._, this _11th_ of April 2011.

18

19                                    _Franklin_
                                      FRANKLIN E. ZIMRING

20

21

22

23

24

25

26

27

28

12

## FRANKLIN E. ZIMRING

9 September 2010

**PERSONAL**  Born 1942, Los Angeles, California; married; two adult children.

**EDUCATION**  Los Angeles Public Schools; B.A. with Distinction, Wayne State University (1963); J.D. *cum laude*, University of Chicago (1967).

**PRESENT POSITION**  **WILLIAM G. SIMON PROFESSOR OF LAW; WOLFEN DISTINGUISHED SCHOLAR** and **CHAIR**, Criminal Justice Research Program, Institute for Legal Research (formerly the Earl Warren Legal Institute), Boalt Hall School of Law, University of California, Berkeley.

**OTHER WORK**  **Principal Investigator**, Center on Culture, Immigration and Youth Violence Prevention (2005-).

**DIRECTOR**, Earl Warren Legal Institute (1983-2002).

**FACULTY OF LAW**, University of Chicago (1967-85): **KARL N. LLEWELLYN PROFESSOR OF JURISPRUDENCE** (1982-85) and **DIRECTOR**, Center for Studies in Criminal Justice (1975-85).

**MEMBER,** MacArthur Foundation Research Program on Adolescent Development and Juvenile Justice (1997-2007).

**FELLOW**, Center for Advanced Studies in the Behavioral Sciences, Stanford, California (1979-80).

**RAPPORTEUR**, Task Force on Sentencing Policy for Young Offenders, Twentieth Century Fund (1978).

**VISITING PROFESSOR OF LAW**, University of California, Irvine (2004), University of South Africa (1993), University of California, Berkeley (1983-85), Yale University (1973), and University of Pennsylvania (1972).

**DIRECTOR OF RESEARCH**, Task Force on Firearms, National Commission on the Causes and Prevention of Violence (1968-69).

**CONSULTANT:**  American Bar Foundation, Police Foundation, National Commission on Reform of Federal Criminal Laws, Institute for Defense Analysis, Department of Justice, Rand Corporation, Abt Associates, Federal Parole Commission, Federal Bureau of Prisons, Federal Bureau of Investigation, General Accounting Office, Canadian Institute for Advanced Studies, States of Alaska, California, Nebraska, Illinois, Virginia, and Washington, Cities of Chicago, New York and San Francisco.

**ADVISORY POSTS**  CURRENT: Campaign for Youth Justice (2007-); California Attorney General's Office (2001-); National Policy Committee, American Society of Criminology (1989-91 and 1993-); Board of Directors, Illinois Youth Services Association (Honorary) (1977-); Advisory Committee, National Pre-Trial Services Association (1975-).

PAST: Asian Pacific Violence Prevention Center, National Council on Crime and Delinquency (2001-2005); Advisory Committee, Sentencing Project, American Law Institute (2001-2003); Criminal Justice Policy Group, Advisory Board, National Campaign Against Youth Violence (2000-2002); Expert Panel Member, U.S. Department of Transportation, National Highway Traffic Safety Administration Panel on Crash Risk of Alcohol-Involved Driving (1994-2002); Expert Panel Member, U.S. Department of Education Panel on Safe, Disciplined, and Drug-Free Schools (1998-2001); National Research Council Panel on Juvenile Crime: Prevention, Intervention, and Control (1998-2001); Advisory Board, Center on Crime, Communities, and Culture, Open Society Institute (1998-2000); Affiliated Expert, Center for Gun Policy and Research, Johns Hopkins University (1995-98); Gun Violence Advisory Group, American College of Physicians (1995-98); Advisory Committee, Violent and Serious

Juvenile Offender Project, National Council on Crime and Delinquency (1994-1997); Panel on NIH Research on Anti-Social, Aggressive, and Violence-Related Behaviors and their Consequences (1997-); Task Force on Future Directions for the National Archive of Criminal Justice Data, Bureau of Justice Statistics, Department of Justice (1995); Panel on Antisocial, Aggressive, and Violence-Related Behaviors and Their Consequences, National Institute of Health (1993-94); Panel on Understanding and Control of Violent Behavior, National Research Council, National Academy of Sciences (1989-91); Research Advisory Committee, California Attorney General (1983-1990); Law Enforcement Committee, California Governor's Policy Council on Drug and Alcohol Abuse (1989-91); National Research Council, Working Group Crime and Violence (1985-88); Internal Revenue Service, Advisory Group Taxpayer Compliance Research (1983-87); Board of Directors, Eisenhower Foundation for the Prevention of Violence (1981-84); U.S. Secret Service Advisory Committee on Protection of the President (1981-82); Assembly of Behavioral and Social Sciences, National Academy of Sciences (1977-80); Executive Committee, Illinois Academy of Criminology (1968-71, 1977-78); Advisory Committee, Assessment Center for Alternatives to Juvenile Courts (1977-78) (chairman); Advisory Committee, Law and Social Science Program, National Science Foundation (1976-77); Advisory Committee, Vera Institute of Justice, Court Employment Project Evaluation (1976-77) (chairman); Panel on Deterrence and Incapacitation, National Academy of Sciences (1975-77); Legal Committee, American Civil Liberties Union, Illinois Branch (1967-70).

**EDITORIAL BOARDS**
CURRENT:  Punishment and Society (1998-); Crime and Justice:  An Annual Review of Research (1979-90, 1998-); Western Criminology Review (1997-); Buffalo Criminal Law Review (1996-); Homicide Studies (1996-); The Prison Journal (1992-); Journal of Research in Crime and Delinquency (1976-84, 1990-); Federal Sentencing Reporter (1988-); Studies in Crime and Justice (1980-); Journal of Criminal Justice (1978-).

PAST:  Law and Society Review (1988-1998); British Journal of Criminology (1988-1996);  Journal of Quantitative Criminology (1984-1989); Ethics, (1985-87); Encyclopedia of Crime and Justice (1979-83); Evaluation Quarterly (1976-84); Law and Behavior (1976-85).

**HONORS**
Edwin H. Sutherland Award, American Society of Criminology (2007); August Vollmer Award, American Society of Criminology (2006); Notable Book of the Year, *The Economist* (2003); Society of Research on Adolescence, Biannual Book Award (2002); Pass Award, National Council on Crime and Delinquency (1999); Donald Cressey Award, National Council on Crime and Delinquency (1995); Choice, Outstanding Academic Book Citation (1995 and 1982); Paul Tappan Award, Western Society of Criminology (1994); Fellow, American Society of Criminology (1993); Distinguished Alumni Award, Wayne State University (1989); Bustin Prize for Legal Research, University of Chicago (1981); Cooley Lecturer, University of Michigan Law School (1980); National Distinguished Alumnus Award, Delta-Sigma-Rho (1977); Ten Law Professors Who Shape the Future, *Time Magazine* (1977); Civilian Award of Merit for 1975, Chicago Crime Commission; Gavel Award Certificate of Merit, American Bar Association (1973).

**MEMBER**
American Academy of Arts and Sciences (1990-); California Bar Association (1968-); Order of the Coif (1967-); Phi Beta Kappa (1964-).

**BOOKS AND MONOGRAPHS**

(with David T. Johnson) *The Next Frontier: National Development, Political Change, and the Death Penalty in Asia,* New York: Oxford University Press (January 2009).

(with Bernard E. Harcourt) *Criminal Law and the Regulation of Vice,* American Casebook Series, St. Paul: Thompson/West Publishers (2007).

*The Great American Crime Decline,* New York: Oxford University Press (2006).

*American Juvenile Justice,* New York: Oxford University Press (2005); (Korean translation) Prime Books (November 2009).

*An American Travesty: Legal Responses to Adolescent Sexual Offending,* Chicago: University of Chicago Press (2004); paperback edition (2009).

*The Contradictions of American Capital Punishment,* New York: Oxford University Press (2003); paperback edition (2004); (Chinese translation) Shanghai Joint Publishing (2008).

(with Margaret Rosenheim, David Tanenhaus, and Bernardine Dohrn, eds.) *A Century of Juvenile Justice,* Chicago: University of Chicago Press (2002); (Chinese translation) Beijing: The Commercial Press (2008).

(with Gordon Hawkins and Sam Kamin) *Punishment and Democracy: Three Strikes and You're Out in California,* New York: Oxford University Press (2001).

(with Jeffrey Fagan, ed.) *The Changing Borders of Juvenile Justice: Transfer from Juvenile to Criminal Court,* Chicago: University of Chicago Press (2000).

(with Sam Kamin and Gordon Hawkins) *Crime and Punishment in California: The Impact of Three Strikes and You're Out,* Berkeley: Institute of Governmental Studies (1999).

*American Youth Violence,* New York: Oxford University Press (1998); paperback edition (2000).

(with Gordon Hawkins) *Crime Is Not the Problem: Lethal Violence in America,* New York: Oxford University Press (1997); paperback edition (1999).

(with Gordon Hawkins) *Incapacitation: Penal Confinement and the Restraint of Crime,* New York: Oxford University Press (1995); paperback edition (1997).

(with Gordon Hawkins) *Prison Population and Criminal Justice Policy in California,* Berkeley: Institute of Governmental Studies (1992).

(with Gordon Hawkins) *The Search for Rational Drug Control,* New York: Cambridge University Press (1992); paperback edition (1995).

(with Gordon Hawkins) *The Scale of Imprisonment,* Chicago: University of Chicago Press (1991); paperback edition (1993).

(with Gordon Hawkins) *Pornography in a Free Society,* New York: Cambridge University Press (1988); paperback edition (1991).

(with Michael Laurence and John Snortum, eds.) *Social Control of the Drinking Driver,* Chicago: University of Chicago Press (1988).

(with Gordon Hawkins) *The Citizen's Guide to Gun Control,* New York: Macmillan Publishing Company (1987); paperback edition (1992).

(with Gordon Hawkins) *Capital Punishment and the American Agenda*, New York: Cambridge University Press (1987); paperback edition (1989).

(with Mark Siegler, Steven Toulman, Kenneth Schaffner, eds.) *Medical Innovation and Bad Outcomes: Legal, Social, and Ethical Responses*, Ann Arbor, MI: Health Administration Press (1987).

