Neil R. O'Hanlon, SBN 67018
Hogan Lovells US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
E-mail: neil.ohanlon@hoganlovells.com

Adam K. Levin
S. Chartey Quarcoo
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
E-Mail: adam.levin@hoganlovells.com

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 289-7319
Facsimile: (202) 898-0059
E-Mail: jlowy@bradymail.org

Counsel for *Amicus Curiae*
Brady Center to Prevent Gun Violence

"Filed Proposed Lodged Order"

FAXED

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN BIRDT, <br><br> Plaintiffs, <br><br> v. <br><br> CHARLIE BECK, et al., <br><br> Defendants. | **CASE NO: 10-CV-8377 RGK (JEM)** <br><br> **APPLICATION OF BRADY CENTER TO PREVENT GUN VIOLENCE TO FILE BRIEF AS** *AMICUS CURIAE* <br><br> **DATE:** May 16, 2011 <br> **TIME:** 9 AM <br> **CRTRM:** 850 <br> **JUDGE:** Hon. R. Gary Klausner |

APPLICATION OF BRADY CENTER TO
PREVENT GUN VIOLENCE TO FILE BRIEF
AS *AMICUS CURIAE*

1    Through undersigned counsel, the Brady Center to Prevent Gun Violence
2  applies to the Court for leave to file a brief as *amicus curiae* in this case for the
3  facts and reasons stated below. The proposed brief is attached hereto as Exhibit A
4  for the convenience of the Court and counsel.

5    This motion is made following the conference of counsel pursuant to L.R. 7-
6  3 which took place on March 8, 2011. Defendants stated that they consent to the
7  filing of this application. Plaintiff stated that he does not consent.

8    The Brady Center to Prevent Gun Violence ("*amicus*") is the nation's largest
9  non-partisan, non-profit organization dedicated to reducing gun violence through
10  education, research, and legal advocacy. Through its Legal Action Project, the
11  Brady Center has filed numerous briefs *amicus curiae* in cases involving both state
12  and federal gun laws, including cases involving public carry regulations. *See, e.g.,*
13  *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010); *United States v. Hayes*, 129
14  S. Ct. 1079, 1087 (2009) (citing *amicus* brief of Brady Center to Prevent Gun
15  Violence); *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008); *Bateman v.*
16  *Perdue*, No. 5:10-CV-265-H (D.N.C. Jan. 20, 2011) (order granting Brady Center's
17  application as "timely and useful").

18    District courts have inherent power to grant third parties leave to file briefs as
19  *amici curiae*, particularly regarding "legal issues that have potential ramifications
20  beyond the parties directly involved or if the [*amicus* has] unique information or
21  perspective that can help the court beyond the help that the lawyers for the parties
22  are able to provide." *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 335 F.
23  Supp. 2d 1061, 1067 (N.D. Cal. 2005) (internal quotations omitted). Here, *amicus*
24  brings a broad and deep perspective to the issues raised by this case and has a
25  compelling interest in the federal courts' interpretation of Second Amendment
26  issues. *Amicus* thus respectfully submits the attached brief to assist the Court with
27  the constitutional issues in this case, including important matters of first impression
28  under the Second Amendment.

- 2 -

1  The proposed brief provides an overview of recent and longstanding
2 Supreme Court Second Amendment jurisprudence, the policy implications of
3 recognizing a right to carry firearms in public, and addresses an open question that
4 has resulted from this jurisprudence—namely, what the appropriate standard of
5 review for Second Amendment claims should be, and shows how lower courts have
6 answered that question thus far. The brief also discusses the emerging trend in
7 lower courts towards using a two-pronged approach to Second Amendment claims
8 that asks (1) whether the law or regulation at issue implicates protected Second
9 Amendment activity, and if so, (2) whether it passes the appropriate standard of
10 review. The brief then applies this two-pronged approach to Second Amendment
11 issues in the case at hand, employing case law, sociological data, and legal
12 commentary to place the permitting process of California Penal Code § 12050 in
13 the larger context of Second Amendment issues. The brief concludes that (1)
14 California's concealed weapons permitting process does not implicate protected
15 Second Amendment activity because the Supreme Court has only recognized a
16 Second Amendment right to possess and carry guns in the home, and (2) that even
17 if the permitting process did implicate protected Second Amendment activity, it
18 would survive the appropriate level of review – the reasonable regulation test that
19 over forty states have adopted – because it is a valid exercise of the state's police
20 powers to enact legislation designed to protect public safety. *Amicus*, therefore,
21 respectfully submits the attached brief to assist the Court in deciding the complex
22 and significant issues raised in this matter.

23 / / /
24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

**CONCLUSION**

For the foregoing reasons, *amicus curiae* Brady Center to Prevent Gun Violence respectfully requests that the Court grant leave to file the attached *amicus* brief.

Dated: April 20, 2011

Respectfully submitted,

Neil R. O'Hanlon, SBN 67018
Hogan Lovells US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
E-mail: neil.ohanlon@hoganlovells.com

Adam K. Levin
S. Chartey Quarcoo
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
E-Mail: adam.levin@hoganlovells.com

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005

Attorneys for *Amicus Curiae* Brady Center to Prevent Gun Violence

APPLICATION OF BRADY CENTER TO
PREVENT GUN VIOLENCE TO FILE BRIEF
AS *AMICUS CURIAE*

Ex. A

Neil R. O'Hanlon, SBN 67018
Hogan Lovells US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
E-mail: neil.ohanlon@hoganlovells.com

Adam K. Levin
S. Chartey Quarcoo
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
E-Mail: adam.levin@hoganlovells.com

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 289-7319
Facsimile: (202) 898-0059
E-Mail: jlowy@bradymail.org

Counsel for *Amicus Curiae*
Brady Center to Prevent Gun Violence

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN BIRDT<br><br>        Plaintiff,<br><br>   v.<br><br>CHARLES BECK, et. al.,<br><br>        Defendants. | **CASE NO: 2:10-CV-08377-RGK-JEM**<br><br>**BRIEF OF *AMICUS CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE**<br><br>**DATE:**     May 16, 2011<br>**TIME:**     9:00 a.m.<br>**DEPT:**     850<br>**JUDGE:**   Hon. R. Gary Klausner |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................. 1

INTEREST OF *AMICUS* ................................................................... 1

LEGAL BACKGROUND ..................................................................... 2

ARGUMENT ........................................................................................ 3

I.    THE PERMITTING PROCESS IN SECTION 12050 DOES
      NOT IMPLICATE PROTECTED SECOND AMENDMENT
      ACTIVITY .................................................................................... 4

      A.   The Concealed Weapons Permitting Process at Issue
           Here Does Not Implicate Protected Second Amendment
           Activity Because it Does Not Impact The Right to
           Possess Firearms in The Home Protected in *Heller* and
           *McDonald* ........................................................................... 4

      B.   The Second Amendment Right Should Not Be Extended
           to Prevent Communities from Restricting or Prohibiting
           Carrying Guns in Public ...................................................... 10

II.   EVEN IF THE CONCEALED WEAPONS PERMITTING
      PROCESS IN SECTION 12050 DID IMPLICATE
      PROTECTED SECOND AMENDMENT ACTIVITY, IT
      WOULD WITHSTAND THE APPROPRIATE LEVEL OF
      SCRUTINY ................................................................................. 14

      A.   The Reasonable Regulation Test is the Appropriate
           Standard of Review .............................................................. 14

      B.   The Concealed Weapons Permitting Process at Issue Is
           Constitutionally Permissible ................................................ 19

CONCLUSION .................................................................................. 20

BRIEF OF AMICUS CURIAE, BRADY
CENTER TO PREVENT GUN VIOLENCE

\\\090334\001085 - 76996 v3

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Dep't of Revenue of Ky. v. Davis*
553 U.S. 328 (2008) ...................................................................................... 17

*Dorr v. Weber*
741 F. Supp. 2d 993 (N.D. Iowa 2010) ...........................................................8

*Gonzales v. Oregon*
546 U.S. 243 (2006) ...................................................................................... 18

*Gonzalez v. Village of W. Milwaukee*
No. 09CV0384, 2010 WL 1904977 (E.D. Wis. May 11, 2010) ......................8

