JONATHAN W. BIRDT – SBN 183908
18252 Bermuda Street
Porter Ranch, CA 91326
Telephone: (818) 400-4485
Facsimile: (818) 428-1384
jon@jonbirdt.com
Plaintiff

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JONATHAN BIRDT, | CASE NO. 2:10-CV-08377-RGK (JEM) |
| Plaintiff, | **PLAINTIFF'S JOINT OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| vs. | |
| CHARLIE BECK, LEE BACA, THE LOS ANGELES POLICE DEPARTMENT and THE LOS ANGELES COUNTY SHERIFFS DEPARTMENT, DOES 1 to 50, | Date: May 16, 2011<br>Time: 9:00 a.m.<br>Department: 850<br>Before: Hon. R. Gary Klausner<br>Location: Roybal Courthouse,<br>255 East Temple Street<br>Los Angeles, CA 90012 |
| Defendants. | |

## I. INTRODUCTION

There are no genuine disputes of fact presented by the motions: Plaintiff's CCW application was denied for the sole reason that he was not a victim of a crime and a CCW permit is the only way plaintiff can exercise his Second Amendment right outside of the home.

LAPD 30(b)(6) witness admissions:

Q. Well, let me represent to you that I live across the street from a school. Assuming that to be true, I cannot possession any firearm if I step off my property unless it's in a looked container or I have a CCW permit, true.

…

A   True.

LAPD Deposition, Page 37, Lines 2-9.

The only genuine legal dispute appears to be whether the Second Amendment applies outside the home, for which defendants have relied on California Case law decided before *McDonald v. City of Chicago, 130 S. Ct. 3020*, which Plaintiff contends, to the extent Defendant contends those case support their argument, were overruled in *People v. Delacy (2011) 192 Cal.App.4th 1481*.  Plaintiff has satisfied all of the background and training requirements according to the LAPD 30(b)(6) witness admissions:

Q   Sure.  There are in general three requirements for the issuance of a permit:  Training, background, and good cause; is that fair a statement?

A   Yes.

Q   And as to training and background, I presented sufficient evidence to satisfy those two elements, correct?

A   Yes.  Deposition of LAPD, Page 35, Lines 18-25.

Both the County and City admit that they have not reviewed their policies following *District of Columbia v. Heller, (2008) 128 S. Ct. 2783 and McDonald, infra.*, that they seek to drastically restrict permits out of a belief the issuing CCW permits will increase crime, and both readily admit they have no evidence to support this flawed theory.  Moreover, logic and reality demonstrate that increased training reduces injury, and the last 30 years have seen corresponding drops in violent crime mirrored by increased issuance of CCW Permits.  Therefore Plaintiff's Second Amendment right has been violated due the failure to issue him a CCW Permit.

II. **LASD IMPERSIBLY LIMITS SECOND AMENDMENT RIGHTS TO THOSE WHO HAVE ALREADY BEEN THE VICTIM OF CRIME**

Larry Waldie is the Under Sheriff, vested with full authority under California Law, and the arbiter of "Good Cause" for Los Angeles Residents. Unfortunately, he is not familiar with any recent case law, and has not reviewed his policy in 44 years:

> Q. Okay. Are you aware of any recent change in law by the United States Supreme Court as it would relate to a citizen's right to keeping bear arms?
>
> A No. Waldie Deposition, Page 4 line 24 to page 5, line 2.
>
> Q Okay. So unless a person has been a victim of a criminal threat, they will not receive a CCW permit from your department; true?
>
> A For the most part, yes.

Waldie Deposition, Page 22, Line 23 to Page 24, line 1.

As set forth above, for a Los Angeles resident, the only way they can exercise their inherent right in Los Angeles is after they have been the victim of a crime and the only way to carry a functional firearm is with a CCW Permit:

> Q. Under normal circumstances -- a citizen who just wants to walk out of their house and walk their dog -- the only way that person can carry a loaded firearm, legally, is if they have a concealed weapons permit; true?
>
> A: I would think that would be true.

Waldie deposition, Page 12, Lines 5-12.

