JONATHAN W. BIRDT – SBN 183908
18252 Bermuda Street
Porter Ranch, CA 91326
Telephone:  (818) 400-4485
Facsimile:   (818) 428-1384
jon@jonbirdt.com
Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN BIRDT,<br><br>Plaintiff,<br><br>v.<br><br>CHARLIE BECK, LEE BACA, THE LOS ANGELES POLICE DEPARTMENT and THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, and DOES 1 through 50,<br><br>Defendants. | CASE NO. CV 10-08377 RGK (JEMx)<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS LOS ANGELES COUNTY SHERIFF'S DEPARTMENT & LEE BACA'S AMENDED SEPARATE STATEMENT OF UNDISPUTED FACTS**<br><br>MSJ Date;   **May 16, 2011**<br>Time:        9:00 a.m.<br>Dept.         850<br><br>Action Filed:   November 4, 2010<br>**Trial Date:    October 4, 2011** |

## PLAINTIFF'S RESPONSE TO LASD  UNDISPUTED FACTS AND EVIDENCE

| **LASD Defendants' Undisputed Facts** | **Plaintiff's Response** |
|---|---|
| 1.    Larry L. Waldie is the Undersheriff for Los Angeles County. As part of his responsibilities as Undersheriff he has been designated to act as the Sheriff's sole authorized | 1.    Undisputed for purposes of this motion. |

| LASD Defendants' Undisputed Facts | Plaintiff's Response |
|---|---|
| representative for reviewing applications for (CCW) licenses for the county of Los Angeles.  In that role, he and members of his staff, evaluate CCW applications.  While members of his staff make recommendations regarding applications, he is the final decision-maker. | |
| 2.      As part of his evaluation of CCW applications, he will review the entire application packet and any and all supporting documentation.  He has been involved in these decisions since he became Undersheriff in 2005. | 2.      Undisputed for purposes of this motion. |
| 3.      In Los Angeles County, there are four distinct categories of CCW licenses:  Employment, Standard, Judges, and Reserve Police Officers.  The Employment CCW license is issued only to a person who spends a substantial period of time in his or her principal place of employment or business in Los Angeles County.  The Standard CCW license is issued to residents of Los Angeles County or to | 3.      Disputed, the only category is law abiding citizen, who has passed a background check, received proper training, and been the victim of a crime. (Deposition of Larry Waldie at Page 22). |

| LASD Defendants' Undisputed Facts | Plaintiff's Response |
|---|---|
| residents of a particular city within Los Angeles County.  The Judge CCW license is issued to California judges, full-time commissioners, and to federal judges and magistrates of the federal courts.  The Reserve Police Officer CCW license may be issued to reserve police officers appointed pursuant to California Penal Code § 830.6. | |
| 4.     If an applicant resides in an incorporated city not policed by the LASD, the applicant must apply to the chief of police of their city of residence for a concealed weapons license and have such application acted upon.  Within 60 days after a denial of such application, such city resident may file a separate application with the LASD, attaching a copy of the application denied by the chief of police.  The LASD will exercise independent discretion in granting or denying licenses to such person but may review, consider, and give weight to the grounds upon which such denial was made. | 4.     LASD does not exercise discretion, LASD has a policy of requiring all permit holders to be victims of a crime as a matter of policy and no permit will issue unless the applicant has been the victim of a crime. (Deposition of Larry Waldie at page 22). |

| | LASD Defendants' Undisputed Facts | Plaintiff's Response |
|---|---|---|
| 1 | | |
| 2-9 | 5.   California Penal Code sections 12050-12054 set forth the general criteria that CCW applicants must meet. Applicants must be of good moral character, be a resident of, or spend substantial time in the County they apply in, take a firearms course, and demonstrate good cause for the license. | 5.   Undisputed for purposes of this motion. |
| 10-19 | 6.   The issuance of licenses enabling a private citizen to carry a CCW is of great concern to the LASD.  The LASD's overriding policy is that no CCW license should be granted merely for the personal convenience of the applicant.  No position or job application in itself shall constitute good cause for the issuance, or for the denial, of a CCW license. | 6.   Disputed, LASD is not familiar with any current case law and has not reviewed their policy in the past 7 years to reflect changes in the law. (Deposition of Larry Waldie at Page 4). |
| 20-27 | 7.   The LASD defines "good cause" under California Penal Code section 12050 as requiring convincing evidence of a clear and present danger to life or of great bodily harm to the applicant, his spouse or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which | 7.   LASD requires as an element of "good cause" that the applicant be a victim of a crime as a matter of policy and no permit will issue unless the applicant has been the victim of a crime. (Deposition of Larry Waldie at Page 22). |
| 28 | | |

| LASD Defendants' Undisputed Facts | Plaintiff's Response |
|---|---|
| danger cannot be reasonably avoided by applicant's carrying of a concealed firearm. | |
| 8.     Each application is individually reviewed for cause.  The LASD's definition of good cause has been in existence since Undersheriff Waldie began reviewing CCW applications in 2005.  It is the Undersheriff's understanding that this definition of good cause, or one similar to it, is utilized by many other counties within California, including San Diego. | 8.     Disputed.  Sacramento accepts "self-defense" San Diego requires only an articulable need, but LASD requires that the applicant be a victim of a crime.  (Deposition of Larry Waldie at Page 22). |
| 9.     In evaluating whether an applicant has presented "convincing evidence of a clear and present danger to life or of great bodily harm to the applicant, his spouse or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which danger cannot be reasonably avoided by applicant's carrying of a concealed firearm," an applicant's stated reason of self-defense is not enough. | 9.     LASD requires as an element of "good cause" that the applicant be a victim of a crime as a matter of policy and no permit will issue unless the applicant has been the victim of a crime. (Deposition of Larry Waldie at Page 4). |
| 10.     The applicant must demonstrate a credible threat of violence which would | 10.     Undisputed for purposes of this motion. |

| LASD Defendants' Undisputed Facts | Plaintiff's Response |
|---|---|
| justify the need to possess a concealed weapon.  If an applicant claims that he or she has been threatened, the LASD looks for documentation of that threat, such as police reports or other evidence. | |
| 11.    One of the purposes for the LASD's policy is to protect against gun violence to the community at large, as well as to protect officers conducting law enforcement operations on the streets. | 11.    Undisputed as to the purpose, but disputed that there is any relationship between the policy and the goal. |
| 12.    Gun violence is a problem throughout the State of California and Los Angeles County is no exception. The vast majority of homicides in Los Angeles County are committed with the use of guns.  Handguns are of particular concern because they are much more likely to be used than shotguns and rifles.  Because handguns are small, easy to conceal, and deadly at short range, they are of paramount concern and danger.  Further, most of the violent acts committed in this County involving the use of guns are by gang members. | 12.    Plaintiff objects to this fact as irrelevant since it has nothing to do with CCW holders. |

| LASD Defendants' Undisputed Facts | Plaintiff's Response |
|---|---|
| 13.     The presence of more guns on the streets of Los Angeles County creates many problems for law enforcement officers.  Officers are often charged with monitoring public gatherings as well as with breaking up public nuisances.  Officers must act quickly whenever a disturbance occurs.  Often times, this involves isolating one or two problem individuals.  However, if multiple persons within a crowd are carrying concealed weapons, this creates an increased likelihood that guns will be brandished or used.  Thus, the increased presence of guns creates not only increased safety problems for officers but also for members of the community at large. | 13.     Plaintiff objects to this fact as irrelevant since it has nothing to do with CCW holders. |
| 14.     It is the LASD's position that increasing the numbers of concealed weapons in the community increases the threat of gun violence to the community at large, to those who use the streets and go to public accommodations, and to law enforcement officers patrolling the streets.  Further, the increased presence | 14.     Plaintiff objects as this is not a fact, but an opinion that is speculative and lacks any foundation. |

