**JONATHAN W. BIRDT – SBN 183908**
18252 Bermuda Street
Porter Ranch, CA 91326
Telephone:  (818) 400-4485
Facsimile:    (818) 428-1384
jon@jonbirdt.com
Plaintiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN BIRDT, | CASE NO.  2:10-CV-08377-RGK (JEM) |
| Plaintiff, | **PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT; DECLARATIONS OF LAWRENCE MUDGETT AND JONATHAN W. BIRDT IN SUPPORT THEREOF** |
| vs. | |
| CHARLIE BECK, LEE BACA, THE LOS ANGELES POLICE DEPARTMENT and THE LOS ANGELES COUNTY SHERIFFS DEPARTMENT, DOES 1 to 50, | Date: May 16, 2011
Time: 9:00 a.m.
Department: 850
Before: Hon. R. Gary Klausner
Location: Roybal Courthouse,
255 East Temple Street
Los Angeles, CA 90012 |
| Defendants. | |

## I. INTRODUCTION

Defendants carry the burden of establishing the nexus between their need and their infringement upon a Fundamental Right.  Under *Cantwell v. Connecticut* (1940) 310 U.S. 296, and progeny, States and localities may not condition a license that is necessary to engage in constitutionally protected conduct on the grant of a license that officials have *discretion to withhold*.  Further, a host of prior restraint cases

establish that "the peaceful enjoyment of freedoms *which the Constitution guarantees*" may not be made "contingent upon the uncontrolled will of an official." *Staub v. Baxley* (1958) 355 U.S. 313, 322 (emphasis added).

## II. <u>CONCEALED CARRY IS THE ONLY METHOD OF CARRY PERMITTED BY CALIFORNIA LAW AND DOES NOT POSE ANY RISK TO PUBLIC SAFETY</u>

The need to carry concealed is due only to the decision of the California legislature to make that the only method of permissible carry. The legislature has otherwise banned the possession of a loaded firearm by law abiding citizens. Even further, the legislature has banned even the possession of an unloaded weapon within 1,000 feet of a school, which in Southern California would make travel nearly impossible task. As such, being left with the only legally viable option of concealed carry, defendants cannot premise the exercise of this Right upon first being the victim of a crime.

Plaintiff will not now repeat all of the evidence and law offered in opposition to defendants Motions for Summary Judgment set to be heard concurrently herewith, but does incorporate those documents herein by reference; however, it is important to note that there is no dispute that some regulation is permitted, but the right to carry cannot be completely forbidden with no rational basis:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626-27. Certainly, the basic contours of these restrictions reflect an understanding that <u>permissible</u> regulations will not simply preclude objectively

qualified private citizens from possessing and carrying guns. The Court explained it supplied its "presumptively lawful" restrictions "as examples." <u>Id</u>. 627 n.26.

### III. DEFENDANTS HAVE NOT MET THEIR BURDEN WITH ANY EVIDENCE

Defendants admit they have no evidence to support their theories and instead offer the ramblings of Mr. Franklin Zimring.  Should the Court not simply exclude the Zimring Declaration based on the objections filed, Plaintiff offers in rebuttal the declaration of Lawrence Mudgett, an expert qualified to opine about issues of concealed weapons, public safety and risks of concealed carry.

That defendant bears the burden under any level of scrutiny is clear:

> Thus, a two-part approach to Second Amendment claims seems appropriate under *Heller*, as explained by the Third Circuit Court of Appeals, <u>see</u> *Marzzarella*, 614 F.3d at 89, and Judge Sykes in the now-vacated *Skoien* panel opinion, <u>see</u> 587 F.3d at 808-09. The first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." <u>Id</u>. This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. <u>See</u> *Heller*, 128 S.Ct. at 2816. If it was not, then the challenged law is valid. <u>See</u> *Marzzarella*, 614 F.3d at 89. If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny. <u>See id</u>. Heller left open the issue of the standard of review, rejecting only rational-basis review. Accordingly, unless the conduct at issue is not protected by the Second Amendment at all, the Government bears the burden of justifying the constitutional validity of the law.