(with Gordon Hawkins, ed.) *The Pursuit of Criminal Justice: Essays From the Chicago Center*, Chicago: University of Chicago Press (1984); Midway reprint edition (1986).

(with Michael Tonry, ed.) *Reform and Punishment: Essays on Criminal Sentencing*, Chicago: University of Chicago Press (1983).

*The Changing Legal World of Adolescence*, New York: The Free Press (1982); paperback edition (1985).

-(with Richard Frase) *The Criminal Justice System: Materials on the Administration and Reform of the Criminal Law*, Boston: Little, Brown and Company (1980).

*Confronting Youth Crime: Report of the Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders*, New York: Holmes and Meier (1978).

(with Gordon Hawkins) *Deterrence: The Legal Threat in Crime Control*, Chicago: University of Chicago Press (1973); Phoenix edition (1976).

*Perspectives on Deterrence*, Washington, D.C.: National Institute of Mental Health (1971).

(with George P. Newton) *Firearms and Violence in American Life*, Task Force Report to the National Commission on the Causes and Prevention of Violence, Washington, D.C.: U.S. Government Printing Office (1969).

## SCHOLARLY ARTICLES

(with Jeffrey Fagan and David T. Johnson) Executions, Deterrence, and Homicide: A Tale of Two Cities *Journal of Empirical Legal Studies* 7:1-29 (March 2010).

Delinquency, Opportunity and the Second Generation Immigrant Puzzle, in Frost, et al, eds., *Contemporary Issues in Criminal Justice Policy: Policy Proposals from the American Society of Criminology Conference,* Wasdworth/Cenage Learning (2010) 247-249.

Juvenile Crime, in Shweder, et al, eds., *The Child: An Encyclopedic Companion*, University of Chicago Press (2009) 217-219.

Debating a Federal Sentencing Commission circa 1978, *Federal Sentencing Reporter* 21:271 (April 2009).

(with Alex Piquero, Wesley Jennings and Stephanie Hays) Investigating the Continuity of Sex Offending: Evidence from the Second Philadelphia Birth Cohort *Justice Quarterly* 26:59 (March 2009).

(with Chrysanthi S. Leon) A Cite Checker's Guide to Sexual Dangerousness, *Berkeley Journal of Criminal Law* 13:65 (Spring 2008).

Public Sentiment, Political Action, and Governmental Crime Policy–On the Origins and Significance of Mixed Feelings, *Criminology and Public Policy* 7:467 (August 2008).

Criminology and Its Discontents: The American Society of Criminology 2007 Sutherland Address, *Criminology* 46:255 (May 2008)

Violence and Drugs: Divide, Then Conquer? *Berkeley Review of Latin American Studies* pp. 40-41 (Spring 2008).

Handgun Control, The Second Amendment and Judicial Legislation in the D.C. Circuit: A Note on *Parker v. District of Columbia, New Criminal Law Review* 2:312 (2008).

(with David Johnson) Law, Society and Capital Punishment in Asia, *Punishment & Society* 10:103 (2008); also published in *Criminal Law Review* 19:109, (translated into Chinese by Richard Chiang for Peking University Press) (2006).

(with Gordon Hawkins) Crime Is Not the Problem: Lethal Violence in America, in Mary E. Vogel, ed., *Crime, Inequality and the State,* Routledge (2007).

Protect Individual Punishment Decisions from Mandatory Penalties, *Criminology and Public Policy* 6:881 (November 2007).

(with Alex Piquero and Wesley Jennings) Sexual Delinquency in Racine: Does Early Sex Offending Predict Later Sex Offending in Youth and Young Adulthood? *Criminology and Public Policy* 6:507 (August 2007).

Vollmer Award Address: The Necessity and Value of Transnational Comparative Study—Some Preaching from a Recent Convert, *Criminology and Public Policy* 5:615 (November 2006).

(with David Johnson) Taking Capital Punishment Seriously, *Asian Criminology* 1:89 (2006).

(with Cheryl Marie Webster and Anthony N. Doob) Proposition 8 and Crime Rates in California: The Case of the Disappearing Deterrent, *Criminology and Public Policy* 5:1501 (August 2006).

(with Jeffrey Fagan and Amanda Geller) Capital Punishment and Capital Murder: Market Share and the Deterrent Effects of the Death Penalty, *Texas Law Review* 84:1803 (June 2006).

(with David Johnson) Public Opinion and the Governance of Punishment in Democratic Political Systems, *The Annals of The American Academy of Political and Social Science* 605:266 (May 2006).

(with David Johnson) On the Comparative Study of Corruption, *British Journal of Criminology* 45:793 (2005); also in the *Pacific McGeorge Global Business and Development Law Journal* 20:243 (2007) and in K. Padmaja, ed., *Corruption: Socio Legal Dimensions,* The ICFAI University Press (2008).

Penal Policy and Penal Legislation in Recent American Experience, *Stanford Law Review* 58:323 (2005).

Path Dependence, Culture and State-Level Execution Policy: A Reply to David Garland, *Punishment and Society* 7:377 (2005).

Minimizing Harm from Minority Disproportion, in Darnell F. Hawkins and Kimberly Kempf-Leonard, eds., *Our Children, Their Children: Confronting Racial and Ethnic Differences in American Juvenile Justice,* University of Chicago Press (2005).

Política Criminal y Legislación Penal en la Experiencia Estadounidense Reciente [Criminal Policy and Penal Legislation in the Recent American Experience], in José Luis Díez Ripollés, Ana María Prieto del Pino and Susana Soto Navarro, eds., *La Política Legislative Penal en Occidente: Una Perspectiva Comparada* [Legislative Penal Policy in the West: A Comparative Perspective], Tirant lo Blanch (2005).

In Memoriam: Norval Morris (1923-2004), *The University of Chicago Law Review* 72:459 (2005).

The Unexamined Death Penalty: Capital Punishment and Reform of the Model Penal Code, *Columbia Law Review* 105:1396 (2005).

Symbol and Substance in the Massachusetts Commission Report, *Indiana Law Journal* 80:115 (2005).

(with Michael Vitiello, Clark Kelso, Erwin Chemerinsky, Kevin Reitz, and Jonathan Turley) A Proposal for a Wholesale Reform of California's Sentencing Practice and Policy, *Loyola of Los Angeles Law Review* 38:903 (2004).

The Discrete Character of High-Lethality Youth Violence, *Youth Violence: Scientific Approaches to Prevention, Annals of the New York Academy of Sciences* 1036:290 (2004).

The Weakest Link: Human Rights and the Criminal Offender in Modern Democratic Government, in Gerben Bruinsma, Henk Elffers, and Jan de Keijser, eds., *Punishment, Places, and Perpetrators: Developments in Criminology and Criminal Justice Research,* Wilan Publishing (2004).

Firearms, Violence, and the Potential Impact of Firearms Control, *The Journal of Law, Medicine, and Ethics* 32:34 (2004).

(with Gordon Hawkins) Democracy and the Limits of Punishment: A Preface to Prisoners' Rights, in Michael Tonry, ed., *The Future of Imprisonment,* Oxford University Press (2004).

Continuity and Change in the American Gun Debate in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence,* Washington, DC: Brookings Institution Press (2003); also as Chapter 1 in Bernard E. Harcourt, ed., *Guns, Crime, and Punishment in America*, New York: New York University Press (2003).

The Peculiar Present of American Capital Punishment in Stephen P. Garvey, ed., *Beyond Repair? America's Death Penalty*, Durham, NC: Duke University Press (2003).

(with Sam Kamin) Facts, Fallacies, and California's Three Strikes, *Duquesne Law Review* 40:605 (2002).

(with Gordon Hawkins) Capital Punishment, in *Oxford Companion to American Law*, New York: Oxford University Press (2002).

The New Politics of Criminal Justice:  Of "Three Strikes," Truth-in-Sentencing, and Megan's Laws, *National Institute of Justice Research Report, Perspectives on Crime and Justice: 1999-2000 Lecture Series, Washington, DC,* Volume 4 (March 2001).

Crime, Criminal Justice, and Criminology for a Smaller Planet: Some Notes on the 21st Century (Noriyoshi Takemura, translator), *Toin Law Review* 8:75 (2001)

Crime, Criminal Justice, and Criminology for a Smaller Planet: Some Notes on the 21st Century, *The Australian and New Zealand Journal of Criminology* 34:213 (2001)

Imprisonment Rates and the New Politics of Criminal Punishment, *Punishment and Society* 3:161 (2001); also as Chapter 10 in David Garland, ed., *Mass Imprisonment: Social Causes and Consequences*, London: Sage Publications (2001).

The Common Thread: Diversion in Juvenile Justice, *California Law Review* 88:2477 (2000); also as Chapter 5 in (with Margaret Rosenheim, David Tanenhaus, and Bernardine Dohrn, eds.) *A Century of Juvenile Justice*, Chicago: University of Chicago Press (2002).

(with Jeffrey Fagan) The Search for Causes in an Era of Declining Crime Rates: Some Lessons from the Study of New York City Homicide, *Crime and Delinquency* 46:446 (2000).

Incarceration Patterns, in *Mass Incarceration: Perspectives on U.S. Imprisonment, University of Chicago Law School Roundtable, A Journal of Interdisciplinary Legal Studies*, Volume 7 (2000).

Penal Proportionality and the Young Offender: Notes on Immaturity, Capacity, and Diminished Responsibility, in Thomas Grisso and Robert G. Schwartz, eds., *Youth on Trial*, Chicago: University of Chicago Press (2000).

The Punitive Necessity of Waiver, Chapter 6 in Fagan and Zimring, eds., *The Changing Borders of Juvenile Justice*, Chicago: University of Chicago Press (2000).

(with Jeffrey Fagan) Transfer Policy and Law Reform, Chapter 12 in Fagan and Zimring, eds., *The Changing Borders of Juvenile Justice*, Chicago: University of Chicago Press (2000).

American Youth Violence: Implications for National Juvenile Justice Policy, *Update on Law-Related Education* (American Bar Association publication) 23:6 (1999).