*Harman v. Pollock*
586 F.3d 1254 (10th Cir. 2009) .................................................................... 17

*Heller v. District of Columbia* ("*Heller II*")
698 F. Supp. 2d 179 (D.D.C. 2010) ........................................................ passim

*Kelley v. Johnson*
425 U.S. 238 (1976) ...................................................................................... 18

*Kennedy v. Louisiana*
554 U.S. 407 (2008) ................................................................................ passim

*Mathews v. Eldridge*
424 U.S. 319 (1976) ...................................................................................... 15

*McDonald v. City of Chicago*
130 S. Ct. 3020 (2010) ........................................................................... passim

*Peruta v. County of San Diego*
--- F. Supp. 2d ---, 2010 WL 5137137 (S.D. Cal. Dec. 10, 2010) ............. 6, 19

*Planned Parenthood v. Casey*
505 U.S. 833 (1992) ...................................................................................... 15

*Queenside Hills Realty Co. v. Saxl*
328 U.S. 80 (1946) ........................................................................................ 17

*Richmond v. J.A. Croson Co.*
488 U.S. 469 (1989) ...................................................................................... 18

*Robertson v. Baldwin*
165 U.S. 275 (1897) ............................................................................... 1, 2, 3, 4

*Teng v. Town of Kensington*
No. 09-cv-8-JL, 2010 WL 596526 (D.N.H. Feb. 17, 2010) ...........................8

\\\090334/001085 - 76996 v3

*Terry v. Ohio*
   392 U.S. 1 (1968)..................................................................................... 15

*Turner Broad. Sys., Inc. v. FCC*
   520 U.S. 180 (1997)................................................................................. 18

*United States v. Bledsoe*
   No. SA-08-CR-13(2)-XR, 2008 WL 3538717 (W.D. Tex. 2008).................... 16

*United States v. Chester*
   628 F.3d 673 (4th Cir. 2010) ................................................................... 16

*United States v. Hart*
   725 F. Supp. 2d 56 (D. Mass. 2010)...........................................................8

*United States v. Hayes*
   555 U.S. 415 (2009)...................................................................................3

*United States v. Marzzarella*
   614 F.3d 85 (3rd Cir. 2010) ..................................................................... 16

*United States v. Masciandaro*
   --- F.3d ---, 2011 WL 1053618 (4th Cir. Mar. 24, 2011) ........................... 7, 8, 10

*United States v. Miller*
   604 F. Supp. 2d 1162 (W.D. Tenn. 2009) .............................................. 16, 18

*United States v. Tooley*
   717 F. Supp. 2d 580 (S.D. W. Va. 2010)....................................................8

*United States v. Yanez-Vasquez*
   No. 09-40056-01-SAC, 2010 WL 411112 (D. Kan. Jan. 28, 2010)................. 16

*Young v. American Mini Theatres, Inc.*
   427 U.S 50 (1976)................................................................................... 18


**CALIFORNIA CASES**

*Agricultural Prorate Commission v. Superior Court in and for Los Angeles County,*
   5 Cal.2d 550 (Cal. 1936)............................................................................5

*People v. Flores*
   169 Cal.App.4th 568 (2008) .......................................................................6

*People v. Yarbrough*
   169 Cal.App.4th 303 (2008) ..................................................................... 10

*People v. Zonver*
   132 Cal.App.3d Supp.1 (1982) ................................................................. 13

BRIEF OF AMICUS CURIAE, BRADY
CENTER TO PREVENT GUN VIOLENCE

\\\090334\001085 - 76996 v3

**OTHER STATE CASES**

*Andrews v. State*
  50 Tenn. 165 (1871)...................................................................................9

*Avant Indus. Ltd. v. Kelly*
  318 A.2d 47 (N.J. Super. Ct. App. Div. 1974) ....................................... 17

*Aymette v. State*
  21 Tenn. 154 (1840)...................................................................................9

*Bleiler v. Chief, Dover Police Dep't*
  927 A.2d 1216 (N.H. 2007) ................................................................. 15, 16

*Bliss v. Commonwealth*
  12 Ky. 90 (1822)........................................................................................9

*Commonwealth v. Robinson*
  600 A.2d 957 (Pa. Super. Ct. 1991).................................................... 13

*Commonwealth v. Romero*
  673 A.2d 374 (Pa. Super. Ct. 1996)..................................................... 13

*English v. State*
  35 Tex. 473 (1871).....................................................................................9

*Ex parte Thomas*
  97 P. 260 (Okla. 1908)...............................................................................9

*Fife v. State*
  31 Ark. 455 (1876).....................................................................................9

*Hill v. State*
  53 Ga. 472 (1874) ......................................................................................9

*In re Factor*
  2010 WL 1753307 (N.J. Super. Ct. App. Div. Apr. 21, 2010).............8

*Jackson v. State*
  68 So.2d 850 (Ala. Ct. App. 1953) ..................................................... 15, 16

*People v. Aguillar*
  --- N.E.2d ----, 2011 WL 693241 (Ill.App. 1 Dist., Feb. 23, 2011)....................7

*People v. Dawson*
  934 N.E.2d 598 (Ill. App. Ct. 2010) ................................................. 6-7

*Riddick v. United States*
  995 A.2d 212 (D.C. 2010) ........................................................................8

*Robertson v. City & County of Denver*
  874 P.2d 325 (Colo. 1994)................................................................ 15, 16

*State v. Buzzard*
  4 Ark. 18 (1842).........................................................................................9

BRIEF OF AMICUS CURIAE, BRADY
CENTER TO PREVENT GUN VIOLENCE

\\090334/001085 - 76996 v3

9

*State v. Cole*
665 N.W. 2d 328 (Wis. 2003)...................................................................... 16, 19

*State v. Comeau*
448 N.W.2d 595 (Neb. 1989).......................................................................... 16

*State v. Dawson*
159 S.E.2d 1 (N.C. 1968)................................................................................ 16

*State v. Hamdan*
665 N.W.2d 785 (Wis. 2002)........................................................................... 16

*State v. Jumel*
13 La. Ann. 399 (1858)..................................................................................... 9

*State v. Knight*
218 P.3d 1177 (Kan. Ct. App. 2009) ............................................................... 7

*State v. Workman*
35 W. Va. 367 (1891) ....................................................................................... 9

*Trinen v. City of Denver*
53 P.3d 754 (Colo. Ct. App. 2002) ................................................................ 16

*United States v. Walker*
380 A.2d 1388 (D.C. 1977) ............................................................................ 10

*Williams v. State*
10 A.3d (Md. 2009) ..................................................................................... 6, 7

**FEDERAL STATUTES**

18 U.S.C. § 922(g)(9)......................................................................................... 3

**CALIFORNIA STATUTES**

Cal. Penal Code § 12026(b) ........................................................................... 14

Cal. Penal Code § 12031(a)(5)........................................................................ 13

Cal. Penal Code § 12050................................................................................ passim

**OTHER STATE STATUTES**

Ark. Act of Apr. 1, 1881 .................................................................................. 9

Tex. Act of Apr. 12, 1871 ................................................................................ 9

Wyo. Comp. Laws Chapter 52, § 1 (1876)...................................................... 8

BRIEF OF AMICUS CURIAE, BRADY
CENTER TO PREVENT GUN VIOLENCE

**OTHER AUTHORITIES**

Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683,
686-87, n. 12 (2007)............................................................................................... 15

Brian Hass, *Finger gestures, brake slamming, then road rage turned into a
murder*, SOUTH FLORIDA SUN-SENTINEL, Aug. 8, 2008 ..................................... 11

Charles C. Branas et al., *Investigating the Link Between Gun Possession and
Gun Assault*, 99 Amer. J. Pub. Health 1 (Nov. 2009)................................... 12-13

D.W. Webster et al., *Effects of State-Level Firearm Seller Accountability
Policies on Firearm Trafficking*, 6 J. Urban Halth: Bulletin of the N.Y.
Acad. Of Med. 525 (2000)................................................................................. 18, 19

D.W. Webster et al., *Relationship Between Licensing, Registration, and
Other State Gun Sales Laws and the Source State of Crime Guns*, 7 Injury
Prvention 184 (2001)........................................................................................ 18, 19