III. **LAPD IMPERSIBLY LIMITS SECOND AMENDMENT RIGHTS TO THOSE WHO HAVE ALREADY BEEN THE VICTIM OF CRIME**

In the past ten years, the LAPD has issued four CCW permits, and adheres to a "very strict" policy of defining good cause to limit the number of permit holders (24 total, 15 of whom were *Assenza*[1] Plaintiffs). It is unclear how many of the remaining nine had to sue, but Chief Bratton issued only two as has Chief Beck:

---

[1] See Exhibit B to the Declaration of Plaintiff attached to the Opposition to LAPD's Separate Statement.

| | | |
|---|---|---|
| Q. | My understanding is the City of Los Angeles only has 24 activity CCW permits right now; is that correct? | |
| A | Yes. | |
| Q | And of those permits can you tell me approximately how many are ascends[*Assenza*] of plaintiffs? | |
| A. | 15. | |
| Q | And of the remaining approximately nine, can you tell me how many of those are new applicants, let's say, within the last 10 years? | |
| A. | I have a vague recollection that we have four new applicants or Ccw applicants or permits. | |

LAPD Deposition, Page 7, Lines 8-25.

The LAPD witness also confirmed that, for a Los Angeles resident, the only way they can possess a functional firearm outside of the home is with a CCW Permit:

Q   I'm talking about normal circumstances.  I want to for walk my dog, there's nobody chasing me with a gun, the only way I can lawfully possession a load[ed] firearm is with a CCW permit?

A   Yes.  Again, with the exeption of 12025, yes.

LAPD Deposition, Page 33, Lines 2-6

The LAPD also confirms that it has not made any changes in response to *Heller/McDonald*, and in fact follows a policy that is arguably moot, citing <u>Penal Code</u> 12025 which permits Concealed Carry without a permit when someone is under the immediate threat of harm, the exact same standard for the issuance of a permit, thus leading to the logical question- Why did the legislature create a separate permitting system with requirements?

The LAPD 30(b)(6) witness admissions describing "Good Cause":

Q   What is required to establish good cause.

…

| | | |
|---|---|---|
| 1 | A | LAPD defines good cause to be a clear and present danger of immediate |
| 2 | | threat to life or great bodily injury to the applicant, to his suppose, or to |
| 3 | | his kids.  And that threat cannot be dealt with by existing law |
| 4 | | enforcement resources.  And the applicant cannot reasonably avoid that |
| 5 | | danger or threat.  And LAPD will also look at whether or not the |
| 6 | | issuance of the CCW will significantly lesson the threat or danger to the |
| 7 | | applicant. |

LAPD Deposition, Page 15, line 13 to page 16, line 1.

The LAPD 30(b)(6) witness admissions describing why their policy is so draconian:

Q	Why does did LAPD have such a restrictive definition of good cause.

…..

A	LAPD has a very strict CCW policy to limit the amount of CCW permits that are issued by the Chief of police specifically to the people that need them, that people can -- that we can't protect or help.

……

A	It was dramatic pause.  Again, it also protects the life of the Los Angeles Police Officer and the community members.

LAPD Deposition Page 30 lines 8-23.

The LAPD designated spokesperson on the Good Cause Policy admitting that they do not have ANY justification for their policy:

Q	And can you please tell me all evidence, facts, studies or information upon which you rely for the assertion that your very strict policy protects officers?

A.	I don't.  I have any of the information for you, sir.

Q	Would your answer be the same if I asked about how it would protect the community?

A	That's correct. LAPD Deposition, Page 30 line 24 to Page 31, line 10.

| | | |
|---|---|---|
| Q | | Any other reason you provide for why you have a very strict policy to limit the number of permits other than the two you gave me? |
| A | | If we make the policy any less strict, the vast majority of the people in Los Angeles would have – or would qualify for CCW, and would put more guns on the street and lead to more gun violence, and the fear of the gun violence. |
| Q. | | And can you please tell me all of the facts, evidence, information, studies, or other information upon which you support your statement that issuing more permits would lead to more gun violence. |
| … | | |
| A | | I don't have any of information, Sir. |

LAPD Deposition, Page 31, Lines 11-25.

Clearly, while the LAPD does not want to recognize the right of residents, they can point to no compelling, logical, or even rational reason for restricting a fundamental constitutional right.  It is also important to note that in each State that has recognized the right of its' citizenry to bear arms, there has been no rush on permits, and in Florida, a shall issue State, less than five percent of adult citizens have sought a permit.