| LASD Defendants' Undisputed Facts | Plaintiff's Response |
|---|---|
| of concealed handguns make law enforcement operations more difficult thus taking away valuable resources which would be better used conducting law enforcement operations. | |
| 15.   Los Angeles County's "good cause" requirement is intended to drastically restrict the number of persons who are secretly armed in the County. | 15.   Undisputed for purposes of this motion. |
| 16.   At present, there are approximately 400 concealed weapons permits that were issued by the LASD. The Undersheriff is informed and believe that the County's Chief Executive Office has estimated that the population of Los Angeles County as of January 2010 was 10,441,080 people. | 16.   Undisputed for purposes of this motion. |
| 17.   The LASD reviewed Mr. Birdt's first application and determined that he failed to show good cause as required by LASD policy, and as defined above. LASD has not yet responded to Mr. Birdt's second application as of the date of the Undersheriff's Declaration. | 17.   Undisputed for purposes of this motion. |

| | LASD Defendants' Undisputed Facts | Plaintiff's Response |
|---|---|---|
| 1 | | |
| 2 | 18.    In his initial application to the LASD, Plaintiff states as justification: <u>Details of Reason for Applicant Desiring a CCW License</u>: Volunteer LA Superior Court Judge.  Frequent Las Vegas Travel with large sums of cash. Unprotected/Unsecured office with threat against employer.  Representation of victims of violence, abuse + murder. | 18.    Undisputed, though incomplete. |
| 11 | 19.    Birdt never spoke with anyone from the LAPD to report threats against him and to his knowledge, no report was ever generated. | 19.    Undisputed for purposes of this motion. |
| 15 | 20.    Birdt was never threatened in his capacity as a volunteer judge. | 20.    Plaintiff was never "expressly" threatened.  As a Judge, Advocate, GAL and High Profile litigation attorney, is exposed to a greater risk of harm. (Declaration of Jonathan Birdt attached hereto at Paragraph 2). |
| 22 | 21.    Birdt was never specifically threatened as a result of his position on the juvenile dependency court panel. | 21.    Plaintiff was never "expressly" threatened. As a Judge, Advocate, GAL and High Profile litigation attorney, is exposed to a greater risk of harm. (Declaration of Jonathan Birdt attached hereto at Paragraph 2). |

| LASD Defendants' Undisputed Facts | Plaintiff's Response |
|---|---|
| 22.     Birdt himself has never been expressly threatened with harm at all. | 22.     Disputed, see Plaintiff's deposition. As a Judge, Advocate, GAL and High Profile litigation attorney, is exposed to a greater risk of harm. (Declaration of Jonathan Birdt attached hereto at Paragraph 2). |
| 23.     In 2009, there were 126,352 adults arrested by the LASD, and 46,329 felony arrests. | 23.     Plaintiff objects to this fact as irrelevant since it has nothing to do with CCW holders. |
| 24.     In that same year, 23,001 LASD arrests involved those with prior felony convictions. | 24.     Plaintiff objects to this fact as irrelevant since it has nothing to do with CCW holders. |

DATED: April 25, 2011                    Respectfully submitted,


                                         By        /s/
                                              _____
                                              JONATHAN W. BIRDT

## <u>DECLARATION OF JOANTHAN W. BIRDT</u>

I, JONATHAN W. BIRDT, declare as follows:

1.      I am an attorney at law, duly licensed to practice law in all of the Courts of the State of California. I have personal knowledge of the facts set forth below and if called as a witness, I could and would testify thereto.

2.      As a Judge, Advocate, GAL and High Profile litigation attorney, is exposed to a greater risk of harm. (Declaration of Jonathan Birdt attached hereto at Paragraph 2).

3.      Attached hereto as Exhibit A is the Deposition of Larry L. Waldie.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States of America.

Executed this 25th day of April, 2011 in Los Angeles, California.


_____/S/_____
JONATHAN W. BIRDT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit A

copy larry waldie

1           *** ROUGH DRAFT ONLY ***

2           *************************

3    NOTE NOTE NOTE NOTE NOTE NOTE NOTE NOTE NOTE NOTE

4           *************************

5           CCP SECTION 2025 (R)(2) STATE:

6           "WHEN PREPARED AS A ROUGH DRAFT
     TRANSCRIPT, THE TRANSCRIPT OF THE DEPOSITION MAY NOT BE
7    CERTIFIED AND MAY NOT BE USED, CITED, OR TRANSCRIBED AS
     THE CERTIFIED TRANSCRIPT OF THE DEPOSITION PROCEEDINGS.
8    THE ROUGH DRAFT TRANSCRIPT MAY NOT BE CITED OR USED IN
     ANY WAY OR AT ANY TIME TO REBUT OR CONTRADICT THE
9    CERTIFIED TRANSCRIPT OF DEPOSITION PROCEEDINGS AS
     PROVIDED BY THE DEPOSITION OFFICER.
10
             THE STENOGRAPH NOTES TAKEN IN THE
11   PROCEEDING ARE BEING TRANSLATED INSTANTANEOUSLY INTO
     THEIR ENGLISH EQUIVALENT THROUGH AN AUTOMATED PROCESS
12   CALLED REALTIME TRANSLATION.

13           THIS REALTIME TRANSLATION IS BEING
     PROVIDED TO COUNSEL AT A RATE IN ADDITION TO A NORMAL
14   PAGE RATE.  PLEASE ASK THE REPORTER AND/OR THE
     REPORTING AGENCY FOR THIS RATE.
15
             THE REALTIME DRAFT IS UNEDITED AND
16   UNCERTIFIED AND MAY CONTAIN UNTRANSLATED STENOGRAPHIC
     SYMBOLS, OCCASIONAL REPORTER'S NOTE, MISSPELLED PROPER
17   NAMES, AND/OR NONSENSICAL WORD COMBINATIONS.  ALL SUCH
     ENTRIES WILL BE CORRECTED ON THE FINAL CERTIFIED
18   TRANSCRIPT.

19           ALSO BE AWARE THAT THE PAGE NUMBERS WILL
     NOT CORRESPOND TO THE FINAL CERTIFIED TRANSCRIPT, WHICH
20   WE WILL DELIVER TO YOU IN ACCORDANCE WITH OUR STANDARD
     DELIVERY TERMS OR ON AN EXPEDITED BASIS SHOULD YOU
21   DESIRE FASTER DELIVERY.

22           PLEASE DO NOT MAKE ANY DECISIONS BASED ON
     THE INFORMATION CONTAINED IN THE ROUGH DRAFT
23   TRANSCRIPT.  THE ROUGH DRAFT IS FOR THE PURPOSE OF
     AUGMENTING COUNSEL'S NOTES ONLY AND NOT TO USE OR CITE
24   IN ANY COURT PROCEEDING OR TO DISTRIBUTE TO ANY OTHER
     PARTIES.
25

        ROUGH DRAFT FOR LARRY WALDIE APRIL 19, 2011     1

                    (800)640-1949

copy larry waldie

1   **********************************************************

2                    *** ROUGH DRAFT ONLY ***

3                    DUE TO THE NEED TO HAVE THE REPORTER
    CORRECT ENTRIES PRIOR TO CERTIFICATION, I AGREE TO USE
4   THE REALTIME DRAFT ONLY FOR THE PURPOSE OF AUGMENTING
    COUNSEL'S NOTES AND NOT TO USE OR CITE IT IN ANY COURT
5   PROCEEDING OR TO DISTRIBUTE IT TO ANY OTHER PARTIES.