*United States v. Chester* (2010) 628 F.3d 673

Plaintiff is submitting the declaration of Officer Lawrence Mudgett. This is a detailed declaration indicating he has reviewed available reports and statistics which confirm that with the rise in CCW issuance, there has been a drop in overall crime. The declaration also states that it is the generally held opinion outside of California

that issuing CCW's has not created the circumstances defendants contend they seek to protect against:

- **The Lott-Mustard Report**

  John Lott and David Mustard, in connection with the University of Chicago Law School, examining crime statistics from 1977 to 1992 for all U.S. counties, concluded that the thirty-one states allowing their residents to carry concealed, had significant reductions in violent crime. Lott writes, "Our most conservative estimates show that by adopting shall-issue laws, states reduced murders by 8.5%, rapes by 5%, aggravated assaults by 7% and robbery by 3%. If those states that did not permit concealed handguns in 1992 had permitted them back then, citizens might have been spared approximately 1,570 murders, 4,177 rapes, 60,000 aggravated assaults and 12,000 robberies. To put it even more simply criminals, we found, respond rationally to deterrence threats... While support for strict gun-control laws usually has been strongest in large cities, where crime rates are highest, that's precisely where right-to-carry laws have produced the largest drops in violent crimes."
  (Source: "More Guns, Less Violent Crime", Professor John R. Lott, Jr., *The Wall Street Journal*, August 28, 1996, (The Rule of Law column).

- "Crimes are stopped with guns about five times as frequently as crimes are committed with guns."  John Lott "Gun Laws Can Be Dangerous, Too"  Wall Street Journal, May 12, 1999  http://www.tsra.com/Lott22.htm

- "In Florida, where 315,000 permits have been issued, there are only five known instances of violent gun crime by a person with a permit. This makes a permit-holding Floridian the cream of the crop of law-abiding citizens, 840 times less likely to commit a violent firearm crime than a randomly selected Floridian without a permit." (David Kopel – "More Permits Mean Less Crime..." Los

Angeles Times, Feb. 19, 1996, Monday, p. B-5

http://www.i2i.org/SuptDocs/Crime/More_Permits_Means_Less_Crime.htm )

- "Dade County, Florida, kept meticulous records for six years, and of 21,000 permit holders, there was no known incident of a permit holder injuring an innocent person. In addition, since Virginia passed a right-to-carry law more than 50,000 permits have been issued, but not one permit holder has been convicted of a crime and violent crime has dropped." H. Sterling Burnett, No Smoking Guns http://www.ncpa.org/oped/sterling/mar899.html

Plaintiff also offers his own declaration in response to that of Professor Zimring, offering peer reviewed and authoritative support instead of unfounded political opinions, reflecting:

a. Analyzing county-level data for the entire United States from 1977 to 2000, we find annual reductions in murder rates between 1.5% and 2.3% for each additional year that a right-to-carry law is in effect.

b. For the first five years that such a law is in effect, the total benefit from reduced crimes usually ranges between approximately $2 billion and $3 billion per year.

c. Robbery rates in right-to carry states were rising until the laws were passed and then fell continually after that point. The pattern is very similar to that shown earlier by Lott in examining county-level data from 1977 to 1996.

d. By the time the law has been in effect for six years, the county and state-level data imply a drop in robbery rates of eight and twelve percent respectively.

    e.    By the time the law has been in effect for six years, Ayres and Donohues very own county and state estimates imply that murder rates had fallen by at least ten percent.

    f.    On the risks to police, David Mustard finds that police officers are murdered at a lower rate after concealed handgun laws are passed, and that the longer the laws are in effect, the greater the decline.

"Confirming More Guns, Less Crime", Stanford Law Review, Florenz Plassmann and John Whitley, 2003, p. 1361.

As such, whatever the motivation or animus behind defendants actions, they have not offered a scintilla of evidence to carry their burden, for the sole reason that none exists. One must ask, if not for political reasons, why would the LA politic oppose something shown to save officers lives?