The Hardest of the Hard Cases: Adolescent Homicide in Juvenile and Criminal Courts, *Virginia Journal of Social Policy and the Law*, 6:437 (1999).

The 1990s Assault on Juvenile Justice: Notes from an Ideological Battleground, *Federal Sentencing Reporter* 11:260 (1999).

(with Jeffrey Fagan and June Kim) Declining Homicide in New York City: A Tale of Two Trends, *Journal of Criminal Law and Criminology* 88:1277 (1998); also (with Jeffrey Fagan) as Le Cause Della Diminuzione Dei Reati: Alcune Riflessioni Sull'Analisi Degli Omicidi a New York, in Marzio Barbagli, ed., *Perché É Diminuita La Criminalità Negli Stati Uniti?* Società Editrice Il Mulino (2000).

The Executioner's Dissonant Song: On Capital Punishment and American Legal Values, Chapter 6 in Austin Sarat, ed., *Killing State: Capital Punishment in Law, Politics, and Culture*, Oxford University Press (1999); also in *Institute for Philosophy and Public Policy Report* 19:1 (1999).

(with Gordon Hawkins) Public Attitudes Toward Crime: Is American Violence A Crime Problem? in Edward Rubin, ed., *Minimizing Harm: A New Crime Policy for Modern America*, Westview Press (1999).

Toward a Jurisprudence of Youth Violence, in Michael Tonry and Mark Moore, eds., *Youth Violence. Crime and Justice: A Review of Research*, University of Chicago Press (1998).

The Youth Violence Epidemic: Myth or Reality?, *Wake Forest Law Review* 33:727 (1998).

(with Gordon Hawkins) Crime Is Not the Problem: A Reply, *University of Colorado Law Review* 69:1177 (1998).

(with Gordon Hawkins) Lethal Violence and the Overreach of American Imprisonment, *National Institute of Justice Research Report, Presentations from the 1996 Annual Research and Evaluation Conference, Washington, DC*, July 1997.

Juvenile Violence in Policy Context, *Valparaiso University Law Review* 31:419 (1997).

The Doom of a Good Intention, *Politics and the Life Sciences* 16:44 (1997).

(with Gordon Hawkins) Concealed Handguns: The Counterfeit Deterrent, *The Responsive Community*, Spring 1997, p. 46.

Kids, Guns, and Homicide: Policy Notes on an Age-Specific Epidemic, *Law and Contemporary Problems* 59:25 (1996).

Populism, Democratic Government, and the Decline of Expert Authority: Some Reflections on "Three Strikes" in California, *Pacific Law Journal* 28:243 (1996).

(with Gordon Hawkins) Is American Violence a Crime Problem?, *Duke Law Journal* 46:43 (1996); also in Edward Rubin, ed., *Minimizing Harm as a Goal for Crime Policy in California*, California Policy Seminar Policy Research Program Report (1997).

The Wages of Ambivalence: On the Context and Prospects of New York's Death Penalty, *Buffalo Law Review* 44:303 (1996).

(with Adolfo Ceretti and Luisa Broli) Crime Takes a Holiday in Milan, *Crime and Delinquency* 42:269 (1996).

The Genetics of Crime, *Politics and the Life Sciences* 15:105 (1996).

(with Gordon Hawkins) Toward a Principled Basis for Federal Criminal Legislation, *The Annals of the American Academy of Political and Social Science* 543:15 (1996).

Firearms Control in Federal Law in the United States: Current Conditions and Further Choices, *UNAFEI Resource Materials Series*, No. 46 (Materials Produced during the 96th International Seminar Course on the "Promotion of International Cooperation in Criminal Justice Administration), p. 117 (1995).

Reflections on Firearms and the Criminal Law, *Journal of Criminal Law and Criminology* 86:1 (1995).

(with William Nelson) Cigarette Taxes as Cigarette Policy, *Tobacco Control* 4:S25 (1995).

(with Gordon Hawkins and Hank Ibser) Estimating the Effects of Increased Incarceration on Crime in California, *California Policy Seminar Brief*, Volume 7, July 1995.

(with Johannes van Vuren and Jan van Rooyen) Selectivity and Racial Bias in a Mandatory Death Sentence Dispensation: A South African Case Study, *Comparative and International Law Journal of Southern Africa* 28:107 (1995); Misleading Statistics and the Death Penalty -- Two Authors Reply to Henry Lever, *Comparative and International Law Journal of Southern Africa* 30:364 (1997).

(with Gordon Hawkins) The Growth of Imprisonment in California, *British Journal of Criminology* 34:83 (1994).

Policy Research on Firearms and Violence, *Health Affairs* 12:109 (1993).

(with Gordon Hawkins) Crime, Justice, and the Savings and Loan Crisis, *Crime and Justice* 18:247 (1993).

(with Gordon Hawkins) Continuity and Focus in Criminal Justice Research, *Journal of Research in Crime and Delinquency* 20:525 (1993).

Comparing Cigarette Policy and Illicit Drug and Alcohol Control, in Robert Rabin and Stephen Sugarman, eds., *Smoking Policy: Law, Politics, and Culture*, Oxford University Press (1993).

On the Liberating Virtues of Irrelevance, *Law and Society Review* 27:9 (1993).

Drug Treatment as a Criminal Sanction, *University of Colorado Law Review* 64:809 (1993).

Prison Population and Criminal Justice Policy in California, *California Policy Seminar Brief*, Volume 4, August 1992.

Inheriting the Wind:  The Supreme Court and Capital Punishment in the 1990s, *Florida State University Law Review* 20:1 (1992).

The Jurisprudence of Teenage Pregnancy, in Margaret Rosenheim and Mark Testa, eds., *Early Parenthood and Coming of Age in the 1990s*, Rutgers University Press (1992).

The Multiple Middlegrounds Between Civil and Criminal Law, *Yale Law Journal* 101:1901 (1992).

(with Gordon Hawkins) What Kind of Drug War?, *Social Justice* 18:104 (1991).

Firearms, Violence, and Public Policy, *Scientific American*, November 1991, p. 48; also in Robert K. Miller, ed., *The Informed Argument*, Harcourt Brace (1995); K. Ackley, ed., *Perspective on Contemporary Issues*, Harcourt Brace (1996).

Ambivalence in State Capital Punishment Policy:  An Empirical Sounding, *New York University Review of Law and Social Change* 18:729 (1991).

(with Gordon Hawkins) The Wrong Question:  Critical Notes on the Decriminalization Debate, in Melvyn Krauss and Edward Lazear, eds., *Search for Alternatives:  Drug-Control Policy in the United States*, Hoover Institution Press (1991).

The Limits of Criminal Punishment:  Some Ethical Issues for the 1990s, in David Gordis, ed., *Crime, Punishment, and Deterrence:  An American-Jewish Exploration*, University of Judaism (1991).

The Treatment of Hard Cases in American Juvenile Justice:  In Defense of Discretionary Waiver, *Notre Dame Journal of Law, Ethics and Public Policy* 5:267 (1991).

Punishing the Drinking Driver:  Toward an Experimental Design, *Alcohol, Drugs, and Driving* 6:199 (1990).

(with Gordon Hawkins) On the Scale of Imprisonment:  Downes's *Contrasts in Tolerance*, *Journal of the American Bar Foundation* 14:527 (1989).

The Problem of Assault Firearms, *Crime and Delinquency* 35:538 (1989).

Methods for Measuring General Deterrence:  A Plea for the Field Experiment, in Martin Friedland, ed., *Sanctions and Rewards in the Legal System*, University of Toronto Press (1989).

(with Gordon Hawkins) The Path Toward the Abolition of Capital Punishment in the Industrial West, *Revue Internationale de Droit Penal* 58:669 (1988).

(with Gordon Hawkins) The New Mathematics of Imprisonment, *Crime and Delinquency* 34:425 (1988); Response to Zedlewski, *Crime and Delinquency* 35:316 (1989).

(with Gordon Hawkins) Murder, the Model Code, and the Multiple Agendas of Reform, *Rutgers Law Journal* 19:733 (1988).

Law, Society, and the Drinking Driver:  Some Concluding Reflections, in Michael Laurence, John Snortum, and Franklin Zimring, eds., *Social Control of the Drinking Driver*, University of Chicago Press (1988).

Principles of Criminal Sentencing, Plain and Fancy, *Northwestern University Law Review* 82:73 (1987).

Legal Perspectives on Family Violence, *California Law Review* 75:521 (1987); also as Toward a Jurisprudence of Family Violence, in Lloyd Ohlin and Michael Tonry, eds., *Family Violence*, University of Chicago Press (1989).

(with Gordon Hawkins) Dangerousness and Criminal Justice, *Michigan Law Review* 85:481 (1987).

Some Social Bases for Compensation Schemes, in Mark Siegler, Steven Toulman, Franklin Zimring, and Kenneth Schaffner, eds., *Medical Innovation and Bad Outcomes: Legal, Social, and Ethical Responses*, Health Administration Press (1987).

(with Gordon Hawkins) A Punishment in Search of a Crime:  Standards for Capital Punishment in the Law of Criminal Homicide, *Maryland Law Review* 46:1001 (1986).

Gun Control, *Bulletin of New York Academy of Medicine* 62:5 (1986).

(with James Zuehl) Victim Injury and Death in Urban Robbery:  A Chicago Study, *Journal of Legal Studies* 15:1 (1986).

(with Gordon Hawkins) Cycles of Reform in Youth Corrections:  The Story of Borstal, in Peter Greenwood, ed., *The Juvenile Rehabilitation Reader*, Rand Corporation (1985).

(with Gordon Hawkins) Western European Perspectives on the Treatment of Young Offenders, in Peter Greenwood, ed., *The Juvenile Rehabilitation Reader*, Rand Corporation (1985).

(with Gordon Hawkins) Capital Punishment and the Eighth Amendment:  Furman and Gregg in Retrospect, *UC Davis Law Review* 18:927 (1985).

Violence and Firearms Policy, in Lynn Curtis, ed., *American Violence and Public Policy*, Yale University Press (1985).

(with Rayman Solomon) The Principle of the Thing:  Goss v. Lopez, Student Rights, and Litigation in the Public Interest of Children, in Robert Mnookin, ed., *In the Interest of Children:  Advocacy, Law Reform, and Public Policy*, Part VI, W.H. Freeman (1985).