Darrell A.H. Miller, *Guns as Smut: Defending the Home-Bound Second
Amendment*, 109 COLUM. L. REV. 1278 (Oct. 2009) ......................................... 10

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive
and Defensive Gun Uses: Results From a National Survey* (2000) ................... 11

David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34
Accident Analysis and Prevention 807-14 (2002).............................................. 14

David McDowall et al., *Easing Concealed Firearms Laws: Effects on
Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193, 202-203
(1995).......................................................................................................................... 12

Douglas Weil & Rebecca Knox, *Effects of Limiting Handgun Purchases on
Interstate Transfer of Firearms*, 275 J. Am. Med. Ass'n 1759 (1996) ....... 18, 19

Ernst Freund, The Police Power, Public Policy and Constitutional Rights
(1904) ......................................................................................................................... 10

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-
Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L.
REV. 1443, 1458 (2009)............................................................................................ 16

Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects
of Concealed-Handgun Laws on Crime*, in The Econ, of Gun Control 473
(May 1998)................................................................................................................. 12

Jeff Woods, *Yet Another Killing Charged to State-Licensed Gunman*,
Nashville Scene, Apr. 19, 2010 ............................................................................. 11

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence
from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998)........................... 12

John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*,
73 FORDHAM L. REV. 623 (2004)........................................................................... 12

Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125 (1868)..................9

John J. Donohue, *The Impact of Concealed-Carry Laws*, in Evaluating Gun
    Policy Effects on Crime and Violence (2003).................................... 12

Kathleen Cochrane, *Parking lot shooter claims self-defense*, www.fox8.com,
    Apr. 14, 2010 .................................................................................... 11

KY. CONST. of 1850, Article XIII, § 25 .......................................................9

Lawrence Buser, *Coleman found guilty of second-degree murder in parking
    lot shooting*, MEMPHIS COMMERCIAL APPEAL, July 17, 2010............................ 11

Lisa M. Hepburn & David Hemenway, *Firearm availability and homicide:
    A review of the literature*, 9 Aggression & Violent Behavior 417 (2004) ........ 11

Mark Duggan, *More Guns, More Crime*, 109 J. Pol'y. Econ. 1086 (2001)........... 11

Matthew Miller et al., *Firearm availability and unintentional firearm deaths*,
    33 Accident Analysis & Prevention 477 (Jul. 2000) ......................................... 11

Matthew Miller et al., *Rates of Household Firearm Ownership and Homicide
    Across US Regions and States, 1988–1997*, 92 Am. J. Public Health 1988
    (Dec. 2002)........................................................................................... 11

Matthew Miller et al., *State-level homicide victimization rates in the US in
    relation to survey measures of household firearm ownership, 2001-2003*,
    Soc. Sci. & Med. (2006) ...................................................................... 11

Michael C. Dorf, *Does Heller Protect a Right to Carry Guns Outside the
    Home?*, 59 SYRACUSE L. REV. 225 (2008) ......................................... 10

Philip Cook et al., *Gun Control After Heller: Threats and Sideshows from a
    Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009) .................. 13

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership* (2006)............. 14

*Private Citizens Killed by Concealed Handgun Permit Holders: May 2007 to
    the Present*, available at http:// www.vpc.org/ccwkillers.htm..................... 10, 17

Violence Policy Center, *Concealed Carry Killers* (2011)...................................... 11

BRIEF OF AMICUS CURIAE, BRADY
CENTER TO PREVENT GUN VIOLENCE

\\090334\001085 - 76996 v3

*12*

# INTRODUCTION

The right to keep and bear arms recognized in *District of Columbia v. Heller*, is unique among constitutional rights in the risks that it presents. 554 U.S. 570 (2008). Guns are designed to kill, and gun possession and use subject others to a serious risk of harm that is often deadly. While the Supreme Court held that the Second Amendment protects a limited right to possess a gun *in the home* for self-defense, the Court has never recognized a broader right to carry guns in public, which would expose the public to grave risks.  On the contrary, *Heller* found prohibitions on concealed carrying in line with permissible gun laws, *Heller*, 554 U.S. at 626-27, and did not disturb the Court's ruling that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons." *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897).

In *Heller, supra*, and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the Court had ample opportunity to announce a right to carry in public, but it did not, and repeatedly stated its holding as bound to the home.  Numerous courts, from the 19th century to post-*McDonald*, have recognized that the Second Amendment does not prevent states from restricting or barring the carrying of handguns in public. It would be unprecedented and unwise to hold that the Constitution bars California from allowing those tasked with protecting public safety to determine whether individuals have "good cause" to bring hidden handguns into public spaces.  Such a ruling would run counter to *Heller* and *McDonald*'s "assurances" that "reasonable firearms regulations" will remain permissible, as well as the Court's longstanding recognition that the exercise of protected activity must be balanced against legitimate public interests, chief among which is public safety. *McDonald*, 130 S. Ct. at 3047; *Heller*, 554 U.S. at 626-27 & n. 26.  There is no Constitutional requirement that the general public, when walking to school, driving to work, or otherwise going about their daily life, be subjected to the risks of gun carrying.  And there never has been.

BRIEF OF AMICUS CURIAE, BRADY
CENTER TO PREVENT GUN VIOLENCE

\\090334\001085 - 76996 v3

*13*

1    California's law governing the carrying of concealed weapons – California
2    Penal Code section 12050 – does not implicate protected Second Amendment
3    activity, and even if it did, it is a reasonable and permissible exercise of state police
4    powers. While Plaintiff may disagree, his recourse is the legislative process. This
5    Court is obligated to uphold legislation where there is a reasonable basis, and it
6    should not declare a new Second Amendment right that the Supreme Court has not
7    recognized by striking down a law that is crucial to protect public safety.

8                                    **INTEREST OF *AMICUS***

9        *Amicus,* the Brady Center to Prevent Gun Violence, is the nation's largest
10   non-partisan, non-profit organization dedicated to reducing gun violence through
11   education, research, and legal advocacy. Through its Legal Action Project, the
12   Center has filed many briefs *amicus curiae* in cases involving state and federal gun
13   laws, including on the right to carry and the scope of the Second Amendment post-
14   *Heller. Amicus* brings a broad and deep perspective to the issues raised by this case
15   and has a compelling interest in ensuring that the Second Amendment does not
16   impede reasonable governmental action to prevent gun violence.

17                                   **LEGAL BACKGROUND**

18       Recent Supreme Court Second Amendment Jurisprudence: In *Heller,* the
19   Supreme Court recognized an individual right to keep and bear arms in the home
20   for the purpose of self-defense. 554 U.S. at 628-29. But the Court explained that
21   its holding did not "cast doubt" on other gun laws – even approving of the
22   constitutionality of a number of laws and stating that "[w]e identify these
23   presumptively lawful regulatory measures only as examples; our list does not
24   purport to be exhaustive." *Id.* at 626-27 & n. 26. The Court noted approvingly that
25   "the majority of the 19th-century courts to consider the question held that
26   prohibitions on carrying concealed weapons were lawful under the Second
27   Amendment or state analogues." *Id.* at 626. The Court did not disturb its ruling in
28   *Robertson v. Baldwin* that "the right of the people to keep and bear arms (article 2)

is not infringed by laws prohibiting the carrying of concealed weapons." 165 U.S. at 282. *Heller* also made clear that "carry" did not imply "outside the home," as the Court held that "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license *to carry it in the home*." 554 U.S. 635 (emphasis added).[1]

In *McDonald*, the Court incorporated the Second Amendment to the states, but "repeat[ed]" *Heller's* "assurances" regarding its limited effect, and agreed that "state and local experimentation with reasonable firearms regulation will continue under the Second Amendment." 130 S. Ct. at 3047 (internal citation omitted). The Court did not extend the right outside the home.

<u>Standard of Review</u>: Neither *Heller* nor *McDonald* articulated a standard of review for Second Amendment challenges, though *Heller* explicitly rejected "rational basis" and implicitly rejected the "strict scrutiny." *See Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179, 187 (D.D.C. 2010) ("[S]trict scrutiny standard of review would not square with the [*Heller*] majority's references to 'presumptively lawful regulatory measures' . . . ."). Courts are left with choosing a standard which allows legislatures "a variety of tools for combating" the "problem of handgun violence," and under which a host of firearms regulations are "presumptively lawful," even without analysis. *Heller*, 554 U.S. at 636, 627 & n. 26. The "reasonable regulation" test, overwhelmingly applied by courts construing right to keep and bear arms provisions in the states, is the most appropriate standard of review.