### IV.  DEFENDANTS LEGAL AUTHORITIES HAVE ALL BEEN OVERRULED

Defendants incorrectly cite to *People v. Flores (2008) 169 Cal.App.4th 568, People v. Villa (2009) 178 Cal.App.4th 443* and *People v. Yarbrough (2008) 169 Cal.App.4th 303*, all pre-*McDonald* cases.  Since the filing of Plaintiffs motion, California's First Appellate district, in upholding a regulation, found:

> The Second Amendment to the United States Constitution provides: "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." In *Heller,* the Supreme Court held the Second Amendment protects an individual right "to possess and carry weapons in case of confrontation," unconnected with service in a militia.

(*Heller, supra,* 128 S.Ct. at p. 2797; see also pp. 2817–2818, 2821–2822.) The court struck down a District of Columbia law effectively banning the possession of handguns in the home. (*Id.* at pp. 2817–2819.)

More recently, in *McDonald v. City of Chicago* (2010) –– U.S. ––, 130 S.Ct. 3020, 177 L.Ed.2d 894 (*McDonald* ), the court held the Second Amendment right recognized in *Heller* is "fully applicable to the States." (*Id.* at p. 3026 (plur. opn. of Alito, J.); *id.* at pp. 3058, 3088 (conc. opn. of Thomas, J.).) A plurality of the *McDonald* court concluded the Second Amendment right applies to the states because it is "fundamental" to the American "scheme of ordered liberty" and is therefore incorporated in the due process clause of the Fourteenth Amendment. (*McDonald,* at pp. 3036, 3050 (plur. opn. of Alito, J.).) In a concurring opinion, Justice Thomas agreed with the plurality's characterization of the Second Amendment right as "fundamental." (*Id.* at p. 3059 (conc. opn. of Thomas, J.).)

*People v. Delacy* (2011) 192 Cal.App.4th 1481.

### V. DEFENDANTS ARBITRAILY PROHIBITS LAW ABIDING CITIZENS FROM POSSESSING FUNCTIONAL FIREARMS BASED SOLELY UPON PERSONAL BELIEF THAT GUNS INCREASE VIOLENCE

The United States Supreme Court has clearly stated, with regard to the Second Amendment, that: "Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller* (2008) 128 S. Ct. 2783, 2798.   The state may have an interest in reducing gun violence and accidents, but it cannot presume that the exercise of a constitutional right will cause the sort of harm it is allowed to curtail. Defendants cannot point to the impact of their practice – the deprivation of constitutional rights – as their interest. *Simon & Schuster, Inc.* v. *N.Y. State Crime Victims Bd.* (1991) 502 U.S. 105, 120.  If anything, logically, requiring additional training will reduce gun violence and accidents involving firearms.

There is no State interest in depriving people of the means of self-defense. The State may have an interest in reducing gun violence and accidents, but it cannot presume that the exercise of a constitutional right will cause the sort of harm it is allowed to curtail. Defendants cannot point to the impact of their practice – the deprivation of constitutional rights – as their interest. *Simon & Schuster, Inc.* v. *N.Y. State Crime Victims Bd.* (1991) 502 U.S. 105, 120.

> Q   Okay.  So unless a person has been a victim of a criminal threat, they will not receive a CCW permit  from your department; true?
>
> A   For the most part, yes.

Waldie Deposition at Page 22, Line 23 to Page 24, line 1.

> Q   So let's talk about a threat of immediate harm. What does that mean?
>
> A.  Again, it's pretty clear on the way it's defined.  The person is going to be great bodily injury, going to be hurt with read bodily injury or threat to life.

LAPD Deposition Page 20, Lines 18-23

> Q   But to satisfy the good cause requirement of clear and present danger the applicant must demonstrate that they are in immediate risk of great bodily harm, true?
>
> A   Yes.  Great bodily injury?
>
> Q   Correct?
>
> A   Yes.

LAPD Deposition Page 21, lines 11-17.

There is something deeply illogical about Defendants' refusal to issue a permit to carry a handgun until *after* a realistic threat to one's life and/or loved ones has materialized, it is a little like closing the barn door after the horses have run out. Bearing arms, within the meaning of the Second Amendment, includes carrying handguns "for the purpose . . . of being armed and ready for offensive or defensive

action in a case of conflict with another person." *Heller*, 128 S. Ct. at 2793 (citations omitted, not the phrase "home" because no such limitation exists on the Second Amendment). The Second Amendment does not exist merely to increase the security of previously victimized individuals. If the conflict has already occurred, the unarmed would-be permit applicant might be dead. Because criminal attacks are often random, there is no particular reason to expect that a person who has previously been victimized might be more likely to need a gun than someone who has yet to be victimized. The point of having a gun available for self-defense is to avoid victimization in the first place.