6                    I HAVE READ THE ABOVE TERMS AND CONDITIONS
    FOR THE USE OF THE ROUGH DRAFT REALTIME TRANSLATION.   I
7   UNDERSTAND AND AGREE TO THEM.   THIS CONSTITUTES MY
    ORDER FOR A CERTIFIED COPY OF THE TRANSCRIPT OF THE
8   DEPOSITION OF LARRY WALDIE, APRIL 19, 2011.

9                    ***************************

10

11  BY MR. BIRDT:

12       Q    Mr. Waldie, would you state your name and

13  occupation?

14       A    My name is Larry L. Waldie, and I'm the under

15  sheriff for Los Angeles County.

16       Q    Okay.  And we're here for your deposition

17  today to basically talk about good cause and the CCW P

18  process with the Sheriff's Department.

19            Do you understand that?

20       A    Yes.

21       Q    Okay.  And you understand your testimony today

22  is under oath and carries the penalty of perjury?

23       A    Yes.

24       Q    And nothing I ask is meant to trick, deceive,

25  mislead in any way.  So if there's anything you are


              ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      2
                        (800)640-1949

1   uncertain about what I've asked, please let me know.

2   I'm happy to rephrase any question I ask.  Okay?

                        Page 2

copy larry waldie

3     A    Certainly.

4     Q    The corollary that comes with that is you

5  answer a question I ask you, we being the judge, the

6  jury, the parties, all have a right to assume you

7  understood exactly I asked you.

8     A    Yes.

9     Q    Okay.  And off the record, your attorney and I

10  and you had a discussion in the hallway where I

11  disclosed a prior relationship you and I of an

12  attorney-client nature only for the purpose of making

13  sure it didn't cause you any concern in term of my

14  ability to take your deposition today.

15          I'm not going to go into anything more about

16  it, but you recalled the representation, and you're

17  comfortable with me taking your deposition today on

18  these matters.

19     A    Yes.

20     Q    Okay.  And you've had an opportunity to

21  discuss any concerns you may have with your attorney

22  and you're okay with proceeding?

23     A    Yes.

24     Q    Okay.  Now, I just want to ask a number of

25  foundational questions in terms of your understanding

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011        3
(800)640-1949

1  and how you go about analyzing the issues that relate

2  to concealed weapons in California.

3          And first of all, are you aware that

4  California does not have a constitutional right to

Page 3

                        copy larry waldie
5   keeping bear arms?

6       A    Correct.

7       Q    All right.

8            MS. LEHMAN:  Are you asking him a legal

9   conclusion?

10           MR. BIRDT:  No.  Just his generally

11  understanding as he filters and performs his job

12  duties.  Okay.

13           THE WITNESS:  I think that comes under the

14  Federal Constitution, the right to bear arms, not the

15  State.

16  BY MR. BIRDT:

17      Q    Correct.  And, in fact, that didn't occur

18  until recently in the Hellard and McDonald -- well, let

19  me step back.

20           Are you familiar with the Hellard --

21      A    No.

22      Q    -- and McDonald opinions, generally speaking?

23      A    No.

24      Q    Okay.  Are you aware of any recent change in

25  law by the United States Supreme Court as it would


            ROUGH DRAFT LARRY WALDIE APRIL 19, 2011        4
                      (800)640-1949

⚲


1   relate to a citizen's right to keeping bear arms?

2       A    No.

3       Q    Did the sheriff's department undertake any

4   reviews of its policies regarding good cause in light

5   of any change or ruling by the United States Supreme

6   Court in the last five years?

                      Page 4

copy larry waldie

7       MS. LEHMAN:  I'm going to object based on the

8  official information, privileged, and attorney-client

9  privilege.

10  BY MR. BIRDT:

11      Q    You can answer.

12      MS. LEHMAN:  Actually, no.  He's not going to

13  answer.

14  BY MR. BIRDT:

15      Q    Did you as the under sheriff take any review

16  of your good cause policy in light of any change in the

17  legal environment in the last five years?

18      MS. LEHMAN:  Same objections.

19      If you can answer the question without as to

20  anything you might have done without any consultation

21  with the attorneys, then he is entitled to that.  But

22  anything involving discussions between you and

23  attorneys, he is not entitled to.

24      THE WITNESS:  I can answer that I have not

25  discussed that with my attorneys.


ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      5
(800)640-1949


1  BY MR. BIRDT:

2      Q    Have you discussed it with anybody else?

3      A    No.

4      Q    Okay.  Has there been any change in policy at

5  the sheriff's department in light of any change in the

6  legal environment in the last five years with respect

7  to the good cause policy?

8      A    No.

Page 5

copy larry waldie

9      Q    Has there been any discussion or consideration

10  of making any changes in light of any change in the

11  legal environment in the last five years?

12           MS. LEHMAN:   Same objections.

13           THE WITNESS:   Okay.

14           MS. LEHMAN:   To the extent you can answer

15  without any discussion or --

16           THE WITNESS:   Well --

17           MS. LEHMAN:   -- without revealing any

18  discussions with your attorney, you can answer.

19           THE WITNESS:   I tried to recall if they

20  brought up any information to me, and I don't recall.

21  That's -- so I -- I just -- I will not answer that yet.

22  I don't know.

23  BY MR. BIRDT:

24      Q    Are you aware of any as you sit here today?

25           MS. LEHMAN:   Same objections.


        ROUGH DRAFT LARRY WALDIE APRIL 19, 2011       6
                    (800)640-1949
⚲


1            And again --

2            THE WITNESS:   Yes.

3            MS. LEHMAN:   -- if there's anything outside of

4  attorney-client privilege, I mean, he is entitled to

5  that.   But anything that may have been discussed

6  between you and your attorneys --

7            THE WITNESS:   I -- I really -- I can't recall

8  if I discussed it with the attorneys.   So I -- I really

9  can't answer that.

10  BY MR. BIRDT:

                    Page 6

copy larry waldie

11      Q    I don't want to know what you discussed with
12   the attorneys.  I want to know what you, as the under
13   sheriff with the Los Angeles County have discussed with
14   anybody other than an attorney, regarding possibly
15   changing the good cause policy in light of any change
16   in the legal environment in the last five years.
17           MS. LEHMAN:   Same objections.
18           THE WITNESS:   Yeah.
19           MS. LEHMAN:   Go ahead.
20           THE WITNESS:   I have not discussed it outside
21   the attorneys with anybody.
22   BY MR. BIRDT:
23      Q    Okay.  Now, in terms of your understanding of
24   California law, the only way a resident under normal
25   circumstances, not somebody who's being chased down the

               ROUGH DRAFT LARRY WALDIE APRIL 19, 2011        7
                         (800)640-1949

 1   street by an armed gunman, but just -- let me start
 2   over.
 3           I live across the street from a school.   The
 4   Gun-Free School Zone Act would preclude me from
 5   stepping off my property with a weapon that isn't in a
 6   locked container under normal circumstances; true?
 7           MS. LEHMAN:   Objection.  Calls for a legal
 8   conclusion.   Speculation.
 9           If you can answer.
10           THE WITNESS:   I can't answer.  I don't -- I
11   couldn't answer with specifically what the law would be
12   with that help.

                        Page 7

copy larry waldie

13    BY MR. BIRDT:

14        Q    Okay.  Are you aware that the Gun-Free School

15    Zone Act prohibits anybody from possessing an exposed

16    firearm within 1500 feet of a school?

17            MS. LEHMAN:  Same objection.

18            THE WITNESS:  As I said, I have not read

19    specifically that law.  So I know generally about a

20    gun-free zone.  But I -- I've never been in the field

21    dealing with that for a long time, so I don't know.