### IV. THE SECOND AMENDMENT DOES NOT SAY "IN THE HOME"

Defendants would have the Court believe that because the declaration of a fundamental right declared applicable to the States occurred in a case involving the home, that it is somehow limited to the home. This is almost as preposterous as limiting the shouting of the word "fire" just to crowded theaters. Few would dispute that a (substantially Jewish) community would have compelling public safety reasons for stopping a neo-Nazi group from parading, displaying swastikas, and distributing literature, but these safety reasons were insufficient to override the enumerated rights of speech and assembly. See *Skokie v. Nat'l Socialist Party* (1978) 373 N.E.2d 21.

As previously noted, the Court expressly ruled that the Second Amendment protects the right "to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. If the Supreme Court had intended to limit its broad holding to the home, then it would have been pointless for the Court to identify laws prohibiting guns from specified, sensitive public places as an "example" of a "presumptively lawful" restriction. The Court could have stated simply that "laws forbidding the

carrying of firearms in public" were "presumptively valid." (For that matter, it could have said, "we limit our holding to the home.")

> In *Heller,* the Supreme Court held the Second Amendment protects an individual right "to possess **and carry** weapons in case of confrontation," unconnected with service in a militia…. the court held the Second Amendment right recognized in *Heller* is "fully applicable to the States."…A plurality of the *McDonald* court concluded the Second Amendment right applies to the states because it is "fundamental" to the American "scheme of ordered liberty"

*People v. Delacy* (2011) 192 Cal.App.4th 1481. (emphasis added)

The United States Supreme Court has clearly stated, with regard to the Second Amendment, that: "Putting all of these textual elements together, we find that they guarantee the individual right to possess **and carry weapons in case of confrontation**." *District of Columbia v. Heller* (2008) 128 S. Ct. 2783, 2798. (emphasis added)   The state may have an interest in reducing gun violence and accidents, but it cannot presume that the exercise of a constitutional right will cause the sort of harm it is allowed to curtail. Defendants cannot point to the impact of their practice – the deprivation of constitutional rights – as their interest. *Simon & Schuster, Inc.* v. *N.Y. State Crime Victims Bd.* (1991) 502 U.S. 105, 120.  If anything, logically, requiring additional training will reduce gun violence and accidents involving firearms.

Q. Okay. Can you point to any study or correlation between increased issuance of CCW permit and gun violence?

A   No.

Waldie deposition at page 25 line 4-12.

To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *District of Columbia* v. *Heller* (2008) 128 S. Ct. 2783, 2793 .  "[T]he core

right identified in *Heller* [is] the right of a *law-abiding, responsible* citizen to possess *and carry* a weapon for self-defense." *United States v. Chester* (2010) 628 F.3d 673.

"But uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right." *Hague v. Committee for Indus. Org.* (1937) 307 U.S. 496, 516. Accordingly, the Ninth Circuit rejects alleged public health and safety concerns as a substitute for objective standards and due process. *Desert Outdoor Advertising v. City of Moreno Valley* (1996) 103 F.3d 814, 819.

## V. CONCLUSION

While commonly used in the singular, the Second Amendment contains several fundamental rights, including: the right to keep arms, the right to bear arms, the right to carry arms, and the Right of self-defense. The Second Amendment was incorporated against the states only months ago. The volume of on-point, post-Heller decisions owes to the emergent nature of Second Amendment jurisprudence and the basic fact that – unlike Los Angeles – the vast majority of States and California Counties already allow their citizens to carry handguns on reasonable and non-discretionary terms.

Defendants have admitted that Plaintiff has satisfied all training and background requirements.  It is also clear the Second Amendment protects the right to bear arms for the purpose of self-defense.  As such it is respectfully submitted that this Court declare Defendants Policies unlawful and order Defendants to adopt a good cause policy consistent with the constitution by accepting, self-defense, and other articulable need as good cause for the purposes of enforcing the current statutory scheme for the regulation of firearms in Los Angeles.

April 27, 2011                                   _____/s/_____
                                                        Jonathan W. Birdt, Plaintiff