Youth Homicide in New York:  A Preliminary Analysis, *Journal of Legal Studies* 13:81 (1984).

Sentencing Reform in the States, in Franklin Zimring and Michael Tonry, eds., *Reform and Punishment:  Essays on Criminal Sentencing*, University of Chicago Press (1983).

(with Satyanshu K. Mukherjee and Barrik Van Winkle) Intimate Violence:  A Study of Intersexual Homicide in Chicago, *University of Chicago Law Review* 50:910 (1983).

Kids, Groups, and Crime:  Some Implications of a Well-Known Secret, *Journal of Criminal Law and Criminology* 72:867 (1981).

Handguns in the Twenty-First Century:  Alternative Policy Futures, *The Annals of the American Academy of Political and Social Sciences* 455:1 (1981).

Secret Service "Dangerousness" Research, in Jane Takeuchi, Frederic Solomon, and W. Walter Menniger, eds., *Behavioral Science and the Secret Service:  Toward the Prevention of Assassination*, National Academic Press (1981).

Notes Toward a Jurisprudence of Waiver, in John Hall, Donna Hamparian, John Pettibone, and Joseph White, eds., *Issues in Juvenile Justice Information and Training*, Academy of Contemporary Problems (1981).

Privilege, Maturity, and Responsibility:  Notes on the Emerging Jurisprudence of Adolescence, in Lamar Empey, ed., *The Future of Childhood and Juvenile Justice*, University Press of Virginia (1980).

American Youth Violence:  Issues and Trends, in Norval Morris and Michael Tonry, eds., *Crime and Justice:  A Review of Research*, University of Chicago Press (1979).

(with Gordon Hawkins) Ideology and Euphoria in Crime Control, *Toledo Law Review* 10:370 (1979).

Pursuing Juvenile Justice:  Comments on Some Recent Reform Proposals, *University of Detroit Journal of Urban Law* 55:631 (1978).

Policy Experiments in General Deterrence, 1970-1975, in Alfred Blumstein, Jacqueline Cohen, and Daniel Nagin, eds., *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates*, National Academy of Science (1978).

Bad Checks in Nebraska:  A Study of Complex Threats, in Greenburg, ed., *Punishment and Corrections*, Sage Publications (1977).

The Serious Juvenile Offender:  Notes on an Unknown Quantity, in *The Serious Juvenile Offender: Proceedings of a National Symposium Held in Minneapolis, Minnesota on September 19 and 20, 1977*, U.S. Government Printing Office (1978).

Determinants of the Death Rate from Robbery:  A Detroit Time Study, *Journal of Legal Studies* 6:317 (1977).

Making the Punishment Fit the Crime:  A Consumer's Guide to Sentencing Reform, *Hastings Center Reports*, December 1976; also in University of Chicago Law School, *Occasional Papers*, No. 12 (1977); Hyman Gross and Andrew von Hirsch, eds., *Sentencing*, Oxford University Press (1981); Culbertson and Tezak, eds., *Order Under Law*, Waveland Press (1981).

(with Joel Eigen and Sheila O'Malley) Punishing Homicide in Philadelphia:  Perspectives on the Death Penalty, *University of Chicago Law Review* 43:227 (1976); also in Hugo Bedau and Chester Pierce, eds., *Capital Punishment in the United States*, AMS Press (1976); *Civil Rights*, Staff Report of the Sub-Committee on Constitutional Rights of the Committee on the Judiciary, U.S. Senate (1976).

Street Crime and New Guns:  Some Implications for Firearms Control, *Journal of Criminal Justice* 4:95 (1976).

Field Experiments in General Deterrence:  Preferring the Tortoise to the Hare, *Evaluation Magazine*, Volume 3, Russell Sage Publications (1976).

Firearms and Federal Law:  The Gun Control Act of 1968, *Journal of Legal Studies* 4:133 (1975); also in *Evaluation Annual*, Volume 1, Russell Sage Publications (1977); *Improving the Criminal Justice System in the United States*, 94th Congress, 2d Session, Library of Congress Document No. 94-171, at 273.

Measuring the Impact of Pretrial Diversion from the Criminal Justice System, *University of Chicago Law Review* 41:224 (1974); also in *Crime and Justice Annual -- 1974*, Aldine (1975); Povl Boesen and Stanley Grupp, eds., *Community Based Corrections: Theory, Practice and Research*, Davis Publishing Company (1976).

Threat of Punishment as an Instrument of Crime Control, *Proceedings of the American Philosophical Society* 118:231 (1974).

(with Richard Block) Homicide in Chicago, 1965-70, *Journal of Research in Crime and Delinquency* 10:1 (1973); also in Lee Rainwater, ed., *Deviance and Liberty*, Aldine (1974).

Of Doctors, Deterrence, and the Dark Figure of Crime:  A Note on Abortion in Hawaii, *University of Chicago Law Review* 39:699 (1972).

The Medium is the Message:  Firearms Caliber as a Determinant of the Death Rate from Assault, *Journal of Legal Studies* 1:97 (1972).

(with Gordon Hawkins) The Legal Threat as an Instrument of Social Change, *Journal of Social Issues* 27:33 (1971); also in Ronald Akers and Richard Hawkins, eds., *Law and Control in Society,* Prentice-Hall (1974); June Louin Tapp and Felice Levine, eds., *Law, Justice, and the Individual in Society,* Holt, Rinehart (1977).

Firearms and Federal Criminal Law, *Working Papers of the National Commission on the Reform of Federal Criminal Laws*, Volume II, U.S. Government Printing Office (1970).

(with Norval Morris) Deterrence and Corrections, *Annals of the American Academy of Political Social Sciences* (1969).

(with Gordon Hawkins) Deterrence and Marginal Groups, *Journal of Research in Crime and Delinquency* 5:100 (1968).

Games with Guns and Statistics, *Wisconsin Law Review* 1968:1113 (1968).

Is Gun Control Likely to Reduce Violent Killings?, *University of Chicago Law Review* 35:721 (1968).

(with Edward H. Hunvald) Missouri Implied Consent Statutes, *Missouri Law Review* 33:323 (1968).

"Free Press-Fair Trial" Revisited:  Defendant-Centered Remedies as a Publicity Policy, *University of Chicago Law Review*  33:512 (1966).

## GENERAL

Juvenile Justice: Legal, Policy & Political Issues (expert participant), *Focus on Law Studies,* American Bar Association, Division for Public Education, Vol. XXV, No. 2, Spring 2010, p. 4.

Miraklet I New York, *Magasinet Neo*, No. 2, March/April 2010, p. 38.

Pulling the Plug on Capital Punishment, *The National Law Journal,* Vol. 32, No. 14, December 7, 2009, p. 42.

Foreword to Jane Sprott and Anthony Doob, *Justice for Girls? Stability and Change in the Youth Justice Systems of the United States and Canada,* University of Chicago Press (2009).

(with Jeffrey Fagan) Myths of Get-Tough Law, *St. Petersburg Times,* October 30, 2009; also available online at http://www.tampabay.com/opinion/columns/myths-of-get-tough-law/1048326#.

Preface to the Korean edition, *American Juvenile Justice,* Oxford University Press (2009).

Book review of *The Death Penalty: A Worldwide Perspective* (Roger Hood and Carolyn Hoyle, Oxford University Press, 2008), *Punishment and Society,* Vol. 11, No. 2, April 2009, p. 280.

(with David T. Johnson) Last Days of the Hangman, *New Scientist,* March 14, 2009, p. 22; also available online at http://www.newscientist.com/article/mg20126995.100-capital-punishment-its-all-politics.html.

(with David T. Johnson) The Death Penalty's Future, *The Los Angeles Daily Journal,* January 16, 2009, p. 9.

Preface to the Chinese edition, *The Contradictions of American Capital Punishment,* Shanghai Joint Publishing, pp. 4-7 (2008).

Preface to the Chinese edition, *A Century of Juvenile Justice,* Beijing: The Commercial Press (2008).

Prison Policy Reform, *Issues in Science and Technology,* Vol. 25, No. 1, Fall 2008, p. 11.

A Sick System, *Los Angeles Times,* October 25, 2008, p. A23.

Guns: Liberty or Order? *The National Law Journal,* Vol. 30, No. 30, April 7, 2008, p. 23.

What Lies Behind the Case of Lethal Injection? *The Sacramento Bee,* Sunday, December 16, 2007, p. E1; reprinted in *The Police News* (Gulf Coast edition), Vol. V, No. 1, January 2008, p. 14.

A Tale of Two Despots, *The National Law Journal,* Vol. 29, No. 49, August 6, 2007, p. 23.

Little Changes, Big Results, *The New York Times,* April 8, 2007, p. 9.

Foreword to Peter Greenwood, *Changing Lives: Delinquency Prevention as Crime Control Policy,* University of Chicago Press (2005).

Capital Punishment: An American Dilemma, in "Shalt Thou Kill? An In-Depth Look at Capital Punishment," *Christian Networks Journal,* Fall 2005, p. 17.

Terri Schiavo and the Dilemma of "Life or Death" Litigation, *San Francisco Daily Journal,* June 15, 2005, p. 6.; *Los Angeles Daily Journal,* June 15, 2005, p. 6.

A Death Knell for the Death Penalty? *Newsday,* March 4, 2005, p. A47.

Review of Kathleen Auerhahn, *Selective Incapacitation and Public Policy: Evaluating California's Imprisonment Crisis, Contemporary Sociology* 34:62 (2005).

Foreword to Thomas Grisso, *Double Jeopardy: Adolescent Offenders with Mental Disorders,* University of Chicago Press (2004).

Three-Ring Capital-Punishment Circus, *Los Angeles Daily Journal,* February 20, 2004, p. 6.

Confessions of a Former Smoker, in Jane E. Aaron, *The Compact Reader: Short Essays by Method and Time* (Seventh Edition), Boston: Bedford/St. Martin's (2003);also as Hot Boxes for Ex-Smokers, *Newsweek,* My Turn, April 20, 1987, p. 12.

Train an Impartial Eye on Police Behavior, *Los Angeles Times,* July 12, 2002, p. A17.