### ARGUMENT

For at least two principal reasons, the firearms regulations in Section 12050 are constitutional. First, the permitting process in Section 12050 does not implicate

---

[1] *Heller's* narrow scope was apparent in *United States v. Hayes*, 555 U.S. 415 (2009), which upheld a broad reading of 18 U.S.C. § 922(g)(9) – which prohibits gun possession by persons convicted of misdemeanor crimes of domestic violence – without mentioning the Second Amendment.

1   protected Second Amendment Activity.  Second, even if it did, Section 12050 is a
2   reasonable regulation that furthers important governmental interests established by
3   the California Legislature and the law enforcement community.

4   **I.     THE PERMITTING PROCESS IN SECTION 12050 DOES NOT**
5          **IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY.**

6          *Amicus* respectfully suggests that this Court hold, first, that the permitting
7   process in Section 12050 does not implicate protected Second Amendment activity
8   because Plaintiff has no general "right to 'possess and carry weapons in case of
9   confrontation'" in public places.

10         **A.     The Concealed Weapons Permitting Process at Issue Here Does**
11                **Not Implicate Protected Second Amendment Activity Because it**
                **Does Not Impact The Right to Possess Firearms in The Home**
12                **Protected in *Heller* and *McDonald*.**

13         The  Supreme  Court's  decision  in  *Heller*  recognized  that  the  Second
14   Amendment protects "the right of law-abiding, responsible citizens to use arms *in*
15   *defense of hearth and home*." *Heller*, 554 U.S. at 635 (emphasis added).  In the
16   course of its lengthy majority opinion, the Court had ample opportunity to
17   announce a right to carry guns in public.  However, the Court's holding only
18   mentions a right "*to carry [] in the home*," *id.* (emphasis added), and does not
19   mention the carrying of firearms in public.   *See id.*  The Court focused on the
20   historical recognition of the right of individuals "to keep and bear arms to defend
21   their homes, families or themselves," *id.* at 615 (internal quotation marks omitted),
22   and the continuing need to keep and use firearms "in defense of hearth and home."
23   *Id.* at 635. The Court's holding is limited to the home: "[i]n sum, we hold that the
24   District's ban on handgun possession *in the home* violates the Second Amendment,
25   as does its prohibition against rendering any lawful firearm *in the home* operable for
26   the purpose of immediate self-defense."  *Id.* at 635 (emphasis added). The Court
27   had previously stated that "the right of the public to bear arms (article 2) is not
28   infringed by laws prohibiting the carrying of concealed weapons," *Robertson v.*

BRIEF OF AMICUS CURIAE, BRADY
CENTER TO PREVENT GUN VIOLENCE

\\\090334/001085 - 76996 v3

*16*

1     *Baldwin*, 165 U.S. at 281-82, and *Heller* did not question this ruling.

2        Plaintiff argues, essentially, that *Heller* embraced a Constitutional right to
3 carry guns in public, but chose not to say so. Plaintiff cannot explain why the Court
4 would explicitly hold that the Second Amendment was "not unlimited" and that a
5 non-exhaustive host of gun laws remained "presumptively lawful," yet keep its
6 supposed ruling that the Second Amendment protected a right to carry guns in
7 public implicit, leaving courts with (at most) supposed tea leaves to find a right to
8 carry in public. Nor can Plaintiff explain why *Heller* expressly approved of
9 decisions upholding concealed carry bans, without stating the flip side crucial to
10 Plaintiff's argument -- that some form of public carrying must be permitted.

11        Plaintiff takes snippets from *Heller* to argue that the Court recognized a right
12 to carry guns outside the home, but the Court never recognized such a right. In the
13 quoted passages the Court was only explaining its conclusion that the Second
14 Amendment was not limited to participants in a well-regulated militia. The Court
15 concludes its discussion of the meaning of "bear" and "carry": "Although the
16 phrase ["bear arms"] implies that the carrying of the weapon is for the purpose of
17 "offensive or defensive action," it in no way connotes participation in a structured
18 military organization." *Heller* at 584. The Court's concern was *who* may exercise
19 the right, not *where* it may be exercised.

20        This Court should not reach for an interpretation of *Heller* as implicitly
21 overruling *Robertson*'s recognition that the Second Amendment does not protect a
22 right to carry concealed weapons – especially given *Heller*'s embrace of concealed
23 carry bans and its repeated statements limiting its holding to the home. Lower
24 courts "should uphold State regulation whenever possible," *Agricultural Prorate*
25 *Commission v. Superior Court in and for Los Angeles County*, 55 P.2d 495, 509
26 (Cal. 1936), not expand a novel Constitutional right to strike down democratically-
27 enacted legislation.

28        California courts have refused to read *Heller* and *McDonald* as recognizing a

1 right to carry guns in public. In *People v. Dykes*, the California Supreme Court

2 noted that:

> 3 The [*Heller*] court did not recognize a "right to keep and carry any
> 4 weapon whatsoever in any manner whatsoever and for whatever purpose," observing that historically, most courts have "held
> 5 that prohibitions on carrying concealed weapons were lawful under
> 6 the Second Amendment or state analogues." The high court's decision
> 6 in *Heller* does not require us to conclude that possession in a public
> 7 place of a loaded, cocked, semiautomatic weapon with a chambered
> 7 round, concealed in a large glove and ready to fire, cannot be defined
> as a crime under state law.

8 209 P.3d 1, 44 (2009) (emphasis added) (internal citations omitted). And in *People*

9 *v. Flores*, 169 Cal.App.4th 568, 575 (2008), the California Supreme Court stated

10 that, "[g]iven this implicit approval of concealed firearm prohibitions, we cannot

11 read *Heller* to have altered the courts' longstanding understanding that such

12 prohibitions are constitutional." Recently, a district court rejected a similar

13 challenge, upholding §12050 as constitutional. *Peruta v. County of San Diego*, ---

14 F. Supp. 2d ---, 2010 WL 5137137, *6 (S.D. Cal. Dec. 10, 2010) (finding it

15 unnecessary to decide whether Second Amendment protects right to carry a loaded

16 handgun in public).

17 Other courts have held similarly that the Second Amendment, post-*Heller*,

18 does not protect a right to carry concealed weapons in public. Maryland's highest

19 court rejected the argument that *Heller* endorsed a public right to carry handguns:

> 20 *** *Heller* and *McDonald* emphasize that the Second Amendment is
> applicable to statutory prohibitions against home possession, the dicta
> 21 in *McDonald* that "the Second Amendment protects a personal right to
> keep and bear arms for lawful purposes, most notably for self-defense
> 22 within the home," notwithstanding. Although Williams attempts to
> find succor in this dicta, it is clear that prohibition of firearms in the
> 23 home was the gravamen of the certiorari questions in both *Heller* and
> *McDonald* and their answers. If the Supreme Court, in this dicta,
> 24 meant its holding to extend beyond home possession, it will need to
> 25 say so more plainly.

26 *Williams v. State*, 10 A.3d 1167, 1177 (Md. 2009) (internal citations omitted).

27 In *People v. Dawson*, the Illinois Court of Appeals rejected arguments

28 strikingly similar to Plaintiff's, and held:

The specific limitations in *Heller* and *McDonald* applying only to a ban on handgun possession in a home cannot be overcome by defendant's pointing to the *Heller* majority's discussion of the natural meaning of "bear arms" including wearing or carrying upon the person or in clothing. Nor can the *Heller* majority's holding that the operative clause of the second amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation" require heightened review of the AUUW statute's criminalization of the carrying of an uncased and loaded firearm.   As addressed above, *Heller specifically limited its ruling to interpreting the amendment's protection of the right to possess handguns in the home,* not the right to possess handguns outside of the home in case of confrontation-a fact the dissent heartily pointed out by noting that "[n]o party or *amicus* urged this interpretation; the Court appears to have fashioned it out of whole cloth." The *McDonald* Court refused to expand on this right, explaining that the holding in *Heller* that the second amendment protects "the right to possess a handgun in the home for the purpose of self-defense" was incorporated.