### VI. THE ONLY MECHANISM FOR A LAW ABIDING CITIZEN TO POSSESS A FUNCTIONAL FIREARM IN CALIFORNIA IS WITH A CCW PERMIT, AND CURRENTLY, THAT POWER RESTS SOLELY WITH LARRY WALDIE

Defendants argue that the Second Amendment is limited to the home, or in the alternative, that they do not infringe on it "that much".  To justify their infringement, defendants rely on a vague belief that more guns equal more crime, but do not offer any support for this feeling in their motion, or through the only person with the authority to issue CCW permits:

> Q. Okay.  Can you point to any study or correlation between increased issuance of CCW permit  and gun violence?
> A   No.

Waldie deposition at page 25 line 4-12.

> Q   Can you provide any support for how your  policy of drastically restricting the issuance of CCW   permits prevents violence?
> A    I -- I think just the -- putting more guns on  the street, I think could clearly create much more  violence in the County of Los Angeles, and I think we  need to restrict the number of weapons that are available on the streets legally.

Waldie deposition at Page 25, lines

| | | |
|---|---|---|
| Q | | How does your restrictive policy regarding CCW's protect against gun violence in the community at large? |
| A | | Basically, restricting the number of weapons that possibly could get on the street and lead to violent and inappropriate manner. |
| Q | | Okay. And you've already talked about all of the studies, investigation, or research done by you to support that theory? |
| A | | I said I did not have any. |

Waldie deposition at Page 32 line 22 to page 33 line 9.

Defendants seek to defend their conduct arguing that the compelling interest of public safety drives their actions, but what defendants fail wholeheartedly to show is how their actions accomplish that goal. Defendants admit that their officers lose more guns and cause more harm than CCW holders, and that they do not have any research or statistics to back up their theory. The declaration of purported expert Zimring does not even express an opinion, much less state any opinion to a reasonable degree of scientific certainty, and as such, it should be excluded.

The fact of the matter is that there is no evidence that "drastically curtailing" or imposing a "very strict" policy regarding permits in any way accomplishes the goal of increasing public safety, and if anything, the opposite can be said. Over the last thirty years, the availability of permits has increased from 10 States to 43, gun sales have skyrocketed, and the FBI confirms the rate of violent crime has dropped significantly each year. As such, while many argue the correlation, the only true evidence is that while gun ownership and CCW permits increase, violent crime drops. Further, defendants suggest a fear that every citizen will carry a gun in public, again, reality interferes. Florida has had a Right to Carry Law since the early 1980's and has an adult population of about 20,000,000, but as of the last reporting date (October 31, 2010) only 767,739 licensed permit holders.

In fact, neither witness would even point to any evidence that their policy was in any way related to their goals: Studying crime trends in every county in the U.S., John Lott and David Mustard concluded, "allowing citizens to carry concealed weapons deters violent crimes. . . .[W]hen state concealed handgun laws went into effect in a county, murders fell by 8.5 percent, and rapes and aggravated assaults fell by 5 and 7 percent." Lott, "Crime, Deterrence, and Right To Carry Concealed Handguns" 1996. Former Colorado Asst. Atty. Gen. David Kopel: "Whenever a State legislature first considers a concealed carry bill, opponents typically warn of horrible consequences.... But within a year of passage, the issue usually drops off the news media's radar screen, while gun-control advocates in the legislature conclude that the law wasn't so bad after all." David Kopel, "The Untold Triumph of Concealed-Carry Permits," Policy Review, July-Aug. 1996, p. 9.

An article on Michigan's law: "Concerns that permit holders would lose their tempers in traffic accidents have been unfounded. Worries about risks to police officers have also proved unfounded.... National surveys of police show they support concealed handgun laws by a 3-1 margin....There is also not a single academic study that claims Right to Carry laws have increased state crime rates. The debate among academics has been over how large the benefits have been." "Should Michigan keep new concealed weapon law? Don't believe gun foe scare tactics," Detroit News, 1/14/01.

### VII. EQUAL PROTECTION IS IMPLICATED BECAUSE CRIME VICTIMS ARE SEPARATED OUT

Q   Under normal everyday circumstances, the California legislature has chosen as the only mechanism by which a law abiding citizen under normal circumstances can possess a loaded firearm outside of the home is with a CCW permit; true?