22    BY MR. BIRDT:

23        Q    Okay.  Generally speaking, what's your

24    understanding of the Gun-Free School Zone Act?

25        A    Well, basically, generally, as I do, you can't


            ROUGH DRAFT LARRY WALDIE APRIL 19, 2011       8
                         (800)640-1949

♀

1    be within, as I understand it, in the school grounds

2    and each student, and outside the school grounds,

3    anyone with a weapon.

4            Now what that distance is, what time that

5    frame is, who that is, I don't know.

6        Q    Okay.  Generally speaking, what's your

7    understanding of when a citizen and resident of Los

8    Angeles County can possess a loaded firearm outside of

9    the home?

10           MS. LEHMAN:  Same objections.

11           THE WITNESS:  Well, now, you're talking about

12    12025 of the penal code?  What are you talking about, a

13    specific penal code here?

14    BY MR. BIRDT:

                         Page 8

copy larry waldie

15      Q    I'm just talking about, in general, if there

16   isn't some sort of an emergency situation, under normal

17   circumstances, when can a citizen or resident of Los

18   Angeles County possess a loaded firearm outside of

19   their home?

20          MS. LEHMAN:   Same objections.   Calls for a

21   legal conclusion.   Speculation.   Assumes facts not in

22   evidence.

23          THE WITNESS:   They all speak as a police

24   officer on the street, if someone comes up that's on

25   the street with a loaded firearm, concealed, is a

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011        9

(800)640-1949

♀

1    violation of law.

2    BY MR. BIRDT:

3       Q    Okay.

4       A    Okay.   It would be probably 12031 or 12025,

5    one of the two, if it's loaded or unloaded.   Yes.

6    BY MR. BIRDT:

7       Q    What about if it's not concealed?

8       A    Well, if it's no --

9          MS. LEHMAN:   Same objections.

10          THE WITNESS:   If it's not concealed and not

11   loaded?

12   BY MR. BIRDT:

13      Q    Loaded.

14      A    Loaded and concealed and opened?   I believe

15   the law permits that.

16      Q    Loaded, exposed firearm?

Page 9

copy larry waldie

17     A    Not loaded.  A concealed -- a firearm not

18   concealed, unloaded, is permitted by law.

19     Q    Okay.  I'm not asking about paper weights,

20   though.  What I'm asking about is a functional firearm

21   that's loaded.

22     A    Loaded.

23     Q    Can a citizen possess that exposed, under

24   normal circumstances?

25     A    No.


             ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      10
                        (800)640-1949


 1          MS. LEHMAN:  Objection.  Same objection.

 2          THE WITNESS:  Yeah.

 3          No.  That would be a violation of 12031 of the

 4   penal code, I believe.

 5   BY MR. BIRDT:

 6     Q    Okay.  So under the California Statutory

 7   "sleeve," generally speaking, under normal

 8   circumstances, the only way a citizen or resident of

 9   Los Angeles County can possess a loaded handgun is with

10   a concealed with a weapon's permit; true?

11          MS. LEHMAN:  Objection.  Same -- well, same

12   objection.

13          THE WITNESS:  Well --

14   BY MR. BIRDT:

15     Q    Outside of the home.

16     A    No.  I don't think that's true.  You can have

17   a -- you can carry a weapon in your car, unload it,

18   concealed, and to and from firing ranges.  You can

                        Page 10

                         copy larry waldie
19  carry the weapon, yes.

20  BY MR. BIRDT:

21      Q    Understood.  But what I'm asking you about is

22  a functional loaded firearm possessed by a citizen or a

23  resident.

24           MS. LEHMAN:  Same objection.

25


           ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      11
                      (800)640-1949


 1  BY MR. BIRDT:

 2      Q    So let's start over, just so we're clear.

 3      A    Yeah.

 4      Q    To avoid any objection here.

 5           Under normal circumstances -- a citizen who

 6  just wants to walk out of their house and walk their

 7  dog -- the only way that person can carry a loaded

 8  firearm, legally, is if they have a concealed weapons

 9  permit; true?

10           MS. LEHMAN:  Same objection.

11           THE WITNESS:  I would think that would be

12  true.

13  BY MR. BIRDT:

14      Q    Are you aware of any evidence that issuance of

15  concealed carried permits would increase shooting

16  crimes?

17           MS. LEHMAN:  Can you read that black, please.

18           (Record read.)

19           THE WITNESS:  Well, I'd have to say I'd have

20  to do the research for that.  I think you're not

                         Page 11

copy larry waldie

21  couching it in that frame.  With people carrying many

22  gun on the streets, I think there would be an increased

23  violence and increased possibility of death with those

24  guns on the street.

25


ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      12

(800)640-1949

♀


1   BY MR. BIRDT:

2       Q    Okay.

3       A    Whether or not there's specifically because of

4   concealed weapon or not.  But it's a mere fact that

5   guns on the street does create and foster crime,

6   greater crime, and greater death.  I believe, yes.

7   BY MR. BIRDT:

8       Q    I understand your speculation.  But what I'm

9   asking is is that based upon any scientific or

10  statistical information you can point at.

11      A    Guns on the street, causing more crime or more

12  death?  I'm sure I can find that.

13      Q    Okay.  Generally speaking, in the last 30

14  years in the United States, the prevalence of the

15  availability of concealed weapons permit is greatly

16  increased; true?

17      A    I don't know.

18      Q    You're not aware of that?

19      A    No.

20      Q    Okay.  Do you know how many states 30 years

21  ago were shall issue CCW permit.

22      A    No.

Page 12

                         copy larry waldie
23    Q    Do you know currently how many states are

24   shall issue CCW permits?

25    A    38.


            ROUGH DRAFT LARRY WALDIE APRIL 19, 2011    13
                         (800)640-1949
♀


1     Q    43.  But okay.

2     A    Okay.

3     Q    Do you know if that number has increased over

4   the last 30 years, or was that the same 30 years ago?

5     A    I don't know.

6     Q    Okay.  Do you know if -- strike that.

7          Assuming over the last 30 years the number of

8   state that are shall issue has increased.

9     A    I don't know.

10    Q    All right.  What has happened with the rate of

11   violent crime in the United States in the last

12   30 years?

13         MS. LEHMAN:  Objection.  Speculation.

14         THE WITNESS:  I can't tell you that.

15   BY MR. BIRDT:

16    Q    You're not familiar with the FBI crime

17   statistics?

18    A    I am.

19    Q    And haven't those FBI crime statistics

20   demonstrated a drop in the overall rate of violent

21   crime over the last 30 years?

22         MS. LEHMAN:  Objection.  Speculation.

23         THE WITNESS:  I'd have go look at the reports,

24   again, to see what it say.

                         Page 13

copy larry waldie
25

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      14
(800)640-1949

♀

1    BY MR. BIRDT:

2       Q    Okay.  You don't know that one way or the

3    other?

4       A    Yeah.  I think it's suggests that the crime of

5    violence has gone down, yes.

6       Q    So if the prevalence of CCW permits has gone

7    up and the rate of violent crime has gone down,

8    wouldn't that suggest to you that there isn't a

9    increase in violent crime caused by the availability of

10   CCW permits.

11              MS. LEHMAN:  Misstates the testimony.

12              THE WITNESS:  I -- I'd take it it's a non --

13              MS. LEHMAN:  Objection.  Speculation.

14              Go ahead.

15              THE WITNESS:  Yeah.  It's a non sequitur.  I

16   think that follows.  I don't think that rationale

17   follows.