(with Gordon Hawkins) The Ethics of Criminal Justice: Aspects of Human Dignity, *International Encyclopedia of the Social and Behavioral Sciences,* Volume 5, p. 2949 (2002).

Review of David Garland, *The Culture of Control: Crime and Social Order in Contemporary Society, Criminal Justice* 1:465 (2001).

McVeigh's Execution Will Heal Neither Survivors Nor Public, *Los Angeles Times,* May 11, 2001, p. B17.

The Walking Plea of Wen Ho Lee, *San Francisco Chronicle,* October 2, 2000, p. A21

Contributor to M. Dwayne Smith, *A New Era of Homicide Studies? Visions of a Research Agenda for the Next Decade, Homicide Studies* 4:1 (2000).

It's Violence by All, Not Just Teen Violence, *Los Angeles Times,* August 8, 2000, p. B9.

Bring Courage Back into Fashion, *Los Angeles Times,* January 16, 2000, p. M5.

Capital Punishment, *Microsoft's Encarta Encyclopedia* (CD-ROM) (1999).

Gun Control, *Microsoft's Encarta Encyclopedia* (CD-ROM) (1999).

Criminal Investigation Is Just a Human Art, *Los Angeles Times*, August 1, 1999, p. M5.

Curb Imperial Power of Prosecutors, *Los Angeles Times*, April 20, 1999, p. A15.

Mystery Terms, *Boston Review*, New Democracy Forum, April/May 1999, p. 17.

Marking Time on Death Row, *The 1999 World Book Year Book*, World Book, Inc. (1999).

What is the Aim of Criminal Law?  *Los Angeles Times*, January 14, 1999, p. A15.

The Buck Stops with Prison Managers:  Perspective on the Corcoran Report, *Los Angeles Times*, November 28, 1998, p. M5.

(with Gordon Hawkins) Review of Jacob Sullum, *For Your Own Good: The Anti-Smoking Crusade and the Tyranny of Public Health*, *The Responsive Community* 8:75 (1998).

A Gulag Mentality in the Prisons, *Los Angeles Times*, July 15, 1998, p. B9.

Thank You for Not Sneezing, *Los Angeles Times*, February 1, 1998, p. M5.

The Truth About Repeat Sex Offenders, *Los Angeles Times*, May 5, 1997, p. B5.

Review of Ugljesa Zvekic and Anna Alvazzi del Frate, eds., *Criminal Victimization in the Developing World*, *Contemporary Sociology* 25:663 (1996).

Paranoia on the Playground, *Los Angeles Times*, November 11, 1996, p. B5.

Crying Wolf over Teen Demons, *Los Angeles Times*, August 19, 1996, p. B5.

Gun Control, *Microsoft's Encarta Encyclopedia* (CD-ROM) (1996).

Crime Is Not the Problem, *Iowa Advocate*, Spring/Summer 1996, p. 34.

Deadly Force:  South Africa's Brave and Necessary Gamble with Its Death Penalty, *Chicago Tribune*, July 6, 1995, p. 19.

Will Success Spoil James Q. Wilson?, *Journal of Criminal Law and Criminology* 85:828 (1995).

Introduction to David Indermaur, *Violent Property Crime*, The Federation Press (1995).

For Gun Control, Give Big Cities Local Control, *Los Angeles Times*, May 17, 1995, p. B7.

Death Penalty, *jungeWelt*, April 1, 1995, p. 2.

Don't Bet on Executions Here Any Time Soon, *Newsday*, February 21, 1995, p. A27; also as Executions in New York?  Don't Bet on It, *New York Law Journal*, February 27, 1995.

Clouding the Issue:  Tobacco Industry Tries to Choke Off a Lawsuit, *Los Angeles Daily Journal*, December 12, 1994, p. 4.

The Voodoo Economics of California Crime, *Overcrowded Times*, October 1994, p. 3.

(with Gordon Hawkins) Policy on Crime, in Leonard Levy and Louis Fisher, eds., *Encyclopedia of the American Presidency*, Simon and Schuster (1994).

Tough Crime Laws Are False Promises, *Insight on the News* 10:21 (1994); also in *Federal Sentencing Reporter* 6:61 (1994).

"Three Strikes" Law Is Political Fool's Gold, *The Christian Science Monitor*, April 11, 1994, p. 23.

New Senate, Same Old Crime Debate, *The American Lawyer*, March 1994, p. 25.

To Punish Genocide with Death Is Overkill, *Los Angeles Times*, December 2, 1993, p. B7.

Introduction to Harry Kalven, Jr. and Hans Zeisel, *The American Jury*, Gryphon Editions (1993).

A Country Where There Is No Status Quo, *Los Angeles Times*, June 30, 1993, p. B7.

Hanged If We Do, Or We Don't, *Johannesburg Star*, April 5, 1993.

The Color of Murder, *Legal Times*, February 22, 1993, p. 34.

Intercept Migrating Guns, *Christian Science Monitor*, September 10, 1992, p. 18.

Are State Prisons Undercrowded?, *Federal Sentencing Reporter* 4:347 (1992).

Politics Dictate Wilson's Verdict, *Los Angeles Times*, April 12, 1992, p. M5.

Tribute to Sheldon Messinger, *California Law Review* 80:307 (1992).

(with Gordon Hawkins) Review of Samuel Gross and Robert Mauro, *Death and Discrimination: Racial Disparities in Capital Sentencing, Constitutional Commentary* 9:135 (1992).

(with Gordon Hawkins) Why the S&L Gang Isn't in Jail, *Los Angeles Times*, February 3, 1992, p. B5.

(with Michael Laurence) Capital Punishment, in Leonard Levy, ed., Supplement to the *Encyclopedia of the American Constitution*, Macmillan (1991).

More Jail Cells, Fewer Classrooms, *Los Angeles Times*, May 31, 1991, p. B5.

The Speaking Engagement as One-Night Stand, *California Monthly*, April 1991, p. 17.

The Great American Lockup, *Washington Post*, February 28, 1991, p. A19.

Strategies for Arms Control: Trace Illegal Firearms, *New York Times*, January 4, 1991, p. A13.

Foreword to Stephen Sugarman and Herma Hill Kay, eds., *Divorce Reform at the Crossroads*, Yale University Press (1990).

Greenmail Goes Transnational, *Los Angeles Times*, March 23, 1990, p. B7; also as Can East Germany Leverage Its Way to Wealth?, *Newsday*, April 9, 1990, p. 43.

A Solitary Symbol in a Deadly Tug of War, *Los Angeles Times*, January 29, 1990, p. B5.

Review of Donald Downs, *The New Politics of Pornography*, *New York Times Book Review*, January 28, 1990, p. 18.

(with Gordon Hawkins) Bennett's Sham Epidemic, *New York Times*, January 25, 1990, p. A23.

Hardly the Trial of the Century, *Michigan Law Review* 87:1307 (1989).

Foreword to James Jacobs, *Drunk Driving: An American Dilemma*, University of Chicago Press (1989).

Review of Jack Katz, *Seductions of Crime*, *New York Times Book Review*, November 20, 1988, p. 50.

Drug Death Penalty:  A Federal Tantrum, *New York Times*, September 16, 1988, p. 19; also as A Temper Tantrum Masquerading as an Act of Government, *Los Angeles Daily Journal*, September 20, 1988.

Pint-Sized Debate on Child Executions:  More Jurisprudence from the Briar Patch, *Legal Times*, July 18, 1988, p. 14; also as Can the Bad Die Young?, *The Connecticut Law Tribune*, July 18, 1988, p. 10; Justices Waffle on Death Penalty, *Fulton County Daily Report*, July 19, 1988, p. 2; Decision on Executing Youths Highlights Death Penalty Dilemma, *Manhattan Lawyer*, July 19, 1988, p. 12; The Court's Death Sentence Schizophrenia, *The Texas Lawyer*, July 25, 1988, p. 29; A Stumble at the Finish Line, *The Recorder*, July 28, 1988, p. 4.

If We Have Reached a Landmark in Our Execution Policy, It Is Still One of Confusion, *Los Angeles Times*, March 18, 1988, Part II, p. 7.

NRA's Latest Advice Can Get You Killed, *Los Angeles Times*, December 6, 1987, Part V, p. 5.

Review of James Wright and Peter Rossi, *Armed and Considered Dangerous:  A Survey of Felons and Their Firearms*, *American Journal of Sociology* 93:224 (1987).

Why the Goetz Verdict Was Not a Landmark Precedent, *New York Times*, June 21, 1987, p. 25.

Is Court Too Split To Sanction Death?, *Los Angeles Times*, April 27, 1987, Part II, p. 5.

A Frequent Flier Explains the Thrill, *New York Times*, April 20, 1987, p. 19; also as Rewarding the Pinball for Its Tos and Fros, *International Herald Tribune*, April 23, 1987, p. 5; Confessions of a Frequent Flier, *Chemtech*, June 1988, p. 386.

Beyond Solomon:  The "Tragic Choice" Cases, *Los Angeles Times*, March 16, 1987, Part II, p. 5.

EF Hutton Goes South, *Michigan Law Review* 85:397 (1987).

Is Retribution Only for a Few?, *Los Angeles Times*, December 4, 1986, Part II, p. 7.

Facing the Threat of a Crippled UC, *Los Angeles Times*, September 3, 1986, Part II, p. 5.

The Death Penalty:  Ten Dark Years, *New York Times*, June 19, 1986, p. 27.

Gun Lobby's Victory Can Help Handgun Control, *Los Angeles Times*, April 28, 1986, Part II, p. 5.

Justice Teeters on the Fine Points, *Los Angeles Times*, January 29, 1986, Part II, p. 5.

Review of Henry Pontell, *A Capacity to Punish*, *American Journal of Sociology* 91:724 (1985).

Two New Books on Guns, *Michigan Law Review* 83:954 (1985).

Lessons for the Urban Jungle, *Los Angeles Times*, March 15, 1985, Part II, p. 5.

Smoking and Public Policy, *Chicago Tribune*, Perspective Section, January 18, 1985, p. 27.