934 N.E.2d 598, 605-606 (Ill. App. Ct. 2010) (internal citations omitted) (emphasis added).  Recognizing that "when reasonably possible, a court has the duty to uphold the constitutionality of a statute," *id.* at *6, *Dawson* rejected the contention that the Second Amendment protects a broad right to carry that would invalidate Illinois's law. *See also People v. Aguillar*, --- N.E.2d ----, 2011 WL 693241 (Ill.App. 1 Dist., Feb. 23, 2011) (*Heller* and *McDonald* limited to "the right to possess handguns in the home, not the right to possess handguns outside the home.")

The Kansas Court of Appeals recognized that "[i]t is clear that the [*Heller*] Court was drawing a narrow line regarding the violations related solely to use of a handgun in the home for self-defense purposes. [The defendant's] argument, that *Heller* conferred on an individual the right to carry a concealed firearm, is unpersuasive." *State v. Knight*, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009).

The United States Court of Appeals for the Fourth Circuit declined to extend the Second Amendment right beyond the home, refusing to "push *Heller* beyond its undisputed core holding." *United States v. Masciandaro*, --- F.3d ---, 2011 WL 1053618, *16 (4th Cir. Mar. 24, 2011). The Court held: "On the question of *Heller*'s applicability outside the home environment, we think it prudent to await direction from the Court itself * * * If ever there was an occasion for restraint, this

BRIEF OF AMICUS CURIAE, BRADY CENTER TO PREVENT GUN VIOLENCE

*19*

1    would seem to be it." *Id.* at 16-17.

2        Other courts have similarly held that the right recognized in *Heller* and
3    *McDonald* is confined to the home. *See, e.g., Gonzalez v. Village of W. Milwaukee*,
4    No. 09CV0384, 2010 WL 1904977, *4 (E.D. Wis. May 11, 2010) ("The Supreme
5    Court has never held that the Second Amendment protects the carrying of guns
6    outside the home."); *United States v. Hart*, 725 F. Supp. 2d 56, 60 (D. Mass. 2010)
7    ("*Heller* does not hold, nor even suggest, that concealed weapons laws are
8    unconstitutional."); *Dorr v. Weber*, 741 F. Supp. 2d 993, 1005 (N.D. Iowa 2010)
9    ("[A] right to carry a concealed weapon under the Second Amendment has not been
10   recognized to date."); *Teng v. Town of Kensington*, No. 09-cv-8-JL, 2010 WL
11   596526, *5 (D.N.H. Feb. 17, 2010) ("Given that *Heller* refers to outright
12   'prohibition on carrying concealed weapons' as 'presumptively lawful,' far lesser
13   restrictions of the sort imposed here (i.e., requiring that Teng complete a one-page
14   application and meet with the police chief to discuss it) clearly do not violate the
15   Second Amendment.") (internal citation omitted); *United States v. Tooley*, 717 F.
16   Supp. 2d 580, 596 (S.D. W. Va. 2010) ("Additionally, possession of a firearm
17   outside of the home or for purposes other than self-defense in the home are not
18   within the 'core' of the Second Amendment right as defined by *Heller*."); *In re
19   Factor*, 2010 WL 1753307, *3 (N.J. Super. Ct. App. Div. Apr. 21, 2010) ("[T]he
20   United States Supreme Court has not held or even implied that the Second
21   Amendment prohibits laws that restrict carrying of concealed weapons."); *Riddick
22   v. United States*, 995 A.2d 212, 222 (D.C. 2010) (Second Amendment does not
23   "compel the District to license a resident to carry and possess a handgun outside the
24   confines of his home, however broadly defined." (quoting *Sims v. United States*,
25   963 A.2d 147, 150 (D.C. 2008)) .

26       This understanding of the Second Amendment (and state analogues) as not
27   protecting a right to carry guns or concealed weapons has been recognized for over
28   a century. *See, e.g.*, 1876 Wyo. Comp. Laws ch. 52, § 1 (1876 Wyoming law

W090334/001085 - 76996 v3

20

1   prohibiting anyone from "bear[ing] upon his person, concealed or openly, any

2   firearm or other deadly weapon, within the limits of any city, town or village"). *See*

3   *also* Ark. Act of Apr. 1, 1881; Tex. Act of Apr. 12, 1871; *Andrews v. State*, 50

4   Tenn. 165 (1871); *Fife v. State*, 31 Ark. 455 (1876); *English v. State*, 35 Tex. 473,

5   478 (1871); *Hill v. State*, 53 Ga. 472, 474 (1874); *State v. Workman*, 35 W. Va.

6   367, 373 (1891); *Ex parte Thomas*, 97 P. 260, 262 (Okla. 1908); *Aymette v. State*,

7   21 Tenn. 154, 159-61 (1840); *State v. Buzzard*, 4 Ark. 18, 21 (1842); *State v. Jumel*,

8   13 La. Ann. 399, 400 (1858).[2]

9        Noted scholars and commentators have also long recognized that a right to

10   keep and bear arms does not prevent states from restricting or forbidding guns in

11   public places. John Norton Pomeroy's Treatise, which *Heller* cited as representative

12   of "post-Civil War 19th century sources" on the right to bear arms, 554 U.S. at 618,

13   stated that the right to keep and bear arms "is certainly not violated by laws

14   forbidding persons to carry dangerous or concealed weapons . . . ." JOHN NORTON

15   POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED

16   STATES 152-53 (1868).  Judge John Dillon explained that even where there is a

17   right to bear arms, "the peace of society and the safety of peaceable citizens plead

18   loudly for protection against the evils which result from permitting other citizens to

19   go armed with dangerous weapons." Hon. John Dillon, *The Right to Keep and Bear*

20   *Arms for Public and Private Defense (Part 3)*, 1 CONT. L.J. 259, 287 (1874).

21   Another authoritative study noted that the Second Amendment and similar state

22   provisions had "not prevented the very general enactment of statutes forbidding the

23   carrying of concealed weapons," which demonstrated that "constitutional rights

24   must if possible be so interpreted as not to conflict with the requirements of peace,

25

26   [2] *Bliss v. Commonwealth*, 12 Ky. 90, 91, 93 (1822), in which the Kentucky
Supreme Court declared Kentucky's concealed-weapons ban in conflict with its

27   Constitution, is recognized as an exception to this precedent.  *See* Joel Prentiss
Bishop, *Commentaries on the Criminal Law* § 125, at 75-76 (1868). The Kentucky

28   legislature corrected the anomalous decision by amending the state constitution to
allow a concealed weapons ban. *See* KY. CONST. of 1850, art. XIII, § 25.

*21*

1   order and security." ERNST FREUND, THE POLICE POWER, PUBLIC POLICY AND

2   CONSTITUTIONAL RIGHTS (1904).  Post-*Heller* scholars recognize the logic behind

3   limiting the right to the home.  *See, e.g.*, Darrell A.H. Miller, *Guns as Smut:*

4   *Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278 (Oct.

5   2009); Michael C. Dorf, *Does Heller Protect a Right to Carry Guns Outside the*

6   *Home?*, 59 SYRACUSE L. REV. 225 (2008).

7       As the concealed weapons permitting process at issue does not impede on the

8   ability of individuals to keep handguns in defense of their homes, the Court should

9   not find that Plaintiff is challenging protected Second Amendment activity.

10      **B.    The Second Amendment Right Should Not Be Extended to Prevent**
11      **Restricting or Prohibiting Carrying Guns in Public.**

12      There are profound public safety rationales for restricting guns in public, as

13  California courts continue to recognize post-*Heller*:

14          Unlike possession of a gun for protection within a residence, carrying
15          a concealed firearm presents a recognized threat to public order, and is
            prohibited as a means of preventing physical harm to persons other
16          than the offender.  A person who carries a concealed firearm on his
            person or in a vehicle, which permits him immediate access to the
17          firearm but impedes others from detecting its presence, poses an
            imminent threat to public safety. . . .

18  *People v. Yarbrough*, 169 Cal.App.4th 303, 314 (2008) (internal quotations and

19  citations omitted); *see also United States v. Walker*, 380 A.2d 1388, 1390 (D.C.