A   Yes.

Waldie deposition at Page 41.

Defendant treats all law abiding citizens, with proper training differently and classifies them based upon whether or not they have been a victim of crime.  In other words, crime victims have their Second Amendment right, but potential victims do not.  This is anathema to the Constitution:

> "The crux of the constitutional promise of equal protection is that persons similarly situated shall be treated equally by the laws. [Citation.] However, neither clause [of the United States or California Constitutions] prohibits legislative bodies from making classifications; they simply require that laws or other governmental regulations be justified by sufficient reasons. The necessary quantum of such reasons varies, depending on the nature of the classification." (*In re Evans* (1996) 49 Cal.App.4th 1263, 1270, 57 Cal.Rptr.2d 314   (*Evans* ).) "In considering whether state legislation violates the Equal Protection Clause ..., we apply different levels of scrutiny to different types of classifications. At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose. [Citations.] Classifications based on race or national origin, [citation] and classifications affecting fundamental rights [citation], are given the most exacting scrutiny. Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy." (*Clark v. Jeter* (1988) 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465.) "[M]ost legislation challenged under the equal protection clause is evaluated merely for the existence of a 'rational basis' supporting its enactment. [Citations.] Under the latter analysis, the question is whether the classification bears a fair relationship to a legitimate public purpose." (*Evans,* at p. 1270, 57 Cal.Rptr.2d 314; see similarly *People v. McKee* (2010) 47 Cal.4th 1172, 1211, fn. 14, 104 Cal.Rptr.3d 427, 223 P.3d 566.)

*People v. Delacy* (2011) 192 Cal.App.4th 1481

Even under a rational basis, there is no reason to deny law abiding citizens who have not yet been victimized and deprive them of their right. The Supreme Court confirmed as much, rejecting the argument that "keep and bear arms" was a unitary concept referring only to a right to possess weapons in the context of military duty. To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *District of Columbia* v. *Heller* (2008) 128 S. Ct. 2783, 2793 . "[T]he core right identified in *Heller* [is] the right of a *law-abiding, responsible* citizen to possess *and carry* a weapon for self-defense." *United States v. Chester* (2010) 628 F.3d 673.  As such, and contrary to the moving papers, two rights are recognized, the right to possess and the right to carry.

Public safety is invoked to justify most laws, but where a fundamental right is concerned, a mere incantation of a public safety rationale does not save arbitrary licensing schemes. In the First Amendment arena, where the concept has been developed extensively, [W]e have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places . . . There are appropriate public remedies to protect the peace and order of the community if appellant's speeches should result in disorder or violence. *Kunz v. New York* (1951) 340 U.S. 290, 294.  "But uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right." *Hague v. Committee for Indus. Org.* (1937) 307 U.S. 496, 516.  Accordingly, the Ninth Circuit rejects alleged public health and safety concerns as a substitute for objective standards and due process.  *Desert Outdoor Advertising v. City of Moreno Valley* (1996) 103 F.3d 814, 819.

## VIII. **CONCLUSION**

While commonly used in the singular, the Second Amendment contains several fundamental rights, including: the right to keep arms, the right to bear arms, the right to carry arms, and the of self-defense.  In identifying and confirming the Fundamental Rights of all Citizens, the Supreme Court has never said this right is limited to the home, or identified only a single core rights:

> Our decision in Heller points unmistakably to the answer. Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in Heller, we held that individual self-defense is "the central component" of the Second Amendment right.  *McDonald v. City of Chicago*, 130 S. Ct. 3020, at 3037.

While there may be a place somewhere between self-defense and crime victim, as a matter of law, crime victim goes too far when a fundamental right is implicated and defendants do not offer a scintilla of evidence linking their actions to the desired results.  The argument that someone who goes through a background check, receives extensive training and demonstrates a strong commitment to the Second Amendment will then somehow contribute to crime and violence is the paranoid rhetoric of the past, unsupported by empiric evidence and not reasonably related to any legitimate government interest.

The reality is that there is no justification offered by defendant showing any nexus between their overly restrictive policy and their interest in public safety. Defendants policy of requiring Plaintiff to first be a victim simply does not pass Constitutional muster and is not related to any governmental interest.

April 25, 2011                             _____/s/_____

                                           Jonathan W. Birdt, Plaintiff