18   BY MR. BIRDT:

19      Q    Okay.  In the states that are shall issue, do

20   you know the percentage of the population that's

21   actually sought permits --

22              MS. LEHMAN:  Objection.  Speculation.

23   BY MS. LEHMAN:

24      Q    -- generally speaking?

25      A    No.

Page 14

copy larry waldie
ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      15
(800)640-1949

♀

1      Q      Okay.   Have you ever tried to look into that?

2      A      No.

3      Q      The county has suggested a fear that if all

4   7 million residents who are eligible sought permits,

5   you'd have 7 million guns on the street.

6             Do you know one way or the another how many

7   people are likely to seek permits, if --

8             MS. LEHMAN:   Objection.   Speculation.

9   BY MR. BIRDT:

10     Q      -- permitted?

11     A      I couldn't possibly know that.

12     Q      Thank you.   What are your concerns regarding

13  issuing a CCW permit to me?

14     A      I don't think you meet our qualifications for

15  it.

16     Q      Under Assenza?

17     A      Under what?

18     Q      Under the Assenza case?

19     A      No.   Under our policies that we -- we use.

20     Q      Okay.   What risk do you believe I present to

21  the public by having a concealed weapons permit?

22            MS. LEHMAN:   Objection.   Speculation.

23            THE WITNESS:   Well, it's not a matter of the

24  risk that you have possession -- have possession of it.

25  It's a matter that if you should have a weapon.   It

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      16
(800)640-1949
Page 15

♀

copy larry waldie

1    would be based on threats.
2    BY MR. BIRDT:
3        Q    Okay.
4        A    It's our main criteria.
5        Q    Understood.
6             What risk to public safety is posed by people
7    who have passed a back background test, passed training
8    satisfactory to you, and have established good cause to
9    possess a concealed weapon and have a permit?  What
10   risk do they pose to public safety?
11            MS. LEHMAN:  Objection.  Speculation.  Assumes
12   facts not in evidence.
13            MR. BIRDT:  Okay.
14            MS. LEHMAN:  Incomplete hypothetical.  And
15   also what is vague and ambiguous as to what your
16   definition of "cause" is in your hypothetical.
17            MR. BIRDT:  I'm just referring to -- we can
18   even do it a different way.
19       Q    In order to get a CCW permit, you have to have
20   sufficient training, establish good cause, and pass a
21   background check; correct?
22       A    Correct.
23       Q    Okay.
24       A    Partial, yes.
25       Q    Okay.  And to get there, then, presumably, you

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011        17
(800)640-1949

♀

1    would have a CCW permit; correct?
                    Page 16

copy larry waldie

```
 2      A    Not necessarily.

 3      Q    Okay.  Let's assume -- strike that.

 4           Of the permit holders, what risk do they

 5  present to public safety.

 6      A    We don't evaluate on the risk to public

 7  safety.  We evaluate the risk to them as to why they

 8  should carry a weapon and have a CCW.

 9      Q    Okay.  But you do not believe that citizens

10  should possess concealed weapons.  That's the policy of

11  your department; correct?

12      A    No.  I issue them.  I have over 400 issued

13  out.  I give them out.  If I didn't believe they should

14  have weapons, I wouldn't give them out.

15      Q    Okay.  How many do you reject a year?

16      A    I don't know I'd have to find that number out.

17      Q    How about just a ballpark?

18      A    I don't know.

19      Q    You can't even tell me generally how many you

20  reject a year?

21           MS. LEHMAN:  Asked and answered.

22  BY MR. BIRDT:

23      Q    You can answer.

24      A    I did.

25      Q    Your answer is you cannot even tell me
```

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      18

(800)640-1949

♀

```
 1  generally how many permits you reject in a given year?

 2      A    No, because my staff puts them all together

 3  and then I don't even see the ones that are rejected --
```
Page 17

copy larry waldie

4    Q    Really?

5    A    -- for the most part.

6    Q    Who does the rejecting?

7    A    I do.

8         When they come in, the final word is -- for

9    example, if someone comes in and has not done the --

10   any -- has not done the background, has not done any of

11   the qualifications necessary to it, there's an

12   automatic reject because he hasn't filled the criteria

13   to do.

14        Those I will not see because they haven't done

15   the criteria.  If they've completed all the criteria,

16   then I'll get them to look at and see if they qualify

17   and meet the standard for the CCW.

18   Q    Okay.  Of those that actually come to you, how

19   many do you reject?  Ballpark?

20   A    I have no idea.

21   Q    How about percentage?  How many --

22   A    I'd rather not answer that.  I'd rather look

23   at the data and give it to you accurately.

24   Q    Well, I'm not asking for what the data says.

25   I'm just asking for your general understanding.  You're

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      19
(800)640-1949

1    a witness sitting here today under oath --

2    A    Uh-huh.

3    Q    -- who's responsible for this procedure.  I'm

4    just asking generally.

5         How many total applications does the Sheriff's

copy larry waldie

6  department receive a year?

7     A    I don't know.

8     Q    Are we talking about a million?  A thousand?

9  A hundred?

10         MS. LEHMAN:  Asked and answered.

11         THE WITNESS:  I don't know.

12 BY MR. BIRDT:

13    Q    Okay.  When issuing a permit to any judicial

14 candidate, are they required to show any sort of

15 threat?

16    A    Yes.

17    Q    So in addition to being a judge, a judge also

18 has to demonstrate a clear and present danger to his

19 safety?

20    A    Yes.

21    Q    And what about in terms of somebody who

22 carries valuables or property?  Do you have a category

23 there for issuance of a permit?

24    A    No.

25    Q    And it's the sheriff's department view that

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011     20
(800)640-1949

1  open carrying a firearms is a bad idea; true?

2         MS. LEHMAN:  Objection.  Speculation.  Assumes

3  facts not in evidence.

4         THE WITNESS:  The violation of the law in the

5  State of California, I would resume we would object to

6  if they carried openly a weapon, yes.

7  BY MR. BIRDT:

Page 19

copy larry waldie

8      Q    What about an unloaded, exposed firearm

9   carried on the person's hip?

10         MS. LEHMAN:  Asked and answered.

11  BY MR. BIRDT:

12     Q    Is that legal or illegal?

13         MS. LEHMAN:  Asked and answered.

14         THE WITNESS:   An unloaded firearm fully

15  exposed is legal.

16  BY MR. BIRDT:

17     Q    Okay.  And that practice is something Sheriff

18  Baca has vocally opposed, even though it's legal; true?

19     A    I think you'd have to ask him.

20     Q    I'm not asking him.  I'm asking you.

21     A    I haven't asked him that question.  I've never

22  heard him specifically state that.

23     Q    Okay.  Do you know what the sheriff's

24  department view is on the exposed carrying movement?

25     A    We don't have a particular view on that.   We

              ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      21
                        (800)640-1949

♀

1   would look at the individual based on the

2   circumstances.  If we saw someone carrying a weapon on

3   the street, we would check it out to ensure, one, it

4   was unloaded and was properly within the confines of

5   the law and wasn't used in a bad manner.

6      Q    What danger are mitigated by the carrying of a

7   concealed weapon?

8      A    What dangers are mitigated?

9      Q    Uh-huh.

                        Page 20

copy larry waldie

10      A    It depends on the threat.  I have no idea what

11  dangers could be.  If there's a particular threat that

12  someone is accosting them, someone is going to accost

13  them, someone has accosted them, someone is following

14  them, there could be innumerable ones.

15      Q    In order to establish your good cause, the

16  person has to be a victim of a crime; true?

17           MS. LEHMAN:  Misstates the testimony.

18           You can answer.

19           THE WITNESS:  He has to be -- have threats to

20  his danger, to his person, to his family, to his home.