Research Agendas, Information Policies and Program Outcomes, in Alan Westin, ed., *Information Policy and Crime Control Strategies:  Proceedings of a Bureau of Justice Statistics/Search Conference*, U.S. Government Printing Office (1984).

Is Crime Going Out of Style?, *Los Angeles Times*, July 12, 1984; also as Is American Crime Up or Down?, *Newsday*, August 30, 1984, p. 89.

The Dan White Case: Justice Is a Victim, *Los Angeles Times*, January 6, 1984, Part II, p. 5.

The Death Penalty's Iron Law, *New York Times*, October 12, 1983, p. 27; also in *Los Angeles Times*, September 21, 1983, Part II, p. 7.

Where Do the New Scholars Learn New Scholarship?, *Journal of Legal Education* 33:453 (1983).

(with Gordon Hawkins) Crime Commissions, in Sanford Kadish, ed., *Encyclopedia of Crime and Justice*, Volume 1, The Free Press, Macmillan (1983).

(with James Lindgren) Regulation of Guns, in Sanford Kadish, ed., *Encyclopedia of Crime and Justice*, Volume 2, The Free Press, Macmillan (1983).

Foreword to John Kaplan, *The Hardest Drug: Heroin and Social Policy*, University of Chicago Press (1983).

Review of Arnold Trebach, *The Heroin Solution*, and John Kaplan, *The Hardest Drug: Heroin and Social Policy*, *The Times Literary Supplement*, June 10, 1983, p. 610.

Choosing the Right Camp for the Children, *Institutions Etc.* 6:21 (1983).

Idealizing the "Angels" on Death Row, *Los Angeles Times*, February 24, 1983, Part II, p. 7.

Uncle Sam's Wars on Crime, *The New Republic* 186:38 (1982).

Poland's "Real" Problem, *Chicago Tribune*, September 28, 1982, Perspective Section, p. 25.

Will the 21st Century Be Safer?, *Chicago Tribune*, April 13, 1982, Section 1, p. 22.

Crime: The 120-Day Solution, *Chicago Tribune*, September 28, 1981, Perspective Section, p. 25.

Review of Peter Prescott, *The Child Savers: Juvenile Justice Observed*, *New York Times Book Review*, June 14, 1981, p. 24.

(with Gordon Hawkins) Review of Walter Berns, *For Capital Punishment: Crime and the Morality of the Death Penalty*, *American Journal of Sociology* 86:1171 (1981).

Portnoy's Real Complaint, *Moment* 6:58 (1980).

Taking a Tour of America's Prisons, *Chicago Tribune*, September 14, 1980, Perspective Section, p. 4.

Foreword to Philip Cook and Daniel Nagin, *Does the Weapon Matter?*, Institute for Law and Social Research (1979).

Comment, Current Developments in Judicial Administration, *Federal Rules Decisions* 80:147 (1979).

Crime in the Streets, *Chicago Sun Times Bookweek*, November 27, 1978, p. 14.

Review of The Institute of Judicial Administration and the American Bar Association, *Juvenile Justice Standards Project*, *Harvard Law Review* 91:1934 (1978).

Review of Charles Silberman, *Criminal Justice, Criminal Violence*, *Chicago Tribune*, November 5, 1978, Section 7, p. 1.

Review of John Allen, *Crime in the Streets: Assault with a Deadly Weapon*, Chicago Sun Times, November 27, 1977.

Foreword to Richard Block, *Violent Crime: Environment, Interaction, and Death*, Heath, Lexington (1977).

Comment, *Hastings Center Report*, p. 44 (1977).

Review of Mark Lane and Dick Gregory, *Code Name Zorro, Chicago Sun Times*, May 1, 1977.

Illegally Seized Evidence:  Exclude It?, *Los Angeles Times*, April 20, 1976.

Review of Pretrial Intervention, in Abt Associates, *Pretrial Services: An Evaluation of Policy Related Research*, p. 152 (1975).

A Tale of Two Cities, *Wall Street Journal*, December 20, 1974, p. 12; also in *Hearings of Senate Subcommittee to Investigate Juvenile Delinquency, Oversight of 1968 Gun Control Act*, Volume 1, p. 11 (1975).

Eight Myths About Gun Control in the United States, *Christian Science Monitor*, July 24, 1972.

Getting Serious About Guns, *The Nation* 214:457 (1972).

Some Facts About Homicide, *The Nation* 214:303 (1972).

Firearms Control:  Hard Choices, *Trial*, p. 53 (1972).

**WRITING REPRINTED IN:**

Funk, Day, Coleman and McMahan, *The Simon and Schuster Short Prose Reader* (2009).

Lee, *Empowered College Reading* (2008).

Feng-Checkett and Checkett, *The Write Start* (2nd edition, 2005).

Anker, *Real Writing with Readings* (2004).

Aaron, *The Complete Reader* (2003).

Nicholas and Nicholl, *Models for Effective Writing* (2000).

Miller, *The Informed Argument* (4th edition, 1995).

Eschholtz and Rosa, *Themes for Writers* (1994).

Winterrowd and Winterrowd, *The Critical Reader, Thinker and Writer* (1992).

REPORTS TO GOVERNMENTAL AGENCIES

(with Peter W. Greenwood) *One More Chance: The Pursuit of Promising Intervention Strategies for Chronic Juvenile Offenders*, Rand Corporation (1985).

(with Peter W. Greenwood and Allan Abrahamse) *Factors Affecting Sentence Severity for Young Adult Offenders*, Rand Corporation (1984).

(with Peter W. Greenwood and Marvin Lavin) *The Transition From Juvenile to Adult Court*, Rand Corporation (1984).

(with Peter W. Greenwood, Albert J. Lipson, and Allan Abrahamse) *Youth Crime and Juvenile Justice: A Report to the California Legislature*, Rand Corporation (1983).

(with Peter W. Greenwood and Joan Petersilia) *Age, Crime, and Sanctions: The Transition From Juvenile To Criminal Court*, Rand Corporation (1980).

*Dealing with Youth Crime: National Needs and Federal Priorities*, a policy paper prepared for the Federal Coordinating Council on Juvenile Justice and Delinquency Prevention (1975) (mimeo).

*The Court Employment Project: A Report to the City of New York* (1974) (mimeo).

# EXHIBIT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JONATHAN BIRDT,                  )
                                 )
          Plaintiff,             )
                                 )
     V.                          )   NO. 2:10-CV-08377-
                                 )   RGK-JEM
CHARLIE BECK, LEE BACA,          )
THE LOS ANGELES POLICE           )
DEPARTMENT and THE LOS           )
ANGELES COUNTY SHERIFFS          )
DEPARTMENT, DOES 1 to 50,        )
                                 )
          Defendants.            )
                                 )

DEPOSITION OF JONATHAN BIRDT, TAKEN ON BEHALF OF THE DEFENDANTS THE LOS ANGELES POLICE DEPARTMENT AND CHARLIE BECK, AT 200 MAIN STREET, 6TH FLOOR, LOS ANGELES, CALIFORNIA, COMMENCING AT 10:08 A.M., TUESDAY, FEBRUARY 22, 2011, BEFORE LEIGHA D'ERRICO, CSR 11199.

COLA Sep. Statement   00145

1      Q.   The clan?  What's your concern?

2      A.   I'm only permitted to say that we parted

3  on mutually acceptable terms.

4      Q.   Okay.  Well, let's just refer to what you

5  indicated in your application, how about that?

6      A.   Okay.  That would be great.

7      Q.   So referencing Exhibit 2, the letter that

8  you wrote.

9      A.   Okay.

10     Q.   You indicated that -- I believe that one

11  of your colleagues was threatened; is that correct?

12     A.   Peter McNulty is a holder of a permit

13  issued by the L.A. County Sheriff's Department, as

14  is an associate of his.

15     Q.   Were you ever threatened while you were

16  at the McNulty firm?

17     A.   Yes.

18     Q.   Did you report that to the police?

19     A.   Yes.

20     Q.   When?

21     A.   I believe there were two occasions where

22  we called 911 and nobody responded.  I believe the

23  most recent was April of '09 and sometime in 2008.

24  I don't recall.

25     Q.   So one time in '09 and one time in '08?

Jonathan Birdt    February 22, 2011

1      A.    Specific threats to that office where we
2   called 911 and LAPD did not respond, yes.
3      Q.    I'm not asking about threats to the
4   office.  I'm asking about threats to you.
5      A.    Yes.
6      Q.    So you were personally threatened?
7      A.    My physical safety was threatened.
8      Q.    How was your physical safety threatened?
9      A.    By angry people who advised they were
10  going to come to the office and potentially do us
11  harm.
12     Q.    Did they advise you or somebody else?
13     A.    I honestly do not recall what the first
14  incident revolved around.  The second incident, I
15  became aware of as it was happening, and I
16  instructed an employee to call 911.
17     Q.    So nobody ever showed up?
18     A.    No, she was there in the lobby.
19     Q.    Nobody from LAPD showed up?
20     A.    Oh, correct, of course.
21     Q.    And did you ever try to make a report
22  after that?
23     A.    Yes.
24     Q.    So did you actually make a report?
25     A.    No.

COLA Sep. Statement   00147

1    Q.    What happened when you tried to make a

2    report?

3    A.    We actually had a private security

4    company, an armed security company that responded

5    about 40 minutes later and they took the report,

6    and I don't recall the exact discussions between --

7    I don't recall how it worked out.

8    Q.    To your knowledge, was LAPD ever

9    notified, other than the 911 call?

10   A.    How else would you like us to notify

11   them, bon fire, SOS, mirrors?

12   Q.    Did you ever actually walk into a police

13   station?

14   A.    I have walked into a police station.   I

15   did not walk into a police station on that

16   occasion.

17   Q.    On either of those two incidents, to your

18   knowledge, was a police report ever generated?

19   A.    I'm relatively certain there wasn't.

20   Q.    You never spoke to anybody from LAPD

21   regarding either of those two incidents?

22   A.    I have no recollection of doing that.

23   Q.    Moving on.   You're a volunteer judge?

24   A.    Yes.

25   Q.    How often do you that?

1    claims disputes.

2        Q.    As a volunteer judge, was your life or

3    your safety ever threatened?

4        A.    I think the inherent nature of judicial

5    conduct creates a presumption of a safety concern.