20  1977) (there is an "inherent risk of harm to the public of such dangerous

21  instrumentality being carried about the community and away from the residence or

22  business of the possessor").  The Fourth Circuit recognized that these public safety

23  concerns support not extending the right to arms beyond the home, stating:

24          This is serious business. We do not wish to be even minutely responsible for
25          some unspeakably tragic act of mayhem because in the peace of our judicial
            chambers we miscalculated as to Second Amendment rights. It is not far-
26          fetched to think the *Heller* Court wished to leave open the possibility that
            such a danger would rise exponentially as one moved the right from the
27          home to the public square.

28  *Masciandaro*, 2011 WL 1053618, *17.

                                    BRIEF OF AMICUS CURIAE, BRADY
                                    CENTER TO PREVENT GUN VIOLENCE
                        - 10 -

\\090334\001085 - 76996 v3

22

The public carrying of firearms – especially of *concealed* weapons – pose issues and challenges not presented by the possession of firearms in the home. First, a broader range of individuals is threatened.  Firearms in the home are primarily a threat to their owners, family members, friends, and houseguests,[3] but firearms in public are a threat to law enforcement officers and other citizens.  The risks posed to society are great, as guns are used "far more often to kill and wound innocent victims than to kill and wound criminals … [and] guns are also used far more often to intimidate and threaten than they are used to thwart crimes." David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257, 271 (2000).  And while the threat to public safety is far broader than Plaintiff's claimed "shootings in street [sic] over parking places," Pl. Brief at 11, numerous concealed carry permit holders have shot and killed persons in public disputes, including over

---

[3] *See, e.g.,* Matthew Miller et al., *State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003,* SOC. SCI. & MED. (2006) ("States with higher rates of firearm ownership had significantly higher homicide victimization rates"); Lisa M. Hepburn & David Hemenway, *Firearm availability and homicide:  A review of the literature,* 9 AGGRESSION & VIOLENT BEHAVIOR 417 (2004) ("households with firearms are at higher risk for homicide, and there is no net beneficial effect of firearm ownership"); Matthew Miller et al., *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988–1997,* 92 AM. J. PUB. HEALTH 1988 (Dec. 2002) ("in areas where household firearm ownership rates were higher, a disproportionately large number of people died from homicide); Mark Duggan, *More Guns, More Crime,* 109 J. POL'Y. ECON. 1086 (2001); Matthew Miller et al., *Firearm availability and unintentional firearm deaths,* 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000) ("A statistically significant and robust association exists between gun availability and unintentional firearm deaths.").

BRIEF OF AMICUS CURIAE, BRADY
CENTER TO PREVENT GUN VIOLENCE

1  trivial matters such as parking.[4]  In just the last four years, concealed handgun

2  permit holders have shot and killed at least 11 law enforcement officers and 286

3  private citizens.  Violence Policy Center, *Concealed Carry Killers* (2011),

4  *available at*: http://vpc.org/ccwkillers.htm. States have a stronger need to protect

5  citizens from guns in public than from guns in homes.

6  Second, the carrying of firearms in public is not a useful or effective form of

7  self-defense and, in fact, has been shown to *increase* the chances of falling victim

8  to violent crime. While Plaintiff claims that an "armed citizenry" has caused a

9  "drop in violent crime" in other states, Pl. Brief at 11, he supplies no citations, and

10  the opposite is true.  Most states with laws broadly allowing concealed carrying of

11  firearms in public appear to "experience increases in violent crime, murder, and

12  robbery when [those] laws are adopted." John J. Donohue, *The Impact of

13  Concealed-Carry Laws*, *in* EVALUATING GUN POLICY EFFECTS ON CRIME AND

14  VIOLENCE 289, 320 (2003).  These laws "have resulted, if anything, in an *increase*

15  in adult homicide rates." Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent

16  Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998)

17  (emphasis in original).  Likewise, "firearms homicides increased in the aftermath of

18  [enactment of these] laws," and may "raise levels of firearms murders" and

19  "increase the frequency of homicide." David McDowall et al., *Easing Concealed

20  Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. &

21  CRIMINOLOGY 193, 202-203 (1995).  Similarly, "[f]or robbery, many states

---

22
23  [4] *See, e.g.*, Brian Hass, *Finger gestures, brake slamming, then road rage turned into a murder*, SOUTH FLORIDA SUN-SENTINEL, Aug. 8, 2008 (concealed carry permit ("CCW") holder shot customs agent in parking lot); *Man shot over parking space, suspect in custody*, WMCTV.COM, Sept. 16, 2010 (CCW holder shot and kill man
24  over parking dispute); Kathleen Cochrane, *Parking lot shooter claims self-defense*, WWW.FOX8.COM, Apr. 14, 2010 (CCW holder shot and killed attendant over
25  parking dispute); *Suspected McDonald's shooter arrested*, WMBFNEWS.COM, July 29, 2009 (CCW holder killed man over parking dispute); Jeff Woods, *Yet Another
26  Killing Charged to State-Licensed Gunman*, NASHVILLE SCENE, Apr. 19, 2010 (CCW holder shot and killed man for driving golf cart into car's path); Lawrence
27  Buser, *Coleman found guilty of second-degree murder in parking lot shooting*, MEMPHIS COMMERCIAL APPEAL, July 17, 2010 (CCW holder shot man over parking
28  dispute).

BRIEF OF AMICUS CURIAE, BRADY
CENTER TO PREVENT GUN VIOLENCE

\\\090334\001085 - 76996 v3

*24*

experience increases in crime" after concealed carry laws are enacted. Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, THE ECON. OF GUN CONTROL 473 (May 1998). Several statistical approaches "indicate a rather substantial increase in robbery," while "policies to *discourage* firearms in public may help prevent violence." John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623 (2004). Another study found "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault," and "guns did not protect those who possessed them from being shot in an assault." Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, AMER. J. PUB. HEALTH, vol. 99, No. 11 at 1, 4 (Nov. 2009). Likewise, another study found:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun. Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults. If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.

Philip Cook et al., *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

Third, the carrying of firearms in public has other negative implications that are not impacted by handguns in the home. When the carrying of guns in public is restricted, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. Ct. 1991); *see also Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996) ("officer's observance of an individual's possession of a firearm in a public place in Philadelphia is sufficient to create reasonable suspicion

BRIEF OF AMICUS CURIAE, BRADY CENTER TO PREVENT GUN VIOLENCE

\\\\090334\001085 - 76996 v3

*25*

1  to detain that individual for further investigation"). Out of "a growing concern over
2  an increase in the carrying of loaded firearms" and the dangers resulting "from
3  either the use of such weapons or from violent incidents arising from the mere
4  presence of such armed individuals in public places," *People v. Zonver*, 132
5  Cal.App.3d Supp.1, 5 (1982) (quoting Stats. 1967, ch. 960, § 6), the California
6  legislature similarly enacted Section 12031, which generally prohibits the carrying
7  of loaded firearms in public or in vehicles, and states that peace officers may arrest
8  persons who they have probable cause to believe are illegally carrying loaded guns.
9  CAL. PENAL CODE §12031(a)(5). Yet if officers were required to effectively
10  presume that a person carrying a firearm in public was doing so lawfully, it is
11  possible that an officer would not be deemed to have cause to arrest, search, or
12  engage in a *Terry* stop if she spotted a person carrying a loaded gun, even though
13  far less risky behavior could justify police intervention. Law enforcement should
14  not have to wait for a gun to be fired before protecting the public. Further, if
15  drivers were allowed to carry loaded guns, road rage can become a more serious
16  and deadly problem. David Hemenway, *Road Rage in Arizona: Armed and*
17  *Dangerous*, 34 ACCIDENT ANALYSIS & PREVENTION 807-14 (2002). An increase in
18  gun prevalence in public also may cause an intensification of criminal violence.
19  Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, J. PUB. ECON.
20  379, 387 (2006).

21  The concealed weapons permitting process at issue here prevents many of
22  these risks to the public, without implicating Second Amendment activity protected
23  in *Heller*. Individuals in California who are not otherwise disqualified by operation
24  of law and who can demonstrate that they can possess and use firearms responsibly
25  are allowed to maintain handguns to protect themselves in the home. *See* CAL.
26  PENAL CODE § 12026(b). There is no basis to expand that right to the carrying of
27  concealed weapons in public.