21  Those threats have to be real, yes.

22  BY MR. BIRDT:

23      Q    Okay.  So unless a person has been a victim of

24  a criminal threat, they will not receive a CCW permit

25  from your department; true?


            ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      22

                      (800)640-1949

♀


1       A    For the most part, yes.

2       Q    What are the exceptions?

3       A    Well, We'd have to look at individual case to

4  see the totality of the circumstances as to why.  If

5  there was not an actual crime, why that a person needed

6  a CCW and if it met with the rest of our criteria and

7  if there were insinuating circumstances to have that to

8  occur.

9       Q    Okay.

10      A    But fore the most, for those, they're very

11  rare, very difficult to evaluate.

                      Page 21

copy larry waldie

12      Q      Okay.  Do any current permits come to mind
13  that have met that criteria?
14      A      No.
15      Q      Okay.  In your declaration you referred to
16  officers killed in the line of duty; correct?
17      A      Uh-huh.
18      Q      Yes?
19      A      Yes.
20      Q      Thank you.
21             Sorry.  "Uh-huh" and "huh-uh" don't --
22      A      Yes.  Yes.  I forget sometimes.
23      Q      Okay.  Were any of those officers anywhere in
24  the country killed by a person with a concealed weapons
25  permit who was outside of their home at the time the

              ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      23
                         (800)640-1949

 1  officer was killed?
 2      A      I have no idea.
 3      Q      So what relationship do the officers killed in
 4  the line of duty have to do with good cause for a CCW
 5  permit?
 6      A      The fact that more guns are on the street, and
 7  the more gun that are issued on the street, even,
 8  probably legally, most of the guns we find on the
 9  suspects are stolen from those people that have guns
10  legally.  And those guns are used to kill officers and
11  other citizens.
12      Q      So --
13      A      It happens all the time.
                         Page 22

copy larry waldie

14      Q      So one of your concerns is that a CCW permit

15   holder would have their weapon stolen while their

16   carrying it and then use that weapon to commit

17   violence?

18      A      It has happened.  People that have had legally

19   weapons in their home or on their person, they have

20   been stolen.  I don't know if at the time they had it

21   on their person, but -- and those guns were used in

22   crimes.

23      Q      I agree.

24             And, in fact, that's happened with your

25   department, hasn't it?


            ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      24
                     (800)640-1949

⚥

 1      A      Yes.

 2      Q      Okay.  I understand your concern about keeping

 3   guns out of gang members hands.  But -- strike that.

 4             Have you reviewed any studies, seen any

 5   evidence, done any investigation to determine the risk

 6   of guns being stolen from CCW holders outside of their

 7   home in terms of how it would impact public safety?

 8      A      No.

 9      Q      Okay.  Can you point to any study or

10   correlation between increased issuance of CCW permit

11   and gun violence?

12      A      No.

13      Q      Can you provide any support for how your

14   policy of drastically restricting the issuance of CCW

15   permits prevents violence?

                     Page 23

copy larry waldie

16      A     I -- I think just the -- putting more guns on

17   the street, I think could clearly create much more

18   violence in the County of Los Angeles, and I think we

19   need to restrict the number of weapons that are

20   available on the streets legally.

21      Q     Last year, how many weapons were stolen from

22   permit holders outside of their home?

23             MS. LEHMAN:   Speculation.

24             Go ahead.

25             THE WITNESS:   I don't know.


             ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      25
                      (800)640-1949
♀

1   BY MR. BIRDT:

2      Q     Last year how many weapons were stolen from

3   sheriffs deputies?

4             MS. LEHMAN:   Objection.   Speculation.

5             You can answer if you know.

6             THE WITNESS:   We've had a couple of stolen

7   from sheriffs deputies, but I don't recall the exact

8   number.

9   BY MR. BIRDT:

10      Q     Last year --

11      A     From the trunks of their car, yes.

12      Q     Last how many weapons issued by the Los

13   Angeles County Sheriff's department were unaccounted

14   for by audit?

15             MS. LEHMAN:   Objection.   Speculation.

16             You can answer if you know.

17             THE WITNESS:   I don't think they have ever
                      Page 24

copy larry waldie

18    done an audit on that.  Quite frankly, it's reported
19    they lose the weapon, and they, in fact, since they're
20    all registered, even their off-duty weapons and their
21    personal weapons, so we don't do an audit to find out,
22    you know, which ones were.
23    BY MR. BIRDT:
24        Q    Okay.  So last year, as far as you recall
25    sitting here.  Sheriffs deputies released more guns to

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011        26
(800)640-1949

1     gang members than CCW permit holders did?
2              MS. LEHMAN:  Wait.  Wait.  Wait.  Wait.  Wait.
3              THE WITNESS:  What was that?  Where we
4     released guns to gang members?
5              MS. LEHMAN:  Objection.  Argumentative.
6     Misstates the testimony.
7              Why don't you --
8              MR. BIRDT:  Let me start over.
9              MS. LEHMAN:  Why don't you -- do you want to
10    restate or --
11    BY MR. BIRDT:
12        Q    You said your concern was that gang members
13    would steal guns, and you'd have more guns on the
14    street; true?
15        A    Yes.
16        Q    Okay.  You also said you have no recollection,
17    as you sit here today, of any CCW permit holder having
18    a weapon taken from them outside of their home last
19    year; true?
                        Page 25

copy larry waldie

20          MS. LEHMAN:  Objection.  Misstates the

21 testimony.

22          I believe he said he did not know.

23          THE WITNESS:  Yeah.  I do not -- I don't know.

24 BY MR. BIRDT:

25     Q    You have no recollection of it happening, as

            ROUGH DRAFT LARRY WALDIE APRIL 19, 2011     27
                    (800)640-1949

1 you sit here right now; true?

2          MS. LEHMAN:  He said he didn't know the

3 number.

4          THE WITNESS:  I don't.

5 BY MR. BIRDT:

6     Q    Do you have any recollection, as you sit here

7 of any CCW permit holder having their weapon taken from

8 them by a criminal last year?  Yes or no?

9     A    I believe we've a couple that were stolen from

10 their homes.

11    Q    Okay.

12    A    I believe.

13    Q    From their homes?

14    A    Yes.

15    Q    Okay.

16    A    Not --

17    Q    But not outside their home?

18    A    Not from their person.

19    Q    Okay.  But you do have a recollection of

20 sheriffs deputies having their weapons stolen outside

21 of the home last year; true?
                    Page 26

copy larry waldie

22      A     I believe one or two were taken out of

23   vehicles.

24      Q     Okay.

25      A     And one was taken off his person and tried to


ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      28
(800)640-1949

♀

1    use against the deputy.

2       Q     Okay.  I hope he was sent for remedial

3    training.

4             In any event last year --

5       A     Yes.

6             MS. LEHMAN:  Question?

7             MR. BIRDT:  Yes.

8       Q     Last year, Sheriffs deputies put more guns

9    into the hands of criminals than CCW permit holders did

10   outside of the home;  true?

11            MS. LEHMAN:  Objection.  Misstates the

12   testimony.  Argumentative.  Assumes facts not in

13   evidence.

14            THE WITNESS:  Correct.

15   BY MR. BIRDT:

16      Q     You can answer.

17      A     No.  I do not know that at all.

18      Q     Okay.  Would you agree that open carry creates

19   a potentially dangerous situation?

20      A     By whom open carry and where?

21      Q     By law abiding citizens anywhere in public?

22            MS. LEHMAN:  Objection.  Speculation.

23   Incomplete hypothetical.  Argumentative.

Page 27

copy larry waldie

24          If you can answer.

25          THE WITNESS:  I would be afraid to go out to


ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      29

(800)640-1949

♀

1    the street if someone was carrying a weapon, particular

2    with all the drinking and arguments that occur and the

3    mental state of people.