6        Q.    So were you ever threatened?

7        A.    No.

8        Q.    Did you ever fear for your life?

9        A.    Every day.

10       Q.    Handling high-profile cases?

11       A.    Is that a question?

12       Q.    Yes.

13       A.    What is it?

14       Q.    Did you handle any high-profile cases?

15       A.    Yes.

16       Q.    Which ones?

17       A.    I handled the endoscopy litigation in

18   Nevada, which resulted in several grand jury

19   indictments and a number of death threats made to

20   the firms I was associated with.  I handled a

21   wrongful death case where the doctor was convicted

22   of murder and is sitting in jail.  Are you looking

23   for just high-profile where it was in the news?

24       Q.    I was actually just referring to your job

25   as a judge pro tem?

COLA Sep. Statement   00149

1    A.    Oh, I'm sorry.

2    Q.    Did you want to keep going?

3    A.    No.  As a judge pro tem nothing high-

4    profile at all.  I'm sorry.

5    Q.    That's okay.  We'll get to those in a

6    little bit.  You sit on a juvenile dependency court

7    panel?

8    A.    Correct.

9    Q.    What is that?

10    A.    Well, there's two facets.  There are

11    attorneys who are appointed by the juvenile

12    dependency court to review tort referrals, so that

13    where there's a ward who's dependent of the court,

14    if the counsel representing them believes they've

15    have been the victim of either negligence or abuse,

16    they write a referral report that is then passed on

17    to me or other attorneys on that panel in the order

18    of rotation to review, and then we make a

19    determination as to whether or not it merits

20    further investigation, and then we are granted

21    access to the confidential juvenile court file and

22    records and appointed as counsel to pursue that

23    action.

24         I'm also, because of that, and this is

25    the only thing I'm active in right now, on the

COLA Sep. Statement   00150

Jonathan Birdt    February 22, 2011

1    public counsel.  They appoint guardian ad litems
2    for victims in the system to represent them and act
3    as their guardian ad litem, and I'm on that panel.
4    Currently I only guardian ad litem in one case,
5    and it's a teenage girl who was raped, and I
6    believe the gentleman's currently facing felony
7    charges for that.
8         Q.    As a result of that position, have you
9    ever been threatened by either -- the children or
10   parents, your life, the life of your family or
11   anything to that regard?
12        A.    Specifically, no.
13        Q.    Impliedly?
14        A.    I believe the gentleman who's facing
15   felony rape charges may be a little upset with me.
16        Q.    Has he ever said anything to you?
17        A.    No, I've never spoken to him.
18        Q.    Why do you feel he's upset with you?
19        A.    I believe it's a common practice for
20   litigants involved in emotional cases to react with
21   violence.  I believe you could ask the family of
22   the Fresno lawyer who was shot in the head and
23   killed by having lunch with her client after a
24   contentious hearing, that being a lawyer can
25   sometimes be dangerous and people get emotional and

1    upset.

2        Q.    Do you think that all lawyers should be

3    awarded CCW permits?

4        A.    I believe that lawyers who have met the

5    training requirements and desire to exercise their

6    second amendment rights who are involved in

7    contentious litigation should certainly be able to

8    exercise that right.

9        Q.    Would you agree that most lawyers are

10   involved in contentious litigation?

11       A.    No.

12       Q.    Why not?

13       A.    Because I think a lot of lawyers do

14   transactional work.  I think a lot of lawyers do a

15   lot of paperwork.

16       Q.    So anybody that's involved in litigation

17   in general, do you think they should be getting CCW

18   permits?

19       A.    I think what I think doesn't matter at

20   all, but generally speaking, I think those, as I

21   just said, involved in contentious litigation, who

22   seek the necessary training and express a desire to

23   exercise their constitutional rights, should be

24   permitted to do so.

25       Q.    Do you do mostly civil or criminal?

Jonathan Birdt   February 22, 2011

1    law in Nevada?

2         A.    I actually do all of my work for that

3    company in California, but I am licensed in Nevada.

4         Q.    Okay.  All right.  The endoscopy

5    litigation, you said you received a number of death

6    threats as a result of that?

7         A.    Well, they were called in to our office

8    in Nevada, but, yes.

9         Q.    To you specifically or to the firm?

10        A.    Nobody said "John Birdt, I'm going to put

11   a bomb in your car."  It was "You lawyers should be

12   hung up and we're going to blow you up," and there

13   are a number of recorded messages, I think, that

14   were turned over to the grand jury.  I don't recall

15   the specific language.

16        Q.    The grand jury meaning there was a

17   criminal investigation into those threats

18   specifically or are you talking about the grand

19   jury in the endoscopy litigation?

20        A.    I'm talking about the grand jury in the

21   endoscopy litigation.

22        Q.    I don't want -- like what was it, what

23   were the facts?

24        A.    There were only two clinics in Las Vegas

25   that did endoscopy and the physicians were

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

42

COLA Sep. Statement   00153

1    reusing -- they were billing Medicare for ten

2    milligram bottles of propofol but that were buying,

3    on sale, 100 milligram bottle of propofol and

4    reusing them from patient to patient, and so when

5    you have patient A, if you inject them twice with

6    propofol you go into the bottle twice, the second

7    time obviously with a contaminated needle.  When

8    the next patient comes in and you draw propofol and

9    give it to the patient you give them hepatitis.

10   And the CDC actually came in and genetically

11   linked, I think, six or seven patients with the

12   hepatitis strain to the patient before them, and

13   they did a public recall in Nevada.  I think they

14   estimated there were 50,000 people potentially

15   exposed to any sort of disease as a result of that.

16   And I represented several of the genetically-linked

17   patients, along with a couple classes and larger

18   groups of patients involved in that litigation.

19        Q.    So how many, specifically, if you

20   remember, threats were called in and left on the

21   machine or whatever happened?

22        A.    I only have a specific mental

23   recollection of one on that voice line.  There were

24   other -- and it seems stupid.  I'm not quite sure

25   why they would go after the lawyers trying to

COLA Sep. Statement   00154

Jonathan Birdt    February 22, 2011

1   vindicate it, and I think the tide turned the other
2   way once people finally realized what happened, but
3   there were other Internet postings, newspaper
4   articles, the Las Vegas Sun and the Las Vegas
5   Review Journal both have a like a web comment page,
6   and for some reason they're very active with that
7   in Las Vegas, and I recall several threats early on
8   directed against us.  That tide quickly changed.
9        Q.    How many attorneys were involved in that
10  litigation?
11       A.    Well, eventually probably thousands,
12  pretty much all of them in Vegas.  We had the first
13  case and the lead plaintiff.  I think the original
14  class was not certified and we had a steering
15  committee of five firms, but it quickly became a
16  massive consolidated litigation with a specially
17  appointed master, and I think there were 40 or 50
18  firms at that point participating in that process,
19  and I was -- or I did the best I could to stay out
20  of that.
21       Q.    Was this while you were still at the
22  McNulty law firm?
23       A.    Yes.
24       Q.    How long ago was it?
25       A.    I think I finished all of our expert

COLA Sep. Statement  00155

Jonathan Birdt    February 22, 2011

1    discovery November of 2009, and then over the

2    weekend before their experts were set to commence,

3    they filed bankruptcy, and everything -- I have no

4    idea what's happened since then.

5        Q.    So the verbal threat that was left on the

6    voice mail, could you estimate what approximate

7    date that was?

8        A.    Early '09.

9        Q.    And did you ever make a police report?

10       A.    No.

11       Q.    Did anybody ever make a police report, to

12   your knowledge?

13       A.    I don't know.  I know that it was

14   reported to the district attorney.  No -- actually,

15   I think it was reported to the metro, because

16   that's who we were communicating with, the metro

17   investigator.  I think it was communicated to

18   her -- wait.  I'm not sure who the point of contact

19   was on that one.  I'm confusing it with another

20   investigator.  Whoever the point of contact was, it

21   was communicated to law enforcement, let's put it

22   that way.

23       Q.    Not by you?

24       A.    Not by me.

25       Q.    Did you ever speak to anybody in law

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

45

COLA Sep. Statement  00156

Jonathan Birdt    February 22, 2011

1    Q.    So how specifically, by representing
2    victims of rape, are you in particular danger?
3    A.    It creates contentious litigation and raw
4    feelings, and people in those situations do stupid
5    things.
6    Q.    You specifically have not been threatened
7    as a result, correct?
8    A.    I'm sorry, I didn't catch your whole
9    question.
10   Q.    You specifically have not been threatened
11   as a result of your representation in these cases,
12   correct?
13   A.    No direct threat by a specific individual
14   has been made against me, specifically, that I'm
15   aware of.
16   Q.    What about your family?
17   A.    No.
18   Q.    How is this something that LAPD can't
19   handle?
20   A.    Well, I guess the argument would be what
21   could LAPD handle.  LAPD response time to my house,
22   even though they're three blocks away, is ten
23   minutes.  Chief Bratton had his own personal police
24   officer follow him around all day long and he
25   apparently still needed a CCW, so apparently even

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

50

COLA Sep. Statement   00157

Jonathan Birdt   February 22, 2011

1    There has been no expressed threat, there has been
2    an implied threat based upon all of my activities
3    as described in my applications, paperwork and
4    discovery responses.
5        Q.    What you've described to me, heretofore,
6    is generalized threat, you feel that you're
7    involved in some contentious litigation, that your
8    life could potentially be at risk, but there has
9    been no actual expressed or implied threat on your
10   life, just that you've been involved in contentious
11   litigation, am I wrong?
12       A.    Yes.
13       Q.    Am I wrong?
14       A.    In so many ways I don't even know where
15   to start.
16       Q.    Try.
17       A.    You have an opinion.  I disagree with
18   your opinion.  The First Amendment gives us both
19   the right to have those opinions, the Second
20   Amendment confirms a right we already have, to bear
21   weapons for the purpose of self-defense.
22       Q.    Okay.  But let's get back to your answer.
23   I'm not really seeing where there's any expressed
24   or implied threat anywhere in your application.  I
25   would like you to explain it to me.