28  **II.    EVEN IF THE CONCEALED WEAPONS PERMITTING PROCESS**

BRIEF OF AMICUS CURIAE, BRADY
CENTER TO PREVENT GUN VIOLENCE

26

**IN SECTION 12050 DID IMPLICATE PROTECTED SECOND
AMENDMENT ACTIVITY, IT WOULD WITHSTAND THE
APPROPRIATE LEVEL OF SCRUTINY.**

Even if this Court were to hold that the Second Amendment protects a right
to carry concealed guns in public, California's permitting process is a permissible
regulation of such a right under any appropriate level of scrutiny.

**A.    The Reasonable Regulation Test is the Appropriate Standard of
Review.**

In choosing a level of scrutiny for Second Amendment challenges, this court
should not be limited to the choices utilized in First Amendment jurisprudence,[5] for
the exercise of Second Amendment rights creates unique risks that threaten public
safety and can be far more lethal than even the most dangerous speech. "Words can
never hurt me," but guns are designed to inflict grievous injury and death. Prior
restraint of speech may be unacceptable, but prophylactic measures to prevent
shootings before they occur are essential to protect the public. *Amicus* respectfully
submits that the standard of review best suited to the Second Amendment is the
"reasonable regulation" test, which has been applied by courts across the country,
for over a century, to construe the right to keep and bear arms.

While courts are just beginning to grapple with a private right to arms under
the federal Constitution, courts in over forty states have construed analogous state
provisions for over a century. With remarkable unanimity, they have coalesced
around a single standard: the "reasonable regulation" test. *See* Adam Winkler,
*Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 686-87, n. 12 (2007).
Under this test, a state "may regulate the exercise of [the] right [to bear arms] under

---

[5] The Supreme Court has fashioned a variety of standards of review tailored to
specific constitutional inquiries. *See, e.g., Kennedy v. Louisiana*, 554 U.S. 407, 420
(2008) (Eighth Amendment's prohibition of cruel and unusual punishment
measured by "evolving standards of decency" test); *Planned Parenthood v. Casey*,
505 U.S. 833, 874 (1992) (right to choose measured by "undue burden" test);
*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (procedural due process requires
balancing three competing interests); *Terry v. Ohio*, 392 U.S. 1, 30 (1968) ("stop
and frisk" under Fourth Amendment upheld on officer's "reasonable grounds").

1    its inherent police power so long as the exercise of that power is reasonable."

2    *Robertson v. City & County of Denver*, 874 P.2d 325, 328, 333 n. 10 (Colo. 1994).[6]

3    This "reasonable regulation" test protects Second Amendment activity, while

4    recognizing "the state's right, indeed its duty under its inherent police power, to

5    make reasonable regulations for the purpose of protecting the health, safety, and

6    welfare of the people." *State v. Comeau*, 448 N.W.2d 595, 599 (Neb. 1989).

7         The reasonable regulation test is more demanding than the rational basis test

8    rejected by the *Heller* majority, as it focuses on whether "the restriction . . . is a

9    reasonable exercise of the State's inherent police powers" and not "merely on

10   whether any conceivable rationale exists under which the legislature may have

11   concluded the law could promote the public welfare." *State v. Cole*, 665 N.W. 2d

12   328, 338 (Wis. 2003).  And unlike the "interest balancing" test suggested by Justice

13   Breyer's dissent, it does not permit states to prohibit all firearm ownership. *See*

14   Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:*

15   *An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1458

16   (2009); *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2002); *Trinen v. City of*

17   *Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002); *State v. Dawson*, 159 S.E.2d 1, 11

18   (N.C. 1968).  Rather, the test allows laws that are reasonably designed to further

19   public safety. *See, e.g., Robertson*, 874 P.2d at 328, 330 n. 10 ("The state may

20   regulate the exercise of [the] right [to bear arms] under its inherent police power so

21   long as the exercise of that power is reasonable."); *Jackson*, 68 So.2d 850, 852

22   (Ala. Ct. App. 1953) (same); *Bleiler*, 927 A.2d at 1223 (same).

23         Adopting the reasonable regulation test here would not be at odds with

24   district courts that have elected to use intermediate scrutiny following *Heller*, for in

25

---

26   [6] *See also Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216, 1223 (N.H. 2007)
     (the relevant inquiry is "whether the statute at issue is a 'reasonable' limitation
27   upon the right to bear arms"); *Jackson v. State*, 68 So.2d 850, 852 (Ala. Ct. App.
     1953) ("It is uniformly recognized that the constitutional guarantee of the right of a
28   citizen to bear arms, in defense of himself and the State... . . . is subject to
     reasonable regulation by the State under its police power.").

\\\090334/001085 - 76996 v3

1    virtually all such cases the court evaluated broad restrictions on classes of
2    individuals and types of arms, not individualized determinations of the sort at issue
3    here. *See, e.g., United States v. Chester*, 628 F.3d 673 (4th Cir. 2010); *United*
4    *States v. Marzzarella*, 614 F.3d 85 (3rd Cir. 2010); *United States v. Yanez-Vasquez*,
5    No. 09-40056-01-SAC, 2010 WL 411112 (D. Kan. Jan. 28, 2010); *United States v.*
6    *Miller*, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009); *United States v. Bledsoe*, No. SA-
7    08-CR-13(2)-XR, 2008 WL 3538717 (W.D. Tex. 2008).[7]  As courts are more wary
8    of laws that restrict broad classes of people than laws that require individual
9    determinations, heightened scrutiny is less appropriate here.

10        The reasonable regulation test affords law enforcement officials the
11   discretion they need to adequately enforce handgun laws.  Given their training and
12   expertise in firearms and their risks, and their familiarity with members of their
13   communities, local law enforcement is best situated to make determinations about
14   who in their communities can carry concealed weapons safely and responsibly.[8]
15   *See, e.g., Harman v. Pollock*, 586 F.3d 1254, 1265 (10th Cir. 2009) ("[Courts] must
16   defer to trained law enforcement personnel, allowing officers to draw on their own
17   experience and specialized training to make inferences from and deductions about
18   the cumulative information available to them.") (internal quotation omitted); *Avant*
19   *Indus. Ltd. v. Kelly*, 318 A.2d 47, 50 (N.J. Super. Ct. App. Div. 1974) ("[w]e defer
20   to [police's] expertise in this field" of reviewing gun permits).  Law enforcement
21   also has a particular stake in who can carry firearms, as they enforce gun laws,
22   respond to situations involving firearms, and are often placed at grave risk.

---

23
24   [7] The only exception appears to be *Heller v. District of Columbia*, in which
     plaintiffs challenged the District of Columbia's firearm registration procedures, and
     prohibitions on assault weapons, and large capacity ammunition feeding devices.
25   698 F. Supp. 2d 179, 181 (D.D.C. 2010).  But in that case, two of the three
     provisions were broad restrictions on classes of weapons.
26   [8] States that do *not* afford any discretion to law enforcement officials have issued
27   handgun carry permits to numerous individuals who have gone on to kill innocent
     civilians and law enforcement members.  *See* Violence Policy Center, *Private*
28   *Citizens Killed by Concealed Handgun Permit Holders: May 2007 to the Present,*
     *available at* http:// www.vpc.org/ccwkillers.htm.

1    There is a profound governmental interest in regulating the possession and

2    use of firearms.  States have "cardinal civic responsibilities" to protect the health,

3    safety, and welfare of their citizens. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328,

4    342 (2008); *see also Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80, 83 (1946)

5    ("[T]he legislature may choose not to take the chance that human life will be lost . .

6    . ."). States are generally afforded "great latitude" in exercising "police powers to

7    legislate as to the protection of the lives, limbs, health, comfort, and quiet of all

8    persons . . . ." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotations

9    omitted).  Regulations on the carrying of firearms are an essential exercise of those

10   powers, for the "promotion of safety of persons and property is unquestionably at

11   the core of the State's police power." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).