4          All the time we see these people blowing up

5    and shooting people's family with guns.  They are

6    access to them.  I'd be terrified of people on the

7    street with all these guns.

8    BY MR. BIRDT:

9      Q    How many times did sheriffs deputies do that

10   last year?

11     A    Do what?

12          MS. LEHMAN:  Objection.  Speculation.

13   BY MR. BIRDT:

14     Q    All right.  Let's be specific.

15          How many times last year was a sheriffs

16   deputy, Los Angeles sheriff's deputy, arrested for

17   driving under the influence while in possession of a

18   weapon?

19          MS. LEHMAN:  Objection.  Speculation.

20          THE WITNESS:  I think 63.

21   BY MR. BIRDT:

22     Q    Okay.  Last year how many sheriff's deputies

23   were involved in an act of domestic violence which also

24   involved a weapon issue to them?

25          MS. LEHMAN:  Objection.  Speculation.

copy larry waldie

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      30
(800)640-1949

♀

1          THE WITNESS:  The weapon was used in the
2    domestic violence or the weapon was on the person.
3    BY MR. BIRDT:
4      Q    Was indicated as an implement in the incident?
5      A    I don't recall any.
6      Q    Okay.  How about just domestic violence by
7    Sheriffs deputies who were in the possession of a
8    weapon?
9          MS. LEHMAN:  Objection.  Speculation.
10          THE WITNESS:  They were in the 20 to 30, I
11    believe.
12    BY MR. BIRDT:
13      Q    How many people were killed last year by
14    permit holders of the Los Angeles Sheriff's Department?
15          MS. LEHMAN:  Objection.  Speculation.
16          Go ahead and answer.
17          THE WITNESS:  Persons issued CCW you mean?
18    BY MR. BIRDT:
19      Q    Correct.  Yes.
20          Did they kill anybody last year?
21          MS. LEHMAN:  Objection.  Speculation.
22          THE WITNESS:  I have no knowledge of anyone
23    having killed anyone that was issued a CCW.
24    BY MR. BIRDT:
25      Q    How many litigation attorneys were shot last

copy larry waldie

(800)640-1949

♀

```
 1   year?
 2           MS. LEHMAN:  Objection.  Speculation.
 3           THE WITNESS:  I have no idea.
 4   BY MR. BIRDT:
 5       Q    Okay.  Are you aware of it happening at least
 6   on several occasions last year?
 7       A    No.
 8       Q    Okay.  Were you aware of the shooting of an
 9   attorney in Fresno just last month?
10       A    Yes.
11       Q    Were you aware of the attorney shot in his
12   driveway in Rolling Hills?
13       A    Yes.
14       Q     Were you aware that the county of Sacramento
15   in the Sacramento sheriffs recently changed their
16   policy on CCW permit issuance to basically to shall
17   issue?
18       A    No.
19       Q    Were you aware of any change in policy by the
20   Sacramento Sheriffs department regarding CCW's?
21       A    No.
22       Q    How does your restrictive policy regarding
23   CCW's protect against gun violence in the community at
24   large?
25           MS. LEHMAN:  Asked and answered.
```

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      32

(800)640-1949

♀

Page 30

copy larry waldie

1          You can answer.
2          THE WITNESS:  Basically, restricting the
3   number of weapons that possibly could get on the street
4   and lead to violent and inappropriate manner.
5   BY MR. BIRDT:
6      Q    Okay.  And you've already talked about all of
7   the studies, investigation, or research done by you to
8   support that theory?
9      A    I said I did not have any.
10     Q    Thank you.
11         In the vast majority -- well, I think we've
12   already answered this.  You said that last year CCW
13   permit holders did not commit any homicides in the
14   County of Los Angeles; correct?
15         MS. LEHMAN:  Misstate the testimony.
16         MR. BIRDT:  All right.  Let me start over
17   because I thought that was a done deal.
18         MS. LEHMAN:  I believe he said he did not know
19   whether any of them had committed any homicide.
20         MR. BIRDT:  Okay.
21     Q    Last year, are you aware of any CCW permit
22   holders committing a homicide?
23     A    Not aware of any.
24     Q    Okay.  In fact, in the history of your
25   involvement in the CCW program, has a CCW holder ever

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011       33
(800)640-1949

1   committed a homicide using the concealed on the permit
Page 31

copy larry waldie

2   you issued to them outside of the home?

3            MS. LEHMAN:  Objection.  Speculation.

4            THE WITNESS:  I have no idea.  I wouldn't on

5   for 44 years.

6   BY MR. BIRDT:

7        Q     Short timer.

8            Do gang members ever apply for CCW permits

9   from you?

10       A     They may.  I do not know.

11       Q     Have you ever issued a permit to a gang

12   member?

13       A     Not to my awareness.

14       Q     Would you?

15       A     Well, if he fell within the confines of the

16   law and there was no criminal record.

17           When you say "gang member," obviously he has

18   criminal background and DOJ wouldn't allow us to issue

19   to that person.  That would probably not, you know,

20   stop them, but they could certainly apply.  And -- but

21   he wouldn't meet the criteria probably, and it would

22   never reach my desk.

23   BY MR. BIRDT:

24       Q     Okay.

25       A     I'd be kind of prone not to want to do that if


ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      34
(800)640-1949


1   they were listed in Cal Gangs as a gang member.

2        Q     Have you ever revoked a permit issued to

3   somebody because they impeded a police investigation?

Page 32

copy larry waldie

4       A    Yes.

5       Q    How many times?

6       A    Several times.  When they've displayed

7    inappropriate conduct with the weapon and -- yes.

8       Q    Was that the instigating event that brought

9    law enforcement to the scene?

10      A    No.

11      Q    What was the instigating event?

12      A    Well, I think, if I recall, one time where he

13   displayed the weapon and brought the officers to the

14   scene, yes.

15      Q    Okay.

16      A    Yes.

17      Q    And the LASD, the Sheriff's department, makes

18   no secret of the fact that you have an overly

19   restrictive good cause policy because of your desire to

20   drastically restrict the number of persons who are

21   armed in the county; correct?

22          MS. LEHMAN:  I'll object to the

23   characterization of "overly restrictive."

24          But the rest of it, you can answer.

25          THE WITNESS:  No.  I don't think that's

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      35
(800)640-1949

1    accurate we're overly restrictive.  We follow the

2    guidelines of the law and are very discreet in who we

3    issue them to because we feel that guns create violence

4    in the community and the workplace.

5    BY MR. BIRDT:

Page 33

copy larry waldie

6      Q     Okay.  But as we've discussed, you don't have

7   any of evidence, studies, research, or investigation --

8      A     Not sure.  They built our policy years ago,

9   they looked at it all completely.

10      Q     Who built that policy?

11      A     It before my time.  The policy of the

12   department for the CCW.

13      Q     Do have you the belief that issuing a CCW

14   permit would make violence more likely?

15      A     I personally believe that.

16      Q     Do you have any support for that other than

17   your personal belief?

18      A     Just generally that more guns in the street

19   can foster greater violence, and those guns are used

20   out in the street.

21      Q     Okay.  Well, we already established, have we

22   not that, violent crimes has gone down over the last

23   30 years, at least according to the FBI; true?

24          MS. LEHMAN:  Objection.  Misstates testimony.

25   Assumes facts not in evidence.  Speculation.

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      36
(800)640-1949

1          THE WITNESS:  I said I generally believe that

2   the FBI report was done that violence is down.