Jonathan Birdt   February 22, 2011

1    A.    I drove down the freeway today and,

2    apparently, sheriff's deputies involved in road

3    rage incidents pull out their service weapons and

4    return fire or open fire on people, so I was

5    impliedly threatened by driving here today.

6    There's a gentleman sitting in a secured building

7    with a

8    firearm on his side.  I'm not aware of any present

9    threat to anybody's life, especially in a secured

10   building, or the need for that.  Implied threats

11   exist all over the place.

12        I'm not quite sure what you're looking

13   for.  I'm involved in a number of things.  I don't

14   think the gentleman that shot the attorney in

15   Fresno last week previously stated an intent to

16   shoot her or her actions probably would have been

17   very different.  I don't believe anybody told the

18   guy in Rolling Hills they were going to sneak up

19   behind his car and shoot him in the head.  Did the

20   implied threat exist beforehand, I believe it

21   absolutely does.

22    Q.    Well, let's focus on you and not them,

23   because they're not in this litigation and you are.

24    A.    You're right, because they're dead.

25    Q.    Right.

COLA Sep. Statement   00159

1       A.      Attorneys involved in contentious

2    litigation who were shot by counterparts and are

3    dead in California recently, yes, that's an implied

4    threat.

5       Q.      So let's focus on you and not them, okay?

6       A.      Okay.

7       Q.      You're saying that you feel there are

8    implied threats everywhere, every time you step

9    outside there's implied threats?

10      A.      I think even without stepping outside,

11   but I also don't think that has any bearing

12   whatsoever on this litigation or whether or not the

13   city's policy violates my constitutional rights.

14      Q.      How does it not have any bearing on that?

15      A.      How does it?  Do you have a policy that

16   violates the Second Amendment or not?  I believe

17   your policy does, and I've set forth paperwork

18   showing why it does and provided you with case

19   authority.  You apparently believe that it does

20   not, and that's why we are involved in litigation.

21   It has nothing to do with whether or not somebody's

22   actually chasing me down the street.  I've made it

23   very clear to you that there have been no expressed

24   threats; however, I'm involved in a great deal of

     activities that I believe put me at increased risk

COLA Sep. Statement   00160

1   if that were even required.  I don't think it is.

2   I think most states, 43 of them, half the counties

3   in this state don't even require an applicant to

4   show any short of threat.  All they have to say is

5   "I would like to defend myself, exercise my Second

6   Amendment right" and they're permitted to do so.

7        Q.     Are you done?

8        A.     Yes.

9        Q.     So if you are not seeking just a

10  definition of self-defense I'm still not clear what

11  you're seeking.  You keep talking about how our

12  policy is unconstitutional and how policy is

13  violating your Second Amendment rights and 43 other

14  states accept self-defense, as well as half the

15  counties in this state, but you don't believe

16  that's the appropriate standard, is not

17  self-defense?

18       A.     I'm not a politician, I'm not a

19  legislature.  I do know that the politicians in

20  L.A. County are currently taking steps to ban

21  exposed open carry of firearms, leaving the only

22  available remedy in this city concealed carry.  I

    know that state legislatures are taking steps to

    ban open carry, leaving the only remedy in the

    state concealed carry.

Jonathan Birdt   February 22, 2011

1   Q.   What is your understanding of why your
2   request was denied, your application was denied?
3   A.   Because I did not meet the department
4   policy of good cause, which requires police reports
5   documenting an imminent threat of physical harm.
6   Q.   And have you had any conversations with
7   anyone from the Sheriff's Department that would
8   lead you to believe that the denial was not based
9   on anything but that?
10   A.   No.
11   Q.   Earlier you talked about how you have
12   seen a list of CCW permits issued by the Sheriff's
13   Department, which we talked about off the record,
14   and in conjunction with that question and answer
15   you said that you have seen two applications
16   that -- from individuals who were on the Sheriff's
17   Department's list; is that correct?
18   A.   Yes.
19   Q.   Who are those two individuals?
20   A.   Peter McNulty and Nanette James.
21   Q.   Is that N-a-n-e-t-t-e?
22   A.   Yes.
23   Q.   Now, Peter McNulty is someone you used to
24   work with, correct?
25   A.   Yes.

1    STATE OF CALIFORNIA          )
                                  )   SS.
2    COUNTY OF LOS ANGELES        )

3        I,   LEIGHA D'ERRICO     , Certified Shorthand

4    Reporter, Certificate Number 11199, for the State

5    of California, hereby certify:

6            The foregoing proceedings were taken

7    before me at the time and place therein set forth,

8    at which time the deponent was placed under oath by

9    me;

10           The testimony of the deponent and all

11   objections made at the time of the examination were

12   recorded stenographically by me and were thereafter

13   transcribed;

14           The foregoing transcript is a true and

15   correct transcript of my shorthand notes so taken;

16           I further certify that I am neither

17   counsel for nor related to any party to said action

18   nor in any way interested in the outcome thereof.

19           In witness whereof, I have hereunto

20   subscribed my name this  3rd  day of  March,

21   2011.

                    _Leigha D'Errico_

COLA Sep. Statement   00155

# EXHIBIT D

LASD Crime & Arrest Statistics

Page 1 of 1

**LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**
**2009 ARREST SUMMARY**
**ADULTS**

| | Felony | | | Misdemeanor/Noncriminal | | | Adults Total |
|---|---|---|---|---|---|---|---|
| | Male | Female | Total | Male | Female | Total | |
| **REGION I** | **11,653** | **3,205** | **14,858** | **22,221** | **7,417** | **29,638** | **44,496** |
| Altadena Station | 254 | 71 | 325 | 1,263 | 383 | 1,646 | 1,971 |
| Crescenta Valley Station | 169 | 37 | 206 | 396 | 91 | 487 | 693 |
| East Los Angeles Station | 2,300 | 396 | 2,696 | 3,067 | 657 | 3,724 | 6,420 |
| Lancaster Station | 2,873 | 900 | 3,773 | 7,039 | 2,879 | 9,918 | 13,691 |
| Malibu/Lost Hills Station | 599 | 158 | 757 | 1,419 | 360 | 1,779 | 2,536 |
| Palmdale Station | 2,465 | 777 | 3,242 | 5,127 | 1,925 | 7,052 | 10,294 |
| Santa Clarita Valley Station | 1,612 | 484 | 2,096 | 2,021 | 602 | 2,623 | 4,719 |
| Temple Station | 1,381 | 382 | 1,763 | 1,889 | 520 | 2,409 | 4,172 |
| **REGION II** | **14,167** | **3,328** | **17,495** | **15,664** | **3,885** | **19,549** | **37,044** |
| Avalon Station | 55 | 5 | 60 | 108 | 19 | 127 | 187 |
| Carson Station | 1,330 | 454 | 1,784 | 2,500 | 742 | 3,242 | 5,026 |
| Century Station | 5,387 | 1,213 | 6,600 | 5,134 | 894 | 6,028 | 12,628 |
| Community College Bureau | 39 | 11 | 50 | 36 | 7 | 43 | 93 |
| Compton Station | 3,096 | 791 | 3,887 | 2,597 | 900 | 3,497 | 7,384 |
| Lennox Station | 2,946 | 555 | 3,501 | 2,139 | 510 | 2,649 | 6,150 |
| Lomita Station | 254 | 84 | 338 | 623 | 215 | 838 | 1,176 |
| Marina del Rey Station | 242 | 79 | 321 | 566 | 211 | 777 | 1,098 |
| West Hollywood Station | 818 | 136 | 954 | 1,961 | 387 | 2,348 | 3,302 |
| **REGION III** | **9,236** | **2,379** | **11,615** | **16,135** | **4,178** | **20,313** | **31,928** |
| Cerritos Station | 279 | 132 | 411 | 415 | 216 | 631 | 1,042 |
| Industry Station | 1,963 | 463 | 2,426 | 4,288 | 1,023 | 5,311 | 7,737 |
| Lakewood Station | 2,421 | 666 | 3,087 | 3,199 | 919 | 4,118 | 7,205 |
| Norwalk Station | 1,962 | 472 | 2,434 | 2,739 | 769 | 3,508 | 5,942 |
| Pico Rivera Station | 1,174 | 317 | 1,491 | 2,401 | 576 | 2,977 | 4,468 |
| San Dimas Station | 831 | 192 | 1,023 | 1,727 | 396 | 2,123 | 3,146 |
| Walnut/Diamond Bar Station | 606 | 137 | 743 | 1,366 | 279 | 1,645 | 2,388 |
| **OFFICE OF HOMELAND SECURITY** Transit Services Bureau | **1,124** | **170** | **1,294** | **6,519** | **1,571** | **8,090** | **9,384** |
| Metrolink | 65 | 24 | 89 | 204 | 34 | 238 | 327 |
| Light Rail/Bus | 1,059 | 146 | 1,205 | 6,315 | 1,537 | 7,852 | 9,057 |
| **SPECIALIZED UNITS** | **870** | **197** | **1,067** | **2,038** | **395** | **2,433** | **3,500** |
| **DEPARTMENT TOTAL** | **37,050** | **9,279** | **46,329** | **62,577** | **17,446** | **80,023** | **126,352** |

COLA Sep Statement   00164

# EXHIBIT E

## DECLARATION OF ROLF EMBOM

I, ROLF EMBOM, declare as follows:

1.       I am the Section Manager for the Los Angeles County Internal Services Department, Information Support Services Division, Client-Server Section.  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

2.       One of the regular responsibilities of my section is to operate and maintain the criminal records system for Los Angeles County.  One of the systems we operate and maintain is the Consolidated Criminal History Reporting System.  I am readily familiar with the maintenance and operation of this system, as well as the procedures, policies, and practices related to its maintenance and function.

3.       We created a computer program to ascertain from our records the number of adults arrested by the Los Angeles County Sheriff's Department (LASD) who had prior felony convictions in the years 2008-2010.  Our inquiry revealed the following.  For 2008, there were 24,542 adults arrested by the LASD with prior felony convictions.  For 2009, there were 23,001 adults arrested by the LASD with prior felony convictions.  For 2010, there were 26,304 adults arrested by the LASD with prior felony convictions.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 8, 2011, at , Cerritos, California.

_____
ROLF EMBOM

HOA.783184.1