12   While individuals and organizations differ on the net risks posed by guns,

13   such disagreement underlines that firearm regulation is best suited for the

14   legislative arena, not the courts.  *See Miller*, 604 F. Supp. 2d at 1172 n. 13 ("[D]ue

15   to the intensity of public opinion on guns, legislation is inevitably the result of

16   hard-fought compromise in the political branches.").  Legislatures are designed to

17   make empirical judgments about the need for and efficacy of regulation, even when

18   that regulation affects the exercise of constitutional rights. *See, e.g., Turner Broad.

19   Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (state legislatures are "far better

20   equipped than the judiciary to 'amass and evaluate the vast amounts of data'

21   bearing upon legislative questions."); *Richmond v. J.A. Croson Co.*, 488 U.S. 469,

22   544 (1989) ("Local officials, by virtue of their proximity to, and their expertise

23   with, local affairs, are exceptionally well qualified to make determinations of public

24   good within their respective spheres of authority.") (internal quotations and

25   citations omitted).   State governments "must [thus] be allowed a reasonable

26   opportunity to experiment with solutions to admittedly serious problems." *Young v.

27   American Mini Theatres, Inc.*, 427 U.S 50, 71 (1976).

28   In fulfilling their responsibility to protect the public, states have enacted laws

BRIEF OF AMICUS CURIAE, BRADY
CENTER TO PREVENT GUN VIOLENCE

- 18 -

30

1    and permitting regimes – like the one at issue here – to ensure that guns are used
2    responsibly and possessed by responsible, law-abiding persons, and these laws have
3    reduced the use of guns in crime and saved lives. *See, e.g.*, D.W. Webster et al.,
4    *Effects of State-Level Firearm Seller Accountability Policies on Firearm*
5    *Trafficking*, 86 J. URBAN HEALTH: BULLETIN OF THE N.Y. ACAD. OF MED. 525
6    (2009); D.W. Webster et al., *Relationship Between Licensing, Registration, and*
7    *Other State Gun Sales Laws and the Source State of Crime Guns*, 7 INJURY
8    PREVENTION 184 (2001); Douglas Weil & Rebecca Knox, *Effects of Limiting*
9    *Handgun Purchases on Interstate Transfer of Firearms*, 275 J. AM. MED. ASS'N
10   1759 (1996).  The risk posed by unduly restricting these legislative judgments is
11   severe, and courts should review such judgments with appropriate deference.  The
12   reasonable regulation test is best situated to defer to these legislative judgments.

13          **B.     The Concealed Weapons Permitting Process at Issue Is**
                     **Constitutionally Permissible.**
14

15          California's concealed weapons permitting process clearly passes the
16   reasonable regulation test.  The law does not infringe on the Second Amendment
17   rights of law-abiding, responsible citizens to a gun in the home for the self-defense.
18   Yet it is supported by the "compelling state interest in protecting the public from
19   the hazards involved with certain types of weapons, such as guns," particularly
20   given "the danger [posed by the] widespread presence of weapons in public places
21   and [the need for] police protection against attack in these places." *Cole*, 665 N.W.
22   2d at 344 (internal quotations omitted).  There is strong evidence that permitting
23   and registration procedures for public carrying reduce gun deaths and criminal
24   access to firearms. *See, e.g.*, Webster et al., *Relationship Between Licensing*, at
25   184. Webster et al., *Effects of State-Level*, at 525; Weil & Knox, *Effects of Limiting*
26   *Handgun Purchases*, at 1759.  The Second Amendment does not forbid state or
27   local governments from using thus restricting the public carrying of firearms as
28

BRIEF OF AMICUS CURIAE, BRADY
CENTER TO PREVENT GUN VIOLENCE

\\\\090334\001085 - 76996 v3                                                    *31*

1    California has done.[9]

2                               **CONCLUSION**

3         For all the foregoing reasons, *amicus* respectfully requests that the Court find

4    Section 12050 to be constitutional.

5

6

7    Dated: April 20, 2011                Respectfully submitted,

8

9                                         *Neil R. O'Hanlon*
                                          Neil R. O'Hanlon, SBN 67018
10                                        Hogan Lovells US LLP
                                          1999 Avenue of the Stars, Suite 1400
11                                        Los Angeles, CA 90067
                                          Telephone: (310) 785-4600
12                                        Facsimile: (310) 785-4601
                                          E-mail: neil.ohanlon@hoganlovells.com
13
                                          Adam K. Levin
14                                        S. Chartey Quarcoo
                                          Hogan Lovells US LLP
15                                        555 13th Street, NW
                                          Washington, DC 20004
16                                        Telephone: (202) 637-5600
                                          Facsimile: (202) 637-5910
17                                        E-Mail: adam.levin@hoganlovells.com

18                                        Jonathan E. Lowy
                                          Daniel R. Vice
19                                        Brady Center to Prevent Gun Violence
                                          Legal Action Project
20                                        1225 Eye Street, NW, Suite 1100
                                          Washington, DC 20005
21
                                          Counsel for *Amicus Curiae* Brady Center to
22                                        Prevent Gun Violence

23

24

25

26

27   _____
     [9] Even under intermediate scrutiny, which *amicus* maintains need not be applied in
28   this case, California's statute would pass constitutional muster. *See Peruta*, 2010
     WL 5137137, at *8.

                                                     BRIEF OF AMICUS CURIAE, BRADY
                                          - 20 -     CENTER TO PREVENT GUN VIOLENCE

1

PROOF OF SERVICE

2   STATE OF CALIFORNIA   )
                          ) ss.
3   COUNTY OF LOS ANGELES )

4   I am employed in the County of Los Angeles, State of California. I am over the age
    of eighteen and not a party to the within action; my business address is: Hogan
5   Lovells US LLP, 1999 Avenue of the Stars, Suite 1400, Los Angeles, CA 90067.

6   On April 20, 2011, I caused the foregoing document described as:

7   **Application of Brady Center to Prevent Gun Violence to file Brief as Amicus
    Curiae**
8

9   to be served on the interested parties in this action by delivering the original
    enclosed in a sealed envelope addressed as follows:

10  See attached Service List.

11  [ ]   **BY E-MAIL.** Based on an agreement of the parties to accept service by e-
          mail, I caused the document to be sent to the person at the e-mail address
12        listed above. I did not receive, within a reasonable time after the
          transmission, any electronic message or other indication that the transmission
13        was unsuccessful.

14  [X]   **BY MAIL.** I sealed said envelope and placed it for collection and mailing
          following ordinary business practices.
15

16  [ ]   **BY HAND DELIVERY.** I caused such envelope to be delivered by hand to
          the offices of the addressee(s) following ordinary business practices.

17  [ ]   **BY UNITED PARCEL SERVICE.** I caused such document to be delivered
          by overnight mail to the offices of the addressee(s) by placing it for collection
18        by UPS following ordinary business practices by my firm, to wit, that
          packages will either be picked up from my firm by UPS and/or delivered by
19        my firm to the UPS office.

20  [ ]   (State) I declare under penalty of perjury under the laws of the State of
          California that the foregoing is true and correct. Executed on , at Los
21        Angeles, California.

22  [X]   (Federal) I am employed in the office of a member of the bar of this court at
          whose direction the service was made. I declare under penalty of perjury
23        under the laws of the United States that the foregoing is true and correct.
          Executed on April 20, 2011 at Los Angeles, California.
24

25

26  Marjorie Sener
    Print Name                                    Signature

27

28

1          **Service List**

2   Jonathan Wesley Birdt
    Law Offices of Jonathan W. Birdt
3   18252 Bermuda Street
    Porter Ranch, CA 91326
4
    Elizabeth Anne Mitchell
5   Office of City Attorney
    City Hall East
6   200 North Main Street, 6th Floor
    Los Angeles, CA 90012
7
    Jennifer A.D. Lehman
8   Los Angeles County Counsel
    651 Kenneth Hahn Hall of Administration
9   500 West Temple Street
    Los Angeles, CA 90012-2713
10
11  Wendy C. Shapero
    Los Angeles City Attorney's Office
12  City Hall E – Police Litigation
    200 N. Main St., 6th Fl.
13  Los Angeles, CA 90012-4130

14  Jonathan C. McCaverty
    Los Angeles County Counsel
15  500 West Temple Street, 6th Floor
    Los Angeles, CA 90012

16

17

18

19

20

21

22

23

24

25

26

27

28