3          Yes.  I did say that.

4   BY MR. BIRDT:

5      Q     Are you also aware of what's happened in terms

6   of gun production and sales -- let's just say -- since

7   Obama was elected in the United States?

Page 34

copy larry waldie

8          MS. LEHMAN:  Objection.  Speculation.

9          THE WITNESS:  I have no idea.

10   BY MR. BIRDT:

11      Q    You have no idea, one way or another, whether

12   production has gone up a little bit?  Down a little

13   bit?  Purchases up a little bit?  Down a little bit?

14      A    No.

15      Q    No idea?

16      A    No idea.

17      Q    Okay.  How do high rates of concealed carry --

18   legal concealed carry with a permit endanger police

19   officers?

20      A    How could it?

21      Q    (No audible response.)

22      A    Any time we encounter anybody for any type of

23   crime -- a traffic stop, going to the house of a

24   domestic violence, just a neighborhood dispute --

25   someone carrying a gun or showing it really,


ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      37
(800)640-1949


1   potentially, could endanger the deputy very much.

2          For the most times officers are killed on

3   domestic violence issues.  And if these people are out

4   on the street with guns and it very much so could put a

5   danger to the officers.

6      Q    For people who are lawfully in possession of

7   the CCW permit, what are the requirements placed upon

8   them when they have an encounter with law enforcement

9   and they are carrying a concealed weapon?

Page 35

copy larry waldie

10      A      There's no specific criteria when they have

11  it, when they're stopped for traffic ticket.

12      Q      Have you attached any conditions to permits

13  that relate to encounters with law enforcement?

14      A      No.

15      Q      Have you considered doing that?

16      A      They -- no, we have not considered that

17  because that would mean -- if someone is stopped by at

18  law enforcement officer and say, "I've got a gun,"

19  that's problematic.  That could be problematic.

20      Q      Wouldn't it be less problematic to instruct

21  them to simply place their hands outside the window and

22  notify the officer that they are a CCW permit holder

23  and are carrying pursuant to that permit?

24          MS. LEHMAN:  Objection.  Argumentative.

25  Assumes facts not in evidence.  Speculation.


ROUGH DRAFT LARRY WALDIE APRIL 19, 2011     38
(800)640-1949


1          THE WITNESS:  Well, it would be probably the

2  right way to do that, but we don't mandate that.

3  BY MR. BIRDT:

4      Q      I mean several other states do.

5          Have you investigated how they handled the

6  situation?

7          MS. LEHMAN:  Same objection.

8          THE WITNESS:  We've not encountered any

9  adverse effects accept for one or two arrests within

10  rejecting a license with this particular problem.

11  BY MR. BIRDT:

Page 36

copy larry waldie
12      Q    Okay.  And in terms of the more than
13   90 percent of police officers who are killed by guns,
14   can you tell me if any of those were caused by a person
15   who was lawfully in possession of a CCW permit at the
16   time outside of their home?
17            MS. LEHMAN:  Objection.  Speculation.
18            THE WITNESS:  I have no idea.
19            MS. MITCHELL:  Can we take a break pretty
20   soon?
21            MR. BIRDT:  Sure.  Can you give me five more
22   minutes?  And then we'll take a --
23            MS. MITCHELL:  Sure.
24            MR. BIRDT:  I'm almost done.
25            Why don't we go ahead and let's take five

                ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      39
                        (800)640-1949
♀

 1   minutes.
 2            (Break taken from 10:47 to 10:51.)
 3            MR. BIRDT:  Okay.  Let's go back on the
 4   record.
 5            THE WITNESS:  Yeah.
 6   BY MR. BIRDT:
 7      Q    Just a couple of follow-up questions.
 8            In your declaration, you stated that most of
 9   the violent acts committed in this county involving the
10   use of guns are by gang members; correct?
11      A    Yes.
12      Q    And you made it pretty clear that chances are
13   slim a gang member is going to pass a DOJ background
                        Page 37

copy larry waldie

14    check for a CCW permit; correct?

15       A    I would think he would not.  With a record, he

16    probably wouldn't.

17       Q    Okay.  And in fact -- strike that.

18            We talked about the State's choice that the

19    only mechanism by which a person can possess a loaded

20    firearm outside the home is with a CCW permit; correct?

21       A    Not necessarily.

22            As I said, you can carry it in the trunk of

23    his car going to and from a shooting range or whatever.

24    There are mechanisms to have a weapon.

25       Q    I'm sorry.


ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      40

(800)640-1949

♀


1            Absent some special exception -- I know

2    there's an exception for an immediate threat of

3    danger --

4       A    Yeah.

5       Q    -- domestic violence restraining order, and

6    I'm just talking about a normal everyday thing walking

7    the dog.  So let me -- with that said -- step back.

8            Under normal everyday circumstances, the

9    California legislature has chosen as the only mechanism

10   by which a law abiding citizen under normal

11   circumstances can possess a loaded firearm outside of

12   the home is with a CCW permit; true?

13      A    Yes.

14      Q    Okay.  And I'm just asking because one of the

15   things the lawyers have cited in the paper work as a

Page 38

copy larry waldie

16 threat to public safety is a person carrying a

17 concealed firearm in his vehicle that he would

18 immediate access to.

19      And we talked about one possible way of

20 mitigating that harm with conditions that can be

21 attached to anybody's CCW permit; true?

22   A   I don't understand the question.

23   Q   Okay.  The lawyers in this case have cited to

24 the judge as one of the reasons why the State restricts

25 CCW permit holders -- strike that?


          ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      41
                    (800)640-1949

♀


 1      You can attach conditions to any CCW permit

 2 you issue; true?

 3   A   Well, we have regulations that we put in our

 4 policy.  Yes, we do have restrictions.  Yes.

 5   Q   Okay.  And you could change or amend those as

 6 necessary to address any public safety concern you may

 7 have?

 8   A   Yes, we could.

 9      MR. BIRDT:  Okay.  I don't have anything

10 further.

11      MS. LEHMAN:  Nothing.

12      MS. MITCHELL:  I've got nothing.

13      MS. LEHMAN:  All right.  What kind of time

14 frame do you need for his transcript?

15      MR. BIRDT:  It sounds like he's out on medical

16 leave --

17      MS. LEHMAN:  Correct.

copy larry waldie

18          MR. BIRDT:  -- for the next 30 days.  So maybe

19   we even just waive signing?

20          MS. LEHMAN:  No.  I want him to look at it.

21          THE WITNESS:  I have to come back,

22   unfortunately, for different things.

23          MR. BIRDT:  Hold on.  Let's go off the record

24   for a sec.

25          (Discussion held off the record.)


              ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      42
                         (800)640-1949


1          MR. BIRDT:  Back on the record.

2          We will stipulate to relieve the reporter of

3   her duty under the code by sending the original

4   transcript to Mr. Lehman.  Who will notify us within

5   30 days of her receipt thereof of the date of signing

6   and any changes thereto.

7          In the interim, a certified copy shall be

8   admissible for all purposes.  And for any reason we're

9   not notified of the date of signing, a certified copy

10   shall be seemed a signed original for all further

11   purposes.

12          MS. LEHMAN:  So stipulated.

13          MS. MITCHELL:  So stipulated.

14          THE REPORTER:  Do any of the counsels need

15   copies?

16          MS. LEHMAN:  Yes.

17          MS. MITCHELL:  Yes.

18          (Whereupon, the deposition concluded

19              at 10:55 a.m.)

                         Page 40

```
                          copy larry waldie
20

21                              -- oOo --

22

23

24

25
```

ROUGH DRAFT LARRY WALDIE APRIL 19, 2011      43

(800)